## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNY THORNLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 21-cv-01922 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| STATE OF ILLINOIS, ILLINOIS STATE | ) | |
| POLICE MERIT BOARD, and JACK S. | ) | |
| GARCIA, individually, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANT JACK S. GARCIA'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT

Defendant, Jack S. Garcia, in his individual capacity, by and through his attorneys, Loeb & Loeb LLP, and for his Answer to Plaintiff's Complaint, states as follows:

### PARTIES

1. Plaintiff, Jenny Thornley ("Plaintiff"), is an individual residing in Springfield, Illinois, Sangamon County.

**ANSWER:** Admitted.

2. Defendant, State of Illinois (the "State of Illinois"), is the state government of Illinois with its principal place of business located in Springfield, Illinois, Sangamon County.

**ANSWER:** Admitted.

3. Defendant, Illinois State Police Merit Board (the "Merit Board"), is an agency of the State of Illinois with its principal place of business located in Springfield, Illinois, Sangamon County.

**ANSWER:** Admitted.

1

4.      Defendant, Jack S. Garcia ("Garcia"), is an individual residing in Orland Park, Illinois, Cook County.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), as this is a civil action arising under the Constitution and laws of the United States for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. This Court may also exercise supplemental jurisdiction over Plaintiff's state law claims under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*, the State Officials and Employees Ethics Act ("Ethics Act"), 5 ILCS 430/1-1 *et seq.*, and the Whistleblower Act ("Whistleblower Act"), 740 ILCS 174/1 *et seq.*, pursuant to 28 U.S.C. § 1367(a).

**ANSWER:** Admitted that this paragraph describes the nature of Plaintiff's claims and allegations, but denied as to the merit or veracity of those claims and allegations.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), because Defendants both reside in Illinois and at least one of Defendants, Defendant Garcia, resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and one or more of the unlawful employment practices are alleged to have occurred in this District.

**ANSWER:** Admitted that venue is proper, but denied as to the merit or veracity of Plaintiff's claims and allegations.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On February 27, 2020, Plaintiff timely filed a charge against the Merit Board and Garcia with the Illinois Department of Human Rights ("IDHR"), which was cross-filed with the

Equal Employment Opportunity Commission ("EEOC"), alleging hostile work environment sexual harassment and retaliation resulting in Plaintiff's placement on administrative leave in February of 2020 ("February 27, 2020 Charge").

**ANSWER:** Admitted that Plaintiff filed the charge as described, but denied as to the merit and veracity of that charge.

8.      On October 5, 2020, Plaintiff timely filed an additional charge against the Merit Board and Garcia with the IDHR, which was cross-filed with the EEOC, alleging quid pro quo sexual harassment, retaliation, and age discrimination resulting in Plaintiff's termination on July 21, 2020 ("October 5, 2020 Charge").

**ANSWER:** Admitted that Plaintiff filed the charge as described, but denied as to the merit and veracity of that charge.

9.      On October 26, 2020, Plaintiff withdrew her February 27, 2020 Charge with the IDHR.

**ANSWER:** Admitted that Plaintiff withdrew her charge.  Garcia lacks information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

10.      On January 4, 2021, the IDHR issued a Notice of Opt Out of the Investigative and Administrative Process, Right to Commence and Action in Circuit Court or Other Appropriate Court of Competent Jurisdiction, and Order of Administrative Closure with respect to the October 5, 2020 Charge ("IDHR Notice"), granting Plaintiff ninety-five (95) days to file a lawsuit against Defendants under state law in federal or state court. (Exhibit A).

**ANSWER:** Admitted that Exhibit A states the information alleged within this paragraph.

11.     On March 12, 2021, the EEOC issued a Notice of Right to Sue Within 90 Days with respect to the February 27, 2020 Charge (Exhibit B) and the October 6, 2020 Charge (Exhibit C) (collectively, "EEOC Notices").

**ANSWER:** Admitted that Exhibits B and C state the information alleged within this paragraph.

12.     Plaintiff's Complaint was timely filed within ninety-five (95) days of the IDHR Notice and ninety (90) days of the EEOC Notice, and Plaintiff has exhausted all administrative remedies.

**ANSWER:** Admitted that Plaintiff's complaint was filed within the time alleged. Garcia lacks information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

## FACTUAL ALLEGATIONS

13.     In approximately May of 2013, Plaintiff was hired as the Chief Fiscal Officer and Director of Personnel for the Merit Board. Plaintiff also served as the Ethics Officer for the Merit Board.

**ANSWER:** Denied as to the first sentence, admitted as to the second sentence.

14.     In approximately September of 2014, Emily Fox ("Emily"), a recent college graduate, was hired as the Human Resources Representative for the Merit Board, a newly-created and lower position than Plaintiff's.

**ANSWER:** Denied.

15.     In approximately April of 2017, Garcia was hired as the Executive Director for the Merit Board.

**ANSWER:** Admitted.

4

16.     At all relevant times, Garcia was the highest ranking official and supervisor of the Merit Board staff, including Plaintiff and Emily.

**ANSWER:** Admitted that Garcia supervised the staff of the Merit Board and was the highest-ranking staff member, but denied to the extent the paragraph alleges that Garcia was the highest-ranking Merit Board official.

17.     On April 20, 2017, Garcia emailed the Merit Board staff, including Plaintiff, requiring that each staff member execute a series of documents, including a waiver and an authorization for personal information and background investigation.

**ANSWER:** Admitted.

18.     As the Ethics Officer, multiple employees reported ethical concerns to Plaintiff related to Garcia's request for their personal information and background reports beyond what was already included in their personnel files.

**ANSWER:** Garcia lacks information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

19.     Plaintiff then reported Garcia's conduct to Roger Heaton ("Heaton"), the chief of staff for the Governor at the time, and the Office of Executive Inspector General ("OEIG"), the administrative agency responsible for investigating allegations of fraud, abuse, mismanagement, misconduct, and other violations of related laws and rules on behalf of the Office of Governor.

**ANSWER:** Garcia lacks information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

20.     A few weeks later, in approximately May of 2017, Garcia asked Plaintiff to meet him at his office in Tinley Park, Illinois, Cook County, which he maintained in addition to the

Merit Board staff's Springfield office as it was closer to his home, to go over the Merit Board's budget reports.

**ANSWER:** Admitted that Garcia maintained an office in Tinley Park. Denied as to the remaining allegations in this paragraph.

21.    Garcia insisted that Plaintiff come alone to the meeting, although at least one other staff member offered to attend the meeting with Plaintiff.

**ANSWER:** Denied.

22.    During the meeting, Garcia and Plaintiff were sitting in separate chairs side-by-side, and Garcia reached over and grabbed Plaintiff's leg.

**ANSWER:** Denied.

23.    Plaintiff attempted to move her chair away from Garcia, however, Garcia then moved his chair closer to Plaintiff.

**ANSWER:** Denied.

24.    Plaintiff then stood up and went to the bathroom to remove herself from the situation.

**ANSWER:** Denied.

25.    When Plaintiff returned from the bathroom, she advised Garcia that she needed to return to Springfield, but Garcia insisted that they have lunch before she left.

**ANSWER:** Denied.

26.    Plaintiff declined Garcia's lunch invitation multiple times but Garcia became very persistent, so Plaintiff agreed to go to lunch with Garcia.

**ANSWER:** Denied.

27.     During lunch, Garcia began asking Plaintiff personal questions of a personal, provocative, and/or sexual nature, at which point Plaintiff became teary eyed and visibly upset as a result of her discomfort.

**ANSWER:** Denied.

28.     Shortly after this incident, in approximately June of 2017, Garcia advised the Merit Board staff, including Plaintiff, not to file any further complaints or reports related to Garcia's conduct with any outside agencies, including the OEIG, because Garcia had "connections."

**ANSWER:** Denied.

29.     That same day, Garcia removed Plaintiff as Ethics Officer and made the Merit Board's legal counsel, Daniel Dykstra ("Dykstra"), the Ethics Officer for the Merit Board.

**ANSWER:** Admitted that Garcia designated Dykstra the Ethics Officer for the Merit Board in 2017. Denied as to the remaining allegations in this paragraph, including as to the timing of the designation, because the events alleged in Paragraphs 20–28 did not occur.

30.     The Ethics Officer for the Merit Board served as the Merit Board's internal control point for ethics and improprieties, allegations, complaints, and other governance issues.

**ANSWER:** Denied.

31.     During the period of June of 2017 to January 23, 2020, Plaintiff made numerous reports and complaints of misconduct to Dykstra, in his capacity as Ethics Officer for the Merit Board, related to Garcia's conduct, including that Garcia:

  (a)     Falsified timekeeping records;
  (b)     Charged non-business expenses to the Merit Board;
  (c)     Misused Merit Board funds;
  (d)     Performed work related to the Illinois State Police Heritage Foundation ("ISP Heritage Foundation"), a 501(c)(3) non-profit corporation committed to preserving the history of the Illinois State Police with no formal relationship with the Merit Board, on Merit Board time;

(e)    Installed police lights and sirens on his vehicle and used them to drive in the emergency lane and avoid traffic;

(f)    Misused state vehicles for purposes not related to the Merit Board;

(g)    Improperly involved himself in Merit Board cases;

(h)    Falsely acted with or portrayed himself to have police authority; and

(i)    Removed the required notices for employees about their rights to be free from illegal discrimination and sexual harassment in the workplace.

**ANSWER:** Denied. Garcia lacks information sufficient to admit or deny whether Plaintiff made such reports, and he therefore denies the allegation. To the extent such reports were made, Garcia denies the truthfulness of the allegations.

32.    In addition to the complaints identified in paragraph 31, Plaintiff also reported to Dykstra on multiple occasions concerns related to Garcia and Emily and their relationship.

**ANSWER:** Denied. Garcia lacks information sufficient to admit or deny whether Plaintiff made such reports, and he therefore denies the allegation. To the extent such reports were made, Garcia denies the truthfulness of the allegations.

33.    Specifically, Thornley reported that Garcia was allowing Emily to bill excessive overtime, including time that Emily had not actually worked. For example, in 2019, Emily billed over 730 hours of overtime and was unlawfully compensated for thousands of dollars of overtime for which she did not actually work.

**ANSWER:** Denied. Garcia lacks information sufficient to admit or deny whether Plaintiff made such reports, and he therefore denies the allegation. To the extent such reports were made, Garcia denies the truthfulness of the allegations.

34.    In addition, Garcia sought multiple pay raises for Emily, with 20% or more increases in her pay each time, and Garcia and Emily would regularly travel together for "business" and charge the Merit Board for their expenses.

**ANSWER:** Denied.

35. Despite Plaintiff's numerous complaints, Dykstra did not take any corrective action with respect to Plaintiff's complaints, including those identified in paragraphs 31-34.

**ANSWER:** Garcia lacks information sufficient to admit or deny whether Plaintiff ever made complaints to Dykstra, and Garcia therefore denies that she did. Admitted that Dykstra did not take corrective action because the alleged conduct never occurred.

36. Dykstra was often present when the conduct identified in paragraphs 31-34 occurred and still failed to take any corrective action.

**ANSWER:** Denied that Dykstra was present for the alleged conduct because the alleged conduct never occurred. Admitted that Dykstra did not take corrective action because the alleged conduct never occurred.

37. For example, Dykstra and Plaintiff were both in the car on at least one occasion when Garcia turned on the police lights and sirens unlawfully affixed to his vehicle and drove on the shoulder of the highway to avoid traffic.

**ANSWER:** Denied.

38. Dykstra was also aware of Garcia's removal of the required notices regarding employees' rights to be free from illegal discrimination and sexual harassment and allowed Garcia to store said notices in a closet.

**ANSWER:** Denied.

39. Work for the Heritage Foundation was also constantly going through and taking place in the Merit Board's office, including the storage of piles of cash unrelated to the Merit Board which Garcia left in plain view of those in the Merit Board's office, including Dykstra.

**ANSWER:** Denied.

40.     On at least four (4) to five (5) occasions, Plaintiff also discussed some of the complaints identified in paragraphs 31-34 with Heaton, but Heaton also failed to take any corrective action.

**ANSWER:** Garcia lacks information sufficient to admit or deny whether Plaintiff ever discussed complaints with Heaton, and Garcia therefore denies that she did. Admitted that Heaton did not take corrective action because the alleged conduct never occurred.

41.     During the period of June of 2017 to January 23, 2020, Garcia also continuously engaged in other conduct directed towards Plaintiff that was of a harassing and offensive nature, including making comments about Plaintiff's appearance, calling Plaintiff late at night to discuss non-work-related matters, and reprimanding Plaintiff if she did not answer his calls.

**ANSWER:** Denied.

42.     At times Dykstra witnessed the conduct alleged in paragraph 41 and still failed to take any corrective action.

**ANSWER:** Denied that Dykstra witnessed the alleged conduct because the alleged conduct never occurred. Admitted that Dykstra did not take corrective action because the alleged conduct never occurred.

43.     On January 23, 2020, Plaintiff was in Garcia's office in Springfield reviewing paperwork when Garcia approached Plaintiff from behind and groped her breast.

**ANSWER:** Denied.

44.     Plaintiff immediately rebuffed Garcia's advance and pushed his arm and hand away from her breast.

**ANSWER:** Denied.

10

45.     When Plaintiff turned around to face Garcia, he stated "maybe if you dressed a little more like Emily, we would get along better."

**ANSWER:** Denied.

46.     Plaintiff then left the office and called her doctor, as she was emotionally traumatized and had significant bruising on her right breast as a result of Garcia grabbing her breast.

**ANSWER:** Denied.

47.     After Garcia's sexual assault on January 23, 2020, Plaintiff did not feel she was able to work and called in sick through January 27, 2020.

**ANSWER:** Denied.

48.     On January 28, 2020, Plaintiff's physician advised Plaintiff to take sick leave for the remainder of the week due to reactions she was having to Garcia's sexual assault on January 23, 2020.

**ANSWER:** Garcia lacks information sufficient to admit or deny what Plaintiff told her physician or what her physician told Plaintiff, and Garcia therefore denies that part of the allegation. Garcia also denies the remainder of the allegation because no sexual assault occurred.

49.     On January 30, 2020, Plaintiff submitted an online charge form with the IDHR related to Garcia's sexual assault.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

50.     On February 1, 2020, Plaintiff also filed a complaint with the OEIG related to Garcia's sexual assault and the other conduct identified in paragraphs 31-34, 41.

**ANSWER:** Garcia denies that the sexual assault or other referenced conduct occurred. Garcia lacks information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

51.     On February 2, 2020, the General Counsel for the Office of Governor called Plaintiff and told her not to report to work until further notice.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

52.     On February 4, 2020, the Merit Board posted a public notice of an emergency meeting to be held later that day, which was in violation of the Open Meetings Act which requires at least forty-eight (48) hours' notice.

**ANSWER:** Admitted that the Merit Board posted a public notice of an emergency meeting on February 4, 2020, for a meeting held that day.  Denied as to the remaining allegations in this paragraph.

53.     The public notice stated that the meeting would be held at The James R. Thompson Center, 100 W. Randolph Street, Chicago, Room 2-026. (Exhibit D).

**ANSWER:** Admitted.

54.     On February 11, 2020, Plaintiff had an interview with the OEIG regarding her complaints related to Garcia's sexual harassment and the other conduct identified paragraphs 31-34, 41.

**ANSWER:** Garcia admits that Plaintiff had an interview with OEIG on February 11, 2021. Garcia denies that the sexual assault or other referenced conduct occurred.   Garcia lacks

information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

55.     Two (2) days after Plaintiff's interview with the OEIG, on February 13, 2020, Dykstra emailed Plaintiff notifying her that she was being placed on administrative leave as a result of "misconduct" that was reported by Garcia to the Merit Board on February 2, 2020. (Exhibit E).

**ANSWER:** Garcia admits that Plaintiff engaged in significant overtime fraud, forgery, and official misconduct, and that Garcia reported this misconduct to the Merit Board.  Garcia denies that the date of the report was February 2, 2020.  Garcia admits that Exhibit E contains an email from Dykstra to Plaintiff notifying her that she was being placed on administrative leave.  Denied as to any remaining allegations in this paragraph.

56.     Dykstra did not specify the allegations against Thornley but stated that an "independent investigation" was going to be performed by McGuireWoods, the law firm in which Heaton was a partner of.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

57.     Thornley, through her counsel, advised Dykstra of the conflict of interest with McGuireWoods given Thornley's complaint with the OEIG involved Heaton and his failure to take corrective action with respect to her reports of misconduct by Garcia.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

58.     Despite this conflict, Dykstra stated McGuireWoods would continue to conduct the "independent investigation."

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

59.     In approximately June of 2020, McGuireWoods issued a notice to Plaintiff, requesting that she appear for an interview on June 24, 2020.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

60.     Due to issues related to Plaintiff's health which eventually required hospitalization, Plaintiff, through counsel, advised Dykstra that Plaintiff would not be able to attend the interview on June 24, 2020 and requested to reschedule the interview.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

61.     Dykstra refused to reschedule the interview though and stated that he had "evidence" that Plaintiff was not sick.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

62.     Without allowing Plaintiff to reschedule her interview and participate in the "independent investigation," and without providing Plaintiff with notice of any of the purported evidence against her, McGuireWoods conclusively determined that the allegations of misconduct against Plaintiff were true.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

63.     Accordingly, at their meeting on July 21, 2020, the Merit Board terminated Plaintiff. (Exhibit F).

**ANSWER:** Admitted that the Merit Board voted to terminate Plaintiff at their July 21, 2020, meeting.

64.     Pursuant to the public notice for the July 21, 2020 Merit Board meeting, the meeting was conducted via telephone conference at (312) 626-6799, a Chicago area code. (Exhibit G).

**ANSWER:** Admitted.

65.     Several of the members of the Merit Board reside in Chicago, Illinois, Cook County and often conduct Merit Board business in Chicago, Illinois, Cook County.

**ANSWER:** Denied.

66.     The meeting minutes from the July 21, 2020 Merit Board meeting that were published to the public also specifically referenced Plaintiff and her "discipline", although historically individual employees were not specifically named in the minutes. (Exhibit H).

**ANSWER:** Admitted that the meeting minutes refer to a "vote on discipline."  Garcia lacks information sufficient to admit or deny the remaining allegations and therefore denies them.

67.     At the time of Plaintiff's termination, Plaintiff was forty (40) years of age.

**ANSWER:** Admitted.

68.     At the time of Plaintiff's termination, Emily was twenty-nine (29) years of age.

**ANSWER:** Admitted.

69.     Immediately following Plaintiff's termination, Emily was promoted to Plaintiff's position as Chief Fiscal Officer and Director of Personnel.

**ANSWER:** Denied.

15

**COUNT I**
**QUID PRO QUO SEXUAL HARASSMENT UNDER 42 U.S.C. § 2000e-2(a)(1)**
**PLAINTIFF v. STATE OF ILLINOIS AND MERIT BOARD**

70.     Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 70 of Count I of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** Garcia admits that Plaintiff purports to incorporate the identified paragraphs by reference, and Garcia's responses to those incorporated paragraphs are unchanged.

71.     At all relevant times, the State of Illinois was an "employer" as defined under 42 U.S.C. § 2000e(b), as it is a government engaged in an industry affecting commerce and has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

72.     At all relevant times, the Merit Board was an "employer" as defined under 42 U.S.C. § 2000e(b), as it is a governmental agency engaged in an industry affecting commerce and has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

73.     At all relevant times, Plaintiff was an "employee" of the State of Illinois and the Merit Board, as defined under 42 U.S.C. § 2000e(f), and Garcia was Plaintiff's direct supervisor.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

74. At all relevant times, Plaintiff was a member of a protected class based on her sex, and the State of Illinois and the Merit Board were aware of Plaintiff's membership in a protected class based on her sex.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

75. On January 23, 2020, Plaintiff was subjected to an unwanted sexual advance or physical conduct of a sexual nature when her direct supervisor, Garcia, came from behind her and grabbed her breast with his hand.

**ANSWER:** Denied.

76. Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was unwelcome, as Plaintiff neither requested nor consented to Garcia grabbing her breast, and Plaintiff immediately rebuffed his sexual advance or physical conduct by pushing his arm and hand away from her and turning around.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

77. Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was based on her sex and sexually motivated.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

78. Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was objectively and subjectively offensive.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

79.     After Plaintiff rebuffed Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast, Garcia stated "maybe if you dressed more like Emily, we would get along better."

**ANSWER:** Denied.

80.     Plaintiff's reaction to Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast affected a tangible aspect and the terms and conditions of her employment in so much as she was subsequently placed on administrative leave, required to turn over all her records and company property, and terminated.

**ANSWER:** Denied.

81.     These adverse employment actions would not have been taken against Plaintiff but for Plaintiff's refusal of Garcia's unwelcome sexual advance or physical conduct of a sexual nature.

**ANSWER:** Denied.

82.     As Garcia was a supervisory agent for the State of Illinois and the Merit Board and Plaintiff's direct supervisor, the State of Illinois and the Merit Board are strictly liable for Garcia's sexual harassment.

**ANSWER:** Garcia admits that he was Plaintiff's direct supervisor.  Denied as to the remaining allegations of the paragraph.

83.     As a result of the foregoing, Plaintiff suffered damages, including without limitation emotional distress, pain and suffering, mental anguish, and the cost of bringing this action.

**ANSWER:** Denied.

## COUNT II
## HOSTILE ENVIRONMENT SEXUAL HARASSMENT UNDER 42 U.S.C. § 2000e-2(a)(1)
## PLAINTIFF v. STATE OF ILLINOIS AND MERIT BOARD

84.     Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 84 of Count II of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** Garcia admits that Plaintiff purports to incorporate the identified paragraphs by reference, and Garcia's responses to those incorporated paragraphs are unchanged.

85.     At all relevant times, the State of Illinois was an "employer" as defined under 42 U.S.C. § 2000e(b), as it is a government engaged in an industry affecting commerce and has fifteen( 15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

86.     At all relevant times, the Merit Board was an "employer" as defined under 42 U.S.C. § 2000e(b), as it is a governmental agency engaged in an industry affecting commerce and has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

87.     At all relevant times, Plaintiff was an "employee" of the State of Illinois and the Merit Board, as defined under 42 U.S.C. § 2000e(f), and Garcia was Plaintiff's direct supervisor.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

88.     At all relevant times, Plaintiff was a member of a protected class based on her sex, and the State of Illinois and the Merit Board were aware of Plaintiff's membership in a protected class based on her sex.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

89.     On January 23, 2020, Plaintiff was subjected to an unwanted sexual advance or physical conduct of a sexual nature when her supervisor, Garcia, came from behind her and grabbed her breast with his hand.

**ANSWER:** Denied.

90.     Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was unwelcome, as Plaintiff neither requested nor consented to Garcia grabbing her breast, and Plaintiff immediately rebuffed his sexual advance or physical conduct by pushing his arm and hand away from her and turning around.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

91.     From May of 2017 to January 23, 2020, Plaintiff was also subjected to other verbal and physical conduct of a sexual or offensive nature by Garcia, including without limitation Garcia's physical touching of Plaintiff's leg, late night non-work-related phone calls, reprimanding of Plaintiff when she did not answer his calls, and comments about Plaintiff's physical appearance.

**ANSWER:** Denied.

92.     Garcia's verbal and physical conduct of a sexual or offensive nature during the period of May of 2017 to January 23, 2020 was also unwelcome, as Plaintiff neither requested or consented to such conduct.

**ANSWER:** Denied in full, because the alleged verbal and physical conduct never occurred.

93.     The harassing conduct identified in paragraphs 89 and 91 were based on sex and sexually motivated.

**ANSWER:** Denied in full, because the alleged harassing conduct never occurred.

94.     The harassing conduct identified in paragraphs 89 and 91 had the effect of unreasonably interfering with Plaintiff's work performance in creating an intimidating, hostile, and offensive environment that seriously affected Plaintiff's psychological well-being and caused her to undergo regular therapy beginning in June of 2017 and psychiatric treatment in February of 2020.

**ANSWER:** Denied in full, because the alleged harassing conduct never occurred.

95.     Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was severe or pervasive enough to create a hostile work environment, as Plaintiff was left with extensive bruising on her breast and emotional trauma requiring her to seek medical attention and take sick leave.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

96.     The harassing conduct identified in paragraph 91 also contributed to and was severe or pervasive enough to create a hostile environment, as the nature and duration of the conduct

significantly impacted Plaintiff's psychological well-being, detracted from Plaintiff's job performance, and discouraged Plaintiff from remaining on the job.

**ANSWER:** Denied in full, because the alleged harassing conduct never occurred.

97.     As Garcia was a supervisory agent for the State of Illinois and the Merit Board and Plaintiff's direct supervisor, the State of Illinois and the Merit Board are strictly liable for Garcia's sexual harassment.

**ANSWER:** Garcia admits that he was Plaintiff's direct supervisor. Denied as to the remaining allegations of this paragraph.

98.     Alternatively, the State of Illinois and the Merit Board were aware of Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast on January 23, 2020 based on Plaintiff's complaints to the IDHR and the OEIG, and through Dykstra, in his capacity as the Ethics Officer for the Merit Board, who was made aware of this incident on or about February 1, 2020.

**ANSWER:** Denied.

99.     The State of Illinois and the Merit Board were also aware or should have been aware of the harassing conduct identified in paragraph 91, as Dykstra, while serving as the Ethics Officer for the Merit, was present and witnessed said conduct on multiple occasions and said conduct persisted for such a duration and with such frequency that knowledge may be inferred.

**ANSWER:** Denied.

100.    The imposition of liability to the State of Illinois and the Merit Board is thus warranted based on their awareness of Garcia's conduct and creation of a hostile environment.

**ANSWER:** Denied.

101.   As a result of the foregoing, Plaintiff suffered damages, including without limitation emotional distress, pain and suffering, mental anguish, and the cost of bringing this action.

**ANSWER:** Denied.

### COUNT III
### RETALIATION UNDER 42 U.S.C. § 2000e-3(a)
### PLAINTIFF v. STATE OF ILLINOIS AND MERIT BOARD

102.   Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 102 of Count III of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** Garcia admits that Plaintiff purports to incorporate the identified paragraphs by reference, and Garcia's responses to those incorporated paragraphs are unchanged.

103.   At all relevant times, the State of Illinois was an "employer" as defined under 42 U.S.C. § 2000e(b), as it is a government engaged in an industry affecting commerce and has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

104.   At all relevant times, the Merit Board was an "employer" as defined under 42 U.S.C. § 2000e(b), as it is a governmental agency engaged in an industry affecting commerce and has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

105.    At all relevant times, Plaintiff was an "employee" of the State of Illinois and the Merit Board, as defined under 42 U.S.C. § 2000e(f).

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

106.    Plaintiff engaged in statutorily protected activities when she opposed unlawful employment practices under Title VII and filed complaints with the IDHR and OEIG related to Garcia's sexual assault on January 23, 2020.

**ANSWER:** Garcia denies that he engaged in the conduct described herein. Garcia lacks information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them.

107.    As a result of filing complaints with the IDHR and OEIG related to Garcia's sexual harassment, Plaintiff suffered adverse employment actions and changes to the terms and conditions to her employment when she was subsequently placed on administrative leave, required to turn over all her records and company property, and terminated.

**ANSWER:** After Thornley asserted her false allegations against Garcia, Garcia recused himself from employment decisions relating to Thornley. Thus, Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

108.    These adverse employment actions would not have been taken against Plaintiff but for Plaintiff filing complaints with the IDHR and OEIG, as is evidenced by the timing and manner in which the adverse employment actions were taken.

**ANSWER:** After Thornley asserted her false allegations against Garcia, Garcia recused himself from employment decisions relating to Thornley. Thus, Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

109. As a result of the foregoing, Plaintiff suffered damages, including without limitation emotional distress, pain and suffering, mental anguish, and the cost of bringing this action.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

### COUNT IV
### AGE DISCRIMINATION UNDER 29 U.S.C. § 621 *et seq.*
### PLAINTIFF v. STATE OF ILLINOIS AND MERIT BOARD

110. Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 110 of Count IV of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** Garcia admits that Plaintiff purports to incorporate the identified paragraphs by reference, and Garcia's responses to those incorporated paragraphs are unchanged.

111. Plaintiff's employment with the Merit Board was terminated on July 21, 2020.

**ANSWER:** Admitted.

112. At the time of Plaintiff's termination, Plaintiff was forty (40) years of age.

**ANSWER:** Admitted.

113. At the time of Plaintiff's termination, Emily was twenty-nine (29) years of age.

**ANSWER:** Admitted.

114. At the time of Plaintiff's termination, Plaintiff was performing her job satisfactorily notwithstanding she was presently on administrative leave and directed to stay home pending the "independent investigation" conducted by McGuireWoods. Prior to being placed on administrative

leave, Plaintiff had consistently performed her job satisfactorily throughout the course of her employment and received only positive performance reviews.

**ANSWER:** Denied.

115.    Following Plaintiff's termination, Emily was promoted to and filled Plaintiff's position as Chief Fiscal Officer and Director of Personnel.

**ANSWER:** Denied.

116.    Prior to July 21, 2020, Emily held a position lower than Plaintiff's.

**ANSWER:** Denied.

117.    Plaintiff was significantly more experienced than Emily.

**ANSWER:** Denied.

118.    However, Garcia continuously demonstrated favorable treatment to Emily by requesting multiple substantial pay raises for Emily and not Plaintiff

**ANSWER:** Denied.

119.    Garcia also allowed Emily to falsely bill and be compensated for thousands of dollars' worth of overtime, including in 2019 when Emily falsely billed over 730 hours of overtime.  Although Plaintiff reported Emily's false billing and overtime, neither the State of Illinois nor the Merit Board or any of their agents, including Garcia and Dykstra, conducted or requested an independent investigation into Plaintiff's claims regarding Emily's timekeeping records and compensation.

**ANSWER:** Garcia admits that he never requested an investigation because Plaintiff never made the alleged reports to Garcia. Denied as to the remaining allegations of the paragraph.

120. Immediately prior to Plaintiff being placed on administrative leave and then subsequently terminated, Garcia told Plaintiff "maybe if you dressed more like Emily, we would get along better."

**ANSWER:** Denied.

121. Garcia had on other occasions made comments to Plaintiff about how she dressed and suggesting that she dress and act more youthful.

**ANSWER:** Denied.

122. The cited reasons for Plaintiff's termination were a pretext for age discrimination in violation of 29 U.S.C. § 623.

**ANSWER:** After Thornley asserted her false allegations against Garcia, Garcia recused himself from employment decisions relating to Thornley. Thus, Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

123. The State of Illinois and the Merit Board acted intentionally and willfully in violating the ADEA, warranting the imposition of liquidated damages.

**ANSWER:** After Thornley asserted her false allegations against Garcia, Garcia recused himself from employment decisions relating to Thornley. Thus, Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

124. As a result of the State of Illinois and the Merit Board's intentional and willful violations of the ADEA, Plaintiff suffered damages, including without limitation loss of employment and the cost of bring this action.

**ANSWER:** Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

**COUNT V**
**QUID PRO QUO SEXUAL HARASSMENT UNDER 775 ILCS 5/2-102(D)**
**PLAINTIFF v. GARCIA**

125.    Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 125 of Count V of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** Garcia admits that Plaintiff purports to incorporate the identified paragraphs by reference, and Garcia's responses to those incorporated paragraphs are unchanged.

126.    At all relevant times, Garcia was an "employee" of the State of Illinois and the Merit Board, as defined under 775 ILCS 5/2-101.

**ANSWER:** This allegations states a legal conclusion which Garcia lacks information sufficient to admit or deny.  Garcia therefore denies them.

127.    At all relevant times, Plaintiff was an "employee" of the State of Illinois and the Merit Board, as defined under 775 ILCS 5/2-101, and Garcia was Plaintiff's direct supervisor.

**ANSWER:** Garcia admits that he was Plaintiff's direct supervisor.   Garcia lacks information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

128.    On January 23, 2020, Plaintiff was subjected to an unwanted sexual advance or physical conduct of a sexual nature when her direct supervisor, Garcia, came from behind her and grabbed her breast with his hand.

**ANSWER:** Denied .

129.    Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was unwelcome, as Plaintiff neither requested nor consented to Garcia grabbing her breast, and Plaintiff

immediately rebuffed his sexual advance or physical conduct by pushing his arm and hand away from her and turning around.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

130.  Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was based on her sex and sexually motivated.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

131.  Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast was objectively and subjectively offensive.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

132.  After Plaintiff rebuffed Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast, Garcia stated "maybe if you dressed more like Emily, we would get along better."

**ANSWER:** Denied.

133.  Plaintiff's reaction to Garcia's sexual advance or physical conduct in grabbing Plaintiff's breast affected a tangible aspect and the terms and conditions of her employment insomuch as she was subsequently placed on administrative leave, required to turn over all her records and company property, and terminated.

**ANSWER:** Denied.

134.  As the highest-ranking official for the Merit Board staff and Plaintiff's direct supervisor, Garcia had the authority to take adverse employment actions against Plaintiff and was involved in and/or directed the adverse employment actions taken against Plaintiff.

**ANSWER:** Admitted that Garcia was Plaintiff's direct supervisor. Denied as to the remaining allegations of this paragraph.

135. These adverse employment actions would not have been taken against Plaintiff but for Plaintiff's refusal of Garcia's unwelcome sexual advance or physical conduct of a sexual nature.

**ANSWER:** Denied in full, because the alleged sexual advance or physical conduct never occurred.

136. As a result of Garcia's sexual harassment and the adverse employment actions taken against Plaintiff, Plaintiff has suffered damages, including emotional harm, mental suffering, and the cost of bringing this action.

**ANSWER:** Denied in full, because the alleged sexual harassment never occurred.

**COUNT VI**
**STATE OFFICIALS AND EMPLOYEES ETHICS ACT, 5 ILCS 430/15-10**
**PLAINTIFF v. STATE OF ILLINOIS AND MERIT BOARD**

137. Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 137 of Count VI of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

138. At all relevant times, Plaintiff was a State employee of the State of Illinois and the Merit Board, a State agency.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

139.    Plaintiff engaged in statutorily protected activity under 5 ILCS 430/15-10 when she disclosed to the OEIG the activities and practices of Garcia that Plaintiff reasonably believed were in violation of various law, rules, and regulations, including those activities and practices identified in paragraphs 31-34, by filing a complaint with the OEIG on February 1, 2020.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

140.    Plaintiff also engaged in statutorily protected activity under 5 ILCS 430/15-10 when she provided information to the OEIG, who was conducting an investigation into Garcia's conduct, during their meeting on February 11, 2020.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

141.    After Plaintiff filed her complaint with the OEIG and was interviewed by the OEIG regarding Garcia's conduct, Plaintiff suffered adverse employment actions and changes in the terms and conditions of her employment insomuch as she was subsequently placed on administrative leave, required to turn over all her records and company property, and terminated in violation of the Ethics Act.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

142.     Plaintiff's filing of a complaint with the OEIG and participation in the investigation conducted by the OEIG into Garcia's conduct was a contributing factor in the retaliatory, adverse employment actions taken by the State of Illinois and the Merit Board.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

143.     The State of Illinois' and the Merit Board's violations of the Ethics Act were intentional and willful.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

144.     As a result of the State of Illinois' and the Merit Board's intentional and willful violations of the Ethics Act, Plaintiff suffered damages, including without limitation loss of employment and the costs of bringing this action.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VI at this time, instead referring the Court to that motion.

### COUNT VII
### STATE OFFICIALS AND EMPLOYEES ETHICS ACT, 5 ILCS 430/15-10
### PLAINTIFF v. GARCIA

145.     Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 145 of Count VII of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** Garcia admits that Plaintiff purports to incorporate the identified paragraphs by reference, and Garcia's responses to those incorporated paragraphs are unchanged.

146.    At all relevant times, Plaintiff was a State employee of the State of Illinois and the Merit Board, a State agency.

**ANSWER:** Admitted that Thornley was an employee of the Merit Board until July 2020. Denied to the extent the paragraph makes any allegations beyond that.

147.    Plaintiff engaged in statutorily protected activity under 5 ILCS 430/15-10 when she disclosed to the OEIG the activities and practices of Garcia that Plaintiff reasonably believed were in violation of various law, rules, and regulations, including those activities and practices identified in paragraphs 31-34, by filing a complaint with the OEIG on February 1, 2020.

**ANSWER:** Denied.

148.    Plaintiff also engaged in statutorily protected activity under 5 ILCS 430/15-10 when she provided information to the OEIG, who was conducting an investigation into Garcia's conduct, during their meeting on February 11, 2020.

**ANSWER:** Garcia denies that he engaged in the conduct described herein. Garcia lacks information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them.

149.    After Plaintiff filed her complaint with the OEIG and was interviewed by the OEIG regarding Garcia's conduct, Plaintiff suffered adverse employment actions and changes in the terms and conditions of her employment insomuch as she was subsequently placed on administrative leave, required to turn over all her records and company property, and terminated in violation of the Ethics Act.

**ANSWER:** After Thornley asserted her false allegations against Garcia, Garcia recused himself from employment decisions relating to Thornley. Thus, Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

150.    Plaintiff's filing of a complaint with the OEIG and participation in the investigation conducted by the OEIG into Garcia's conduct was a contributing factor in the retaliatory, adverse employment actions taken by the State of Illinois and the Merit Board.

**ANSWER:** After Thornley asserted her false allegations against Garcia, Garcia recused himself from employment decisions relating to Thornley. Thus, Garcia lacks information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

151.    Garcia's violations of the Ethics Act were intentional and willful.

**ANSWER:** Denied in full, because Garcia never violated the Ethics Act.

152.    As a result of Garcia's intentional and willful violations of the Ethics Act, Plaintiff suffered damages, including without limitation loss of employment and the costs of bringing this action.

**ANSWER:** Denied.

## COUNT VIII WHISTLEBLOWER ACT, 740 ILCS 174/15
## PLAINTIFF V. GARCIA

153.    Plaintiff reasserts and realleges paragraphs 1 through 69 of Plaintiff's Complaint as paragraph 153 of Count VIII of Plaintiff's Complaint as though fully set forth herein.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

154.    At all relevant times, Garcia was the highest-ranking official of the Merit Board and a supervisory agent of the State of Illinois and the Merit Board.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

34

155.    At all relevant times, Garcia was acting within the scope of his authority, express or implied, as an agent and on behalf of the State of Illinois and the Merit Board in supervising the members of the Merit Board staff, including Plaintiff.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

156.    Under the Whistleblower Act, an employer or an agent of an employer "may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency if the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/10.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

157.    In violation of section 10 of the Whistleblower Act, Garcia implemented a policy in which the members of the Merit Board staff were prohibited from filing complaints or disclosing violations, including violations of a State or federal law, rule, or regulation, related to Garcia or the Merit Board.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

158.    The Whistleblower Act further prohibits an employer or an agent of an employer from "retaliat[ing] against an employee who discloses information to a government or law

35

enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b).

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

159.    In violation of section 15(b) of the Whistleblower Act, Garcia retaliated against Plaintiff for disclosing the violations alleged under paragraphs 31-34 to the OEIG.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

160.    Plaintiff had reasonable cause to believe that the violations alleged under paragraphs 31-34 constituted violations of a State or federal law, rule, or regulation.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

161.    After Plaintiff filed her complaint with the OEIG and was interviewed by the OEIG regarding Garcia's conduct, Plaintiff suffered adverse employment actions and changes in the terms and conditions of her employment insomuch as she was subsequently placed on administrative leave, required to turn over all her records and company property, and terminated in violation of the Whistleblower Act.

**ANSWER:** A motion to dismiss this Count is pending. *See* Dkt. 15. Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

162.     Plaintiff's filing of a complaint with the OEIG and participation in the investigation conducted by the OEIG into Garcia's conduct was a contributing factor in the retaliatory, adverse employment actions taken by the State of Illinois and the Merit Board.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

163.     Garcia's violations of the Whistleblower act were intentional and willful.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

164.     As a result of Garcia's intentional and willful violations of the Whistleblower Act, Plaintiff suffered damages, including without limitation loss of employment and the costs of bringing this action.

**ANSWER:** A motion to dismiss this Count is pending.  *See* Dkt. 15.  Garcia therefore provides no answer to the allegations in Count VIII at this time, instead referring the Court to that motion.

## COUNTERCLAIMS

1.      Sexual assault and sexual harassment are unequivocally unacceptable in all circumstances.  But this litigation is not about sexual assault or sexual harassment.

2.      Instead, it is about the discovery of Plaintiff Jenny Thornley's ongoing scheme to defraud the State of tens of thousands of dollars.

3.      It is about Thornley learning that she had been reported to the Illinois Office of the Executive Inspector General ("OEIG") for theft, forgery, and official misconduct,.

4.      It is about Thornley aggressively leveraging her political influence and powerful connections to insulate her from any accountability for her corrupt actions.

5.      It is about Thornley retaliating against anyone who would dare to pierce her bubble of political influence to hold her accountable.

6.      To avoid accountability for her crimes and to allow her to commit more crimes, Thornley manufactured allegations against the person who discovered her fraud, Jack Garcia.

7.      Her allegations started small, with made-up complaints regarding Garcia allegedly having worked from home without authorization or volunteering for the Illinois State Police Heritage Foundation—an organization dedicated to the memory of Illinois State Police officers killed in the line of duty—at times when he was also working for the Illinois State Police Merit Board ("Merit Board").

8.      When it became clear that these frivolous allegations were insufficient to deflect attention from her serious crimes, Thornley quickly escalated.

9.      Thornley claims on her resume to have been "heavily involved" with various political campaigns "at a high level," including campaigns for current Illinois Governor JB Pritzker, current Illinois Comptroller Susana Mendoza, current Springfield Mayor Jim Langfelder, and current Illinois State Police Director Brendan Kelly.  (Exhibit A).

10.     She called a mutual acquaintance of hers and Garcia, telling him that she would get the Governor's Office involved if Garcia did not back off.

11.     When faced with the prospect of serious sanctions for her crimes against the State, Thornley fabricated the most explosive false allegations that she could invent, allegations that she could spread throughout State government in an effort to discredit, hurt, and neutralize Garcia.

12.     That is how the false sexual assault and harassment allegations that are now the subject of this lawsuit were born.

13.     In the seventy-two hours after Garcia scheduled a meeting with the Springfield Police Department to criminally refer Thornley's fraud and forgery, Thornley sent a flurry of emails and made a series of calls and texts to her political contacts throughout state government.

14.     Sixteen hours after first alleging the sexual assault and harassment, she emailed several people in the Governor's Office to threaten them with reprisal if they did not act: "I will be notifying the Governor personally today to let him know that I have tried for several weeks to discuss the mental and sexual harassment with several individuals within this office."

15.     Even the premise of the threat was false, as Thornley had only just invented the sexual harassment and assault allegations.

16.     She had not been asserting these lies for weeks.

17.     She portrayed her calculated efforts to obstruct justice as a noble crusade, stating that her legal counsel will work "to ensure that the Director of the State Police Merit Board does not have a chance to put his hands on another woman as he has done to me."

18.     She attempted to manipulate the Governor's Office staff: "If I don't stand up for women who are being sexually assaulted. Who will?"

19.    She issued thinly veiled threats of political retribution in the Governor's name: "I hope sexual assault and harassment are taken as serious as our Governor mentions in his most recent State of the State address."

20.    After hearing Thornley's lies, high-ranking officials within the Governor's Office inserted themselves into the investigative process, urged the Merit Board to suspend Garcia, and strongly discouraged the Merit Board from taking any action against Thornley for her fraud until an independent investigation could be conducted.

21.    Multiple comprehensive independent investigations have disproven Thornley's allegations.

22.    After a careful review and analysis of the evidence set forth in the report of the independent internal investigation, the five-member governing Board of the Merit Board unanimously voted to immediately terminate Thornley for cause.  The Merit Board staff was instructed to seek Thornley's criminal prosecution.

23.    The investigations and the termination did nothing to deter Thornley's criminal behavior, however.

24.    Thornley is currently defrauding the State of Illinois out of tens of thousands of dollars in Workers' Compensation benefits, based upon a growing fabric of lies.

25.    To facilitate her Workers' Compensation fraud, Thornley again repeated the false allegations against Garcia and relied on the aid of the Governor's Office, even listing herself as an employee in that Office despite never having worked there.

26.    This lawsuit is merely the latest step in Thornley's campaign to defame Garcia, both in retaliation for his investigating her fraud, and in her ongoing efforts to fraudulently pilfer more money from the State.

27.     Although false allegations Thornley makes in the context of litigation may be privileged, many of her false and harmful statements against Garcia were made outside of and not preliminary to any judicial proceeding.  Those statements are therefore not privileged.

28.     Garcia brings these counterclaims to recover for the professional, reputational, and personal harm caused by Thornley's lies.

## PARTIES

29.     Jenny Thornley is a former employee of the Merit Board.  She resides in Springfield, Illinois.

30.     Jack Garcia is the Executive Director of the Merit Board.  He resides in Orland Park, Illinois.

## JURISDICTION AND VENUE

31.     The Court has supplemental jurisdiction over Garcia's counterclaims pursuant to 28 U.S.C. § 1367 because they are so related to Thornley's claims in this action as to form party of the same case or controversy.

32.     Venue is proper in this district for Garcia's counterclaims because Thornley has consented to the propriety of venue in this Court by filing her claims in this Court.

## FACTS

### – Garcia Discovers That Thornley Had Been Fraudulently Claiming Overtime Payments From the State –

33.     In November 2019, Garcia was alerted to the possibility that Thornley was engaged in a substantial overtime fraud against the State of Illinois.

34.     At that time, Thornley was the Director of Personnel for the Merit Board.  In that role, she was responsible for submitting payroll for Merit Board employees.

35.     In November 2019, Thornley asked another Merit Board staff member, Emily Fox, if Fox had any overtime to submit, because Thornley would be submitting her own overtime and wanted to submit all of the materials together.

36.     Fox mentioned this conversation to Garcia, who was the supervisor for both Thornley and Fox, because Fox did not recall Thornley having worked overtime.

37.     Garcia had never authorized Thornley to work overtime.

38.     Garcia began to investigate whether Thornley did in fact seek payment for unworked overtime.

39.     The Merit Board is overseen by a five-member Board.  Board Members are appointed by the Governor with the advice and consent of the Illinois State Senate, and serve for six-year terms.

40.     Garcia advised Members of the Board, including the Board Chairman, of his investigation into potential overtime theft.

41.     Garcia also advised Melissa Brandenburg, Supervisory Investigator in the OEIG, and Colleen Alderman, Acting Deputy Director of Labor Relations at Illinois Central Management Services ("CMS"), of his investigation.

42.     To begin the investigation, Garcia requested that Thornley provide timekeeping records for all five Merit Board staff members, including Garcia and Thornley.

43.     Garcia had to ask Thornley for these records because, as Director of Personnel, Thornley was responsible for maintaining them.

44.     Several weeks later, Thornley left for vacation, still having not provided Garcia with the timekeeping records.

45.     While on vacation, Thornley texted Garcia, unprompted, multiple times.

46.     These texts were of a personal nature, relating to Thornley's family and her vacation activities.

47.     Garcia responded politely but briefly.

48.     Upon Thornley's return on January 9, Garcia requested that Thornley provide the timekeeping records that same day.

49.     After that request, Thornley's husband—an employee in the State Comptroller's Office—arrived at Thornley's office and the two stayed behind Thornley's closed office door for approximately 45 minutes.

50.     When Thornley left her office, she handed a stack of timekeeping records to Merit Board Chief Legal Counsel Dan Dykstra.

51.     At the top of the stack were Dykstra's timekeeping records.

52.     Included in the stack of timekeeping records were overtime authorizations for Thornley, bearing Garcia's signature.

53.     Garcia's signature on Thornley's overtime authorizations was identical to his signature on Dykstra's timekeeping records.

54.     Even stray pen marks in the signature from Dykstra's records were present on Thornley's authorization.

55.     The only difference between the signatures on the two sets of records was that the signature on Thornley's records were slightly faded, as though having been copied from a different source.

56.     Garcia has an extensive career in law enforcement including twenty-seven years as an Illinois State Police Officer. During that career, he served for five years as the Deputy Director of the Illinois State Police ("ISP") Forensic Services Division, which is responsible for the forensic

investigation of questioned documents. Garcia also served for three years as the Deputy Director of the Division of Internal Investigation.

57.     Based on this experience and a visual inspection of the signature on Thornley's and Dykstra's timekeeping records, Garcia concluded that Thornley had forged his signature on her timekeeping records by conveying the signature from Dykstra's records onto her own.

58.     Garcia identified over 45 hours of overtime in 2019 alone that Thornley had claimed but which Garcia had not authorized.

59.     Further, Thornley had claimed over 670 hours of overtime from July 2016 up to April 2017. When Garcia became Merit Board Executive Director in April 2017, Thornley's claimed overtime abruptly dropped to 0, until 2019.

60.     Based on the evidence of forgery and fraud, Garcia first reported his investigative findings to the OEIG. He made his report to the OEIG on January 22, 2020, and provided the OEIG with documents that proved Thornley's overtime fraud.

61.     On January 30, Garcia scheduled a meeting with the Investigations Commander at the Springfield PD to report Thornley's fraud. That meeting was scheduled for February 3, 2020.

**- Thornley Fabricates Allegations Against Garcia To Block The Investigation Into Her Fraud -**

62.     Unbeknownst to Garcia, Thornley had begun a smear campaign to discredit him once she learned that she was being investigated.

63.     On January 9, 2020—the day Thornley presented the forged records to Garcia— Thornley told Patty Ambrose, Director of Constituent Affairs in the Governor's Office, that Garcia was "conducting himself in an unethical manner by lying on time sheets, not coming to work, and other stuff."

64.    On January 10, Thornley made a disjointed hodgepodge of allegations against Garcia to Sarah Kerley, Chief Administrative Officer at CMS, including that Garcia spent time working for the ISP Heritage Foundation.

65.    Thornley did not mention sexual harassment or assault to Ambrose or Kerley.

66.    On January 15, Thornley had an in-person meeting with two contacts at the Illinois Office of Management and Budget: Deputy Director of Public Safety and Education Lindsay Amerson, and Budget Analyst Steve VanDeKerckhove.

67.    During that meeting, Thornley again made a wide-ranging hodgepodge of allegations against Garcia, none of which involved sexual harassment or assault.

68.    Around this time, Thornley also started texting and calling her contacts at the ISP, to try to find new employment, hoping that switching jobs would somehow insulate her from any investigation into her fraud.

69.    For example, on January 17, Thornley spoke with ISP First Deputy Director Matt Davis about wanting to seek other employment.

70.    On January 18, Thornley and Davis texted regarding a possible job at the ISP.

71.    On January 19, Thornley and Davis texted each other about background checks for that job.

72.    On January 27—the week after the alleged assault occurred—Thornley met with Judy McAnarney, Director of Executive Appointments in the Governor's Office and formerly a designated EEO/AA Officer.

73.    In that meeting, Thornley made yet another string of allegations against Garcia.

74.    None of those allegations involved sexual harassment or assault.

75. On January 27, Thornley texted Declan Binninger, Chief of Staff of the Illinois Emergency Management Agency, and said that McAnarney wanted Thornley to meet with Bria Scudder, First Assistant Deputy Governor in the Governor's Office. Thornley wrote: "They don't want him around much longer."

76. On January 28, Thornley met with Kerley again.

77. In that meeting, Thornley made a hodgepodge of allegations against Garcia.

78. None of those allegations involved sexual harassment or assault.

79. On January 28, Thornley contacted Jim Wolfe, a lawyer who is a mutual acquaintance of Thornley and Garcia.

80. Thornley told Wolfe that Garcia "needs to back off," that Garcia "does not know who he is messing with," and that she would get the Governor's Office involved if Garcia did not back off. (Exhibit B).

81. Garcia has not seen Thornley since before Thornley's conversation with Wolfe, which Wolfe immediately conveyed to Garcia.

82. Despite Thornley's threats, Garcia continued with the reporting of her overtime fraud, including by scheduling a meeting with the Investigations Commander of the Springfield PD subsequent to Thornley's call to Wolfe.

83. Thornley never mentioned sexual harassment or sexual assault to Wolfe.

84. Instead, the first time Thornley communicated the allegation of sexual assault to anyone was in the evening of January 30, when earlier that day Garcia had contacted the Springfield PD to schedule the meeting to report Thornley's theft.

46

85.     Starting on January 30, Thornley quickly repeated this false sexual assault allegation over and over again throughout many agencies in State government, and often at the highest levels of State government.

86.     With the Springfield PD meeting only days away, Thornley was acting quickly to halt the investigation into her crimes, so she did not concern herself with making her false allegations through proper channels.

87.     Instead, Thornley repeatedly made the allegations outside of settings that were preliminary to a judicial or quasi-judicial proceeding.

88.     Thornley focused on the most politically expedient and powerful channels, going straight to her many contacts in the Governor's Office instead of initially reporting through the Illinois Department of Human Rights ("IDHR").

89.     Thornley had worked on campaigns for various elected officials in Illinois, including Governor Pritzker and ISP Director Brendan Kelly.

90.     Political leverage was top of Thornley's mind.  On January 28, 2020, Thornley texted a personal acquaintance, Lieutenant John Thompson, Chief of Government Affairs at the ISP, to ask: "Does Jack have any juice?  I just can't see it at this point."

91.     Thornley made sure to bring to bear whatever political "juice" she had and made true on her threats to Wolfe.

92.     On January 30, 2020, at 6:19 P.M., Thornley texted a contact in the Governor's Office, Nikki Budzinski, who was a Senior Advisor and Campaign Consultant to Governor Pritzker.  Thornley stated that she needed to report "a serious case of sexual harassment with our director."

93.     This was false.  Garcia never engaged in sexual harassment.

94.     Less than 15 minutes later, on January 30, 2020, Thornley contacted her friend Mary Mitchell of Springfield, Illinois, and Thornley told her that Garcia grabbed her breast.

95.     This was false.  Garcia has never sexually assaulted Thornley, grabbed Thornley's breast, or attempted to grab Thornley's breast.

96.     On January 31, 2020, Thornley contacted Merit Board Member Nancy Maldonado. Thornley first told Maldonado that Garcia had been fired and then that there either was or was going to be a sexual harassment claim against him.

97.     This was false.  Garcia had not and has not been fired.

98.     On January 31, 2020, Thornley again contacted Patty Ambrose from the Governor's Office.  Thornley told Ambrose that "my boss just said to me if I dressed more like his assistant we would get along better."

99.     This was false.  First, Emily Fox (to whom Thornley was referring, as shown by, for example, her allegations in this litigation) is not and was not Garcia's assistant; she is the Merit Board's Program Director.  Second, Garcia never made any comment that Thornley should dress more like Fox or that they would get along better if she did.

100.     On January 31, 2020, Thornley called TriStar (the Third-Party Administrator for Workers' Compensation claims submitted by Illinois state government employees) to make a Workers' Compensation claim.  In doing so, Thornley alleged that her Director had groped her right breast and her Director made the comment that they would get along better if she dressed more like Fox.

101.     On information and belief, the person to whom Thornley spoke at TriStar was Heather Young.

102.    On February 1, 2020, Thornley emailed Budzinski, the Governor's Chief of Staff Anne Caprara, and Deputy Governor Christian Mitchell.

103.    Thornley stated that she was "very distraught by the sexual assault and harassment I have been subject to by our Director."

104.    Thornley stated that she "will be notifying the Governor personally today."

105.    On February 1, Thornley had a call with the Governor's General Counsel Anne Spillane and Deputy General Counsel Whitney Rosen.

106.    Thornley told them that she was lining up attendance paperwork in Garcia's office when Garcia approached her from behind, put his right arm underneath her arm, and groped her breast.  Thornley also told them that Garcia told her that they would get along better if she dressed more like Fox.

107.    At the beginning and end of the call, Thornley told Spillane and Rosen that Thornley views the Pritzkers as friends and does not want them to be on the front page of the newspaper.

108.    On February 2, 2020, Thornley texted Illinois First Lady M.K. Pritzker.

109.    Thornley advised First Lady Pritzker that she had spoken with Ann Spillane regarding sexual harassment she experienced.

110.    In the February 2 text to First Lady Pritzker, Thornley stated: "I need JB to know what's going on and hope they are keeping him aware."

111.    In the February 2 text to First Lady Pritzker, Thornley stated also wrote: "If JB would like to talk to see the emails I have sent to his staff, he can reach me at this number."

112.    These efforts ultimately achieved Thornley's intended purpose: on February 2, at the behest of the Governor's General Counsel Ann Spillane and Deputy General Counsel Scott Lerner, the Merit Board placed Garcia on administrative leave.

113.    Spillane and Lerner also advised the Merit Board not to place Thornley on leave for her overtime theft.

114.    Because he had been placed on leave, Garcia had to cancel his meeting with the Springfield PD to report Thornley's theft.

115.    Garcia lives in the Chicagoland area and normally stays at the Crowne Plaza in Springfield when Merit Board work requires him to stay overnight in Springfield.

116.    When the Merit Board staff called to cancel Garcia's reservation at the Crowne Plaza for the night before the now-canceled Springfield PD meeting, the front desk stated that someone had already called to cancel.

117.    On February 2, 2020, the female caller had told Dominique Wells at the Crowne Plaza front desk that Garcia has been fired.

118.    On information and belief, Thornley was the caller.

**- Even After Blocking The Meeting With Springfield PD, Thornley Continued To Retaliate Against Garcia For Investigating Her Crimes And To Leverage Such Allegations For Her Personal Gain -**

119.    On February 3, 2020, Thornley reported her false allegations to the IDHR.

120.    On February 5, 2020, Thornley met with Michele Cusumano, the Human Resources Director at the Illinois Comptroller's Office.  In this meeting, Thornley told Cusumano that Garcia grabbed her breast and said that they would get along better if she dressed more like Fox.

121.    On February 5, 2020, Thornley spoke by phone with Kerley at CMS.  Thornley told Kerley that Garcia tried to grope her.

122.    On February 11, 2020, Thornley told Merit Board maintenance worker Bill Gosda that Garcia had grabbed her chest.

123.    Thornley has repeated her false claim of assault three separate times for the purposes of obtaining Workers' Compensation benefits.  (Exhibit C, attached, is a submission Merit Board staff member Emily Fox made to the OEIG, reporting Thornley's fraud).[1]

124.    In her January 31, 2020, Workers' Compensation claim, Thornley claimed that she was an employee in the Governor's Office.

125.    In her January 31 Workers' Compensation claim, Thornley claimed that JB Pritzker was her supervisor.

126.    On January 31, 2020, Thornley was an employee of the Merit Board.

127.    On January 31, 2020, Thornley was not an employee in the Governor's Office.

128.    Thornley has never been an employee in the Governor's Office.

129.    On February 5, 2020, Thornley filed a notice of injury for her workers' compensation claim with Tristar, stating that her "director" had sexually assaulted her.

130.    The February 5 claim stated that Thornley's supervisor was Ann Spillane, in the Office of the Governor.

131.    Ms. Spillane has never been Thornley's supervisor.

132.    Thornley repeated the false sexual assault allegation in a September 4, 2020, workers' compensation filing.

---

[1] The attachments to the OEIG submission and Thornley's workers' compensation applications are not attached to this Counterclaim.  If the Court deems it necessary, Garcia will promptly file these documents, with Social Security Numbers and birth dates redacted.

**- Thornley's Allegations Against Garcia Have Been Proven False -**

133.     Within days of being placed on leave, Garcia took a polygraph examination administered by a retired FBI agent and longtime FBI polygraph examiner.

134.     The results of the polygraph were conclusive: Garcia truthfully stated that he did not touch Thornley's breast. (Exhibit D[2]).

135.     In February 2020, the Merit Board retained former Assistant U.S. Attorney Christina Egan, of the law firm McGuireWoods, to conduct an independent investigation of (1) Thornley's allegations against Garcia; and (2) Garcia's investigation into Thornley's theft.

136.     After conducting an extensive investigation, Ms. Egan issued a 133-page report that concluded: "(1) The evidence in the investigation is sufficient to support a finding that Thornley caused payments to herself for overtime she did not work.  (2) The evidence in the investigation is insufficient to support a finding that Garcia sexually assaulted Thornley." (Exhibit E[3]).

137.     Thornley knew that her allegations were false and therefore refused to participate in Ms. Egan's investigation.

138.     In fact, the day before a scheduled interview with Ms. Egan, Thornley claimed that she had contracted COVID to avoid sitting for the interview.

139.     Thornley's claim of testing positive for COVID was false.

140.     On the same day that Thornley's representatives claimed that Thornley was unable to provide documents confirming her positive test, Thornley was texting her friends that

---

[2] In the Exhibit, Garcia's month and date of birth are redacted, in accordance with Rule 5.2(a).

[3] Although this report is marked "privileged," the Merit Board has since waived privilege by disseminating the report through various official channels in response to official requests.  In the Exhibit, names of minors (except for the first initial) are redacted, in accordance with Rule 5.2(a).

she did not have COVID and that she was fine, and she was trying to obtain a fake medical note that would say that she could not work due to COVID.

141.    As Thornley was obfuscating, Ms. Egan reviewed phone records and security footage, and she interviewed 45 different individuals to ascertain the truth of the allegations of fraud against Thornley and Thornley's allegations against Garcia.

142.    The video footage—as well as emails and texts—demonstrate that Thornley was working substantially less time than she claimed to be working.  For example, in just the single month of September 2019, a non-exhaustive list of significant discrepancies between when Thornley actually worked in the office and how much work Thornley recorded on timekeeping records includes:

a.    9/9/2019—leaving work 1 hour and 55 minutes earlier than stated on attendance records.

b.    9/11/2019—leaving work 1 hour and 34 minutes earlier than stated on attendance records.

c.    9/13/2019—arriving at work 1 hour and 13 minutes later than stated on attendance records, and leaving 6 hours and 7 minutes earlier than stated.

d.    9/14/2019—leaving work 2 hours and 4 minutes earlier than stated on attendance records.

e.    9/18/2019—arriving at work 1 hour and 12 minutes later than stated on attendance records, and leaving 4 hours and 21 minutes earlier than stated.

f.    9/20/2019—arriving at work 5 hours and 7 minutes later than stated on attendance records, and leaving 2 hours and 3 minutes earlier than stated.

g.  9/26/2019—leaving work 6 hours and 27 minutes earlier than stated on attendance records.

143.    Although it is theoretically possible that Thornley occasionally worked remotely, the evidence Ms. Egan identified makes that highly unlikely: on only three occasions did Thornley send an email after work hours on a day when she claimed to work overtime, and on only one of those days was the email sent after 5 PM (that email was a DoorDash order confirmation).

144.    Additionally, Ms. Egan reviewed forensic images of Thornley's desktop and laptop, which were inconsistent with Thornley's claimed work hours.

145.    For example, on September 13, 2019, Thornley claimed to have worked from 7 AM to 6:30 PM.  The video shows her arriving at 8:13 AM and departing at 12:23 PM.  The human activity on her desktop began at 8:28 AM and ended at 12:15 PM.  There was no human activity on her laptop.

146.    Emails further corroborate what the forensics demonstrate.

147.    For example, on September 13, Thornley sent an email to another state employee at 12:15 PM, saying that she was out until Monday.

148.    Given this conduct, Thornley had plenty of cause for concern if the Springfield PD were ever to receive the evidence gathered by the Merit Board proving overtime theft and forgery.

149.    She therefore had substantial motivation to lie so as to discredit Garcia.

150.    As to her allegations of sexual assault, Thornley offered inconsistent stories regarding the time at which the alleged assault occurred, but she consistently alleged that it occurred in Garcia's office.

151.     Ms. Egan therefore reviewed video footage, email time stamps, phone records, and images of Thornley's computer to identify all of the windows in which Thornley and Garcia could have been in his office on the day of the alleged assault.

152.     Ms. Egan's analysis demonstrated that the "windows of time [in which Thornley and Garcia could have been in Garcia's office alone] are limited and there is some potentially contradicting evidence with each."

153.     For example, during most of the windows of time when both were even in the same section of the building, Garcia was continuously on his phone or Thornley was continuously at her computer.

154.     For the remaining windows, the facts were inconsistent with the facts Thornley recounted.  For example, Thornley told others that she had a conversation with Fox on her way into Garcia's office, but Fox was not in that part of the office building during many of the windows in which Thornley and Garcia both were.

155.     Further, Ms. Egan determined that the "evidence does not support the veracity of Thornley's description of the reason for her being in Garcia's office at the time of the alleged assault."

156.     Specifically, Thornley told Spillane, Rosen, and Cusumano that she was spreading out time sheets or attendance paperwork for Garcia's signature at the time of the alleged assault.

157.     But Ms. Egan's analysis of documents concluded that Garcia signed no time or attendance records on January 23, and there were  "no time and attendance document that were in the Merit Board's possession that could have existed on January 23, 2020 that were signed by Garcia at a later date, were signed by someone else in Garcia's stead on either January 23, 2020 or

at a later date, or remained unsigned and could have conceivably been documents presented to Garcia for signature on that date."

158. Further, Ms. Egan concluded that the "Evidence is inconsistent with Thornley's statements about what she did following the alleged assault."

159. For example, she ran errands with Dykstra shortly after the alleged assault occurred.

160. Thornley did not say to Dykstra that she had been sexually assaulted or sexually harassed, or otherwise gave any indication that anything upsetting had occurred.

161. Additionally, Ms. Egan observed that "email evidence suggests Thornley was in communication with Garcia following the [] timeframe after which she said the alleged assault occurred."

162. Analysis of her computer activity shows that Thornley continued to work throughout that morning and afternoon.

163. Immediately after when the alleged assault would have occurred, Thornley initiated a work related phone call with Michael Yokley, CFO of the ISP, whom Ms. Egan interviewed.

164. Ms. Egan observed: "For Thornley to have called Yokley, who is someone who appears to be a professional friend and to whom she made no statements about having been assaulted, immediately following having been assaulted is fairly implausible and also inconsistent with her description of what she did following the alleged assault."

165. Thornley also returned to work the following day and was observed to be "in a good mood."

166. Further, Ms. Egan's investigation concluded that Thornley engaged in "a pattern of attempts to discredit" Garcia, which "could tend to question the credibility" of her assault allegations.

167. In addition to Ms. Egan's investigation, the ISP also investigated Thornley's allegations, because Thornley filed a sexual assault report with the ISP.

168. The ISP conducted a sweeping investigation that included witness interviews (including a multi-hour interview of Thornley) and a comprehensive review of security camera footage and telephone records.

169. The police forensic investigation revealed that the facts Thornley alleged were virtually impossible.

170. After a review by the Sangamon County State's Attorney's Office, the case was closed.

171. After two independent investigations established that Thornley's allegations of sexual assault were fabricated, Thornley brought this lawsuit, asserting similar false allegations.

**COUNT I – DEFAMATION UNDER ILLINOIS COMMON LAW**

172. Garcia hereby incorporates by reference paragraphs 1 through 171 of this counterclaim, as if restated fully herein.

173. On various occasions, Thornley made false and defamatory statements about Garcia to third parties.

174. Thornley's false and defamatory statements were of the type that, on their face, tend to injure one's reputation, including:

    a. Falsely accusing Garcia of committing the insidious crime of sexual assault;

    b. falsely accusing Garcia of acting without integrity in the performance of his professional duties; and

    c. falsely accusing Garcia in a manner that would otherwise prejudice him in his profession.

175.  As described above, Thornley defamed Garcia on the following occasions:

    a.  To Budzinski on January 30, 2020.

    b.  To Mary Mitchell on January 30, 2020.

    c.  To Maldonado on January 31, 2020.

    d.  To Ambrose on January 31, 2020.

    e.  To Young on January 31, 2020.

    f.  To Budzinski, Caprara, and Christian Mitchell on February 1, 2020.

    g.  To Spillane and Rosen on February 1, 2020.

    h.  To M.K. Pritzker on February 2, 2020.

    i.  To Wells on February 2, 2020.

    j.  To Cusumano on February 5, 2020.

    k.  To Kerley on February 5, 2020.

    l.  To Gosda on February 11, 2020.

    m.  In workers' compensation claims submissions on February 5, 2020, and September 4, 2020.

176.  Thornley also defamed Garcia on the following addition occasion:

    a.  On February 2, 2020, Thornley texted Thompson (the ISP Chief of Government Affairs) and stated that Garcia was "suspended."

    b.  When Thompson asked what happened, Thornley replied, "Sexual harassment," "Didn't hear it from me," and "He's done."

    c.  Thornley also told Thompson by phone that Garcia told her that she would look better if she dressed like Fox.

177.  Thornley knew that these statements were false.

178. Thornley deliberately made false statements with malice, so as to harm Garcia.

179. None of these false statements were privileged.

180. Garcia has been harmed by Thornley's publication of these false statements.

## COUNT II – FALSE LIGHT UNDER ILLINOIS COMMON LAW

181. Garcia hereby incorporates by reference paragraphs 1 through 180 of this counterclaim, as if restated fully herein.

182. Thornley repeatedly made statements to third parties that placed Garcia in a false or misleading light before the public.

183. The information Thornley portrayed would be highly offensive or embarrassing to a reasonable person.

184. Thornley made these statements with malice, specifically to harm Garcia for investigating her for overtime fraud.

185. The specific statements Thornley made are as follows:

    a. To Budzinski on January 30, 2020.

    b. To Mary Mitchell on January 30, 2020.

    c. To Maldonado on January 31, 2020.

    d. To Ambrose on January 31, 2020.

    e. To Young on January 31, 2020.

    f. To Budzinski, Caprara, and Christian Mitchell on February 1, 2020.

    g. To Spillane and Rosen on February 1, 2020.

    h. To M.K. Pritzker on February 2, 2020.

    i. To Wells on February 2, 2020.

    j. To Thompson on February 2, 2020.

k.   To Cusumano on February 5, 2020.

l.   To Kerley on February 5, 2020.

m.   To Gosda on February 11, 2020.

n.   In workers' compensation submissions on February 5, 2020, and September 4, 2020.

186.   Garcia has been harmed by Thornley's actions.

WHEREFORE, Garcia prays for a judgment against Thornley for:

i.   Presumed damages due to Thornley's defamatory statements;

ii.   actual damages for the harm caused by Thornley's tortious actions;

iii.   punitive damages because Thornley acted with actual malice;

iv.   the costs of the action; and

v.   any and all other relief to which Garcia appears entitled.


Date: June 15, 2021                    Respectfully submitted,

By:  */s/ Jeremy D. Margolis*
        Jeremy D. Margolis
        Neil G. Nandi
        Loeb & Loeb LLP
        321 N. Clark Street, Suite 2300
        Chicago, IL 60654
        Tel: (312) 464-3100
        Fax: (312) 464-3111
        jmargolis@loeb.com
        nnandi@loeb.com

        *Attorneys for Defendant Jack S. Garcia, in his individual capacity*