# EXHIBIT E

*Attorney-Client Privileged*
*Attorney Work Product*

# McGUIREWOODS

TO:  Illinois State Police Merit Board

FROM:  McGuireWoods LLP
Christina Egan
Melissa Weiss

DATE:  July 19, 2020

RE:  Internal Investigation Regarding Illinois State Police Merit Board

## PART I – EXECUTIVE SUMMARY

We were retained by the Illinois State Police Merit Board ("Merit Board") to conduct an independent internal investigation into two allegations: (1) an allegation that Jenny Thornley stole payments for overtime to which she was not entitled; and (2) an allegation that Jack Garcia sexually assaulted Thornley. Our work in this investigation has been gathering and analyzing facts. That work has been conducted without influence of the opinion of any individuals.

Our investigative work primarily took place over approximately five weeks in February and March 2020 and approximately four weeks in June 2020. During our investigation, we conducted 66 witness interviews of 45 separate individuals. We also reviewed a significant volume of materials including: text messages; phone records; emails; Merit Board documents; documents from other sources; Merit Board video footage; and evidence from a forensic analysis of Thornley's computer.

Our findings are as follows: (1) The evidence in the investigation is sufficient to support a finding that Thornley caused payments to herself for overtime she did not work. (2) The evidence in the investigation is insufficient to support a finding that Garcia sexually assaulted Thornley.

### I.  Investigation Into Allegations of Theft of Overtime Payments

The evidence from our investigation into the allegation against Thornley for theft of overtime payments supports a finding that Thornley (1) did not receive authorization to work overtime for all time claimed; (2) inaccurately represented the amount of overtime hours she worked on her timekeeping records; (3) inaccurately represented the amount of hours worked on days in which she did not claim that she worked overtime; and (4) even assuming she did accurately track the hours she worked overtime, caused payments to herself for overtime she did not work.

1

*Attorney-Client Privileged*
*Attorney Work Product*

The evidence shows that Thornley had knowledge of the Merit Board's policies related to timekeeping and attendance, specifically that Thornley was aware of the process to obtain approval and work overtime. There is no record of Thornley requesting to work overtime in calendar year 2019 with the exception of December 2019.

A review of the video evidence, Thornley's email and text communications, and forensic image of Thornley's laptop and desktop computers shows that Thornley inaccurately represented the amount of hours worked on at least some of the days in which she claimed she worked overtime. Additionally, a review of the same evidence shows that Thornley inaccurately represented the amount of hours worked on at least some days in which she did not claim that she worked overtime.

Specifically, the evidence demonstrates that Thornley was spending time out of the office, even on the days she claimed she worked overtime. A review of the video evidence shows that Thornley was arriving later and leaving earlier than reported on her monthly Attendance Reports.  In addition to the video evidence, text message and email correspondence support the arrival and departure times contained on the videos and the fact that Thornley was not working the time she claimed. A review of the forensic images of Thornley's computers likewise supports a finding that she was not performing work at the Merit Board or at home for the full time she claimed on her Attendance Report for the days in which she claimed to have worked overtime. There is also text message and email correspondence from Thornley the substance of which supports a finding that she did not work all the hours of overtime which she claims.  In addition to the evidence supporting a finding that Thornley did not work the overtime that she claimed, video evidence, Thornley's email usage, Thornley's computer usage, and Thornley's text and email communication all support a finding that Thornley took time off of work, but did not deduct it from her personal, sick, vacation, or compensatory time bank. Rather, in those instances, she claimed she worked a full day.

An analysis of the timekeeping and payroll records show that even assuming Thornley accurately reported the amount of time and overtime she worked, which the evidence demonstrates she did not, she was compensated for more time than she was entitled. The payroll records show she received more payments in overtime than what would have been paid had Thornley cashed out her compensatory time bank. Since Thornley was required to manually enter any overtime in order for an employee to receive overtime payments, she would have had to manually enter her overtime hours and rate of pay to receive this compensation. While there is a possibility someone accessed her computer without her knowledge, our investigation has not revealed any evidence to support this possibility and find it highly unlikely.

There is also evidence that suggests Thornley may have forged Garcia's signatures on overtime request forms when those forms were requested during the Merit Board's investigation into her overtime usage.  Merit Board employees noticed that Garcia's signature on Thornley's overtime request forms for May 2019 and September 2019 appeared to match Garcia's signature on Dan Dykstra's overtime forms for June 2019 and October 2019. Further, Dykstra noticed that his June 2019 and October 2019 were not in chronological order when he assisted Thornley in scanning in the documents. This was inconsistent with the rest of the documents. We visually and electronically compared these documents. Although we are not handwriting experts,

*Attorney-Client Privileged*
*Attorney Work Product*

Garcia's signature on Thornley's May 2019 compensatory time request form appears to match the signature on Dykstra's June 2019 overtime request form. Similarly, the signature on Thornley's September 2019 overtime request form appears to match the signature on Dykstra's October 2019 overtime request form. We do not have evidence regarding the manner in which Thornley may have forged these signatures but do have evidence that she previously engaged in the unauthorized use of Reeve Waud's electronic signature.

In summary, a review of Thornley's payroll records show that Thornley was compensated $3,120.46 in overtime for they pay period from October 1, 2019 to October 15, 2019, $3,072.46 in overtime for they pay period from November 1, 2019 to November 15, 2019, and $4,320.64 for they pay period November 16, 2019 to November 30, 2019 for a total of $10,513.56. Although we cannot definitively say the amount of overpayment she caused herself to be paid, we can say that Thornley received at least $6,000 in an overpayment. This is likely an underestimate of the overpayment Thornley caused herself to be paid as the evidence shows she inaccurately represented the amount of hours which she worked overtime. In addition, the fact that Thornley inaccurately represented the amount of hours which she worked on days in which she did not claim overtime would also have resulted in payment for time that she did not work.

## II.    Investigation Into Allegations of Sexual Assault

Based upon our investigation, we have found that the evidence is insufficient to support a finding that Garcia sexually assaulted Thornley. Thornley's sexual assault allegations from multiple sources are as follows: Thornley has alleged that Garcia assaulted her on January 23, 2020. She alleged it occurred while she was in his office while she was standing at his conference table spreading out paperwork for him to sign. According to her allegations, Garcia came up from behind her and reached his right arm under her right armpit and groped her right breast. She removed his hand. He said "maybe if you dressed more like Emily we would get along better." She immediately left his office and went to back to her office.

Other than Thornley's own allegations, including the consistency we have observed among the multiple times of which we are aware she has raised the sexual assault allegations, and the fact that she and Garcia were in the office on the day alleged, our investigation has not found evidence consistent with the assault having occurred as alleged. To the contrary, our investigation has found evidence that is inconsistent with the assault having occurred as alleged. The following is a summary of the ways in which the evidence in the investigation is inconsistent with the assault allegation.

*First*, Thornley has been consistent in her allegations that the assault occurred on January 23, 2020 at the Merit Board offices in Garcia's office. Video evidence establishes that both Thornley and Garcia were in the Merit Board offices on January 23, 2020. Within the timeframes Thornley alleges the assault occurred, we have analyzed and narrowed the timing in which it is possible Thornley and Garcia could have been in his office by examining relevant electronic evidence. These include: Merit Board video footage that shows both entering and exiting the Merit Board as well as certain areas within the offices, Thornley's work emails, Garcia's work emails, Thornley's desk phone calls, Garcia's desk phone calls, Garcia's personal cell phone calls, Thornley's personal cell phone call information obtained from witnesses, and

*Attorney-Client Privileged*
*Attorney Work Product*

times at which there was human activity on Thornley's computer. Our analysis has shown that for the majority of the windows of time alleged by Thornley, the evidence does not support there having been an opportunity for them to be alone together in Garcia's office as alleged. The evidence further shows that, while there are limited points during January 23, 2020 within the timeframes alleged by Thornley when it is in fact possible that she and Garcia could have been alone in his office together, there is some contradictory or inconsistent evidence with each of these time periods.

*Second*, there is evidence from the investigation that is inconsistent with the assault having occurred factually in the way detailed by Thornley in two ways: (1) there is evidence that is inconsistent with what Thornley alleged she was doing in Garcia's office at the time of the alleged assault; (2) there is evidence that is inconsistent with the actions she stated she took after the alleged assault.

The evidence does not support the veracity of Thornley's description of the reason for her being in Garcia's office at the time of the alleged assault. Thornley stated that Garcia sexually assaulted her when she was at his conference table spreading out papers for him to sign and on two occasions when she relayed the allegations specified that the documents were "attendance paperwork" or "time sheets." We have reviewed and analyzed all Merit Board time and attendance records we have been able to locate and determined: (1) there are no time and attendance documents that were signed by Garcia on January 23, 2020; (2) there are no time and attendance documents that were in the Merit Board's possession that could have existed on January 23, 2020 that were signed by Garcia at a later date, were signed by someone else in Garcia's stead on either January 23, 2020 or at a later date, or remained unsigned and could have conceivably been documents presented to Garcia for signature on that date.

Additionally, although they cannot be fairly characterized as "time sheets" or "attendance paperwork" as Thornley has stated, and would thus not match Thornley's description of the documents she brought to Garcia in his office in any event, we have also investigated other categories of documents that are handled by Thornley and signed by Garcia, namely vouchers and payroll documents. This analysis similarly showed that based on what we have seen to date there are no documents in either of those categories that Thornley could have presented to Garcia on January 23, 2020 for his signature.

The evidence is also inconsistent with the actions Thornley has stated she took after the alleged assault. Thornley has described at various points going to her office following the assault, shutting the door, calling her husband, therapist, and friend, being upset and unable to work the rest of the afternoon, and not returning to work since the alleged assault. A review of video evidence, however, shows her moving about the office during the day and reflects that she left for a period of time with Dykstra (during which he has told us they ran errands). Her computer activity reflects visiting various websites throughout the day. Phone record evidence received from witnesses shows that she had communications with a professional friend at the Illinois State Police ("ISP") during the relevant time period, which that individual recalls as being a work call. When she did leave early for the day, the evidence demonstrates that it was to attend her job interview with the director of Illinois Emergency Management Agency ("IEMA"). Contrary to her statements, she returned to work the following day.

*Attorney-Client Privileged*
*Attorney Work Product*

*Third*, evidence from the investigation reflects a potential motive for Thornley to make a false accusation against Garcia. The evidence supports a finding that Thornley knew that Garcia was investigating her overtime. It further demonstrates that during the same time period when Garcia was investigating her overtime and Thornley became aware, Thornley was attempting to leave the Merit Board as quickly as possible and was working on potentially obtaining a job at IEMA as their CFO or (at least initially) a position at ISP. She was preliminarily selected as the candidate for the IEMA CFO role pending vetting by the Illinois Office of the Governor ("Governor's Office") and wanted that process to go as quickly as possible so she could start immediately at IEMA.

The evidence shows that she was becoming increasingly concerned that the Governor's Office was not going to approve her for the position, and when the Governor's Office did not agree to her selection, and thus she did not have a new job that would have allowed her to leave the Merit Board, she was extremely upset. During this same time period, she raised sexual harassment by Garcia and ultimately alleged that Garcia sexually assaulted her just over one week earlier. The evidence also reflects that she previously had begun raising specific allegations of other types of alleged misconduct by Garcia once she was aware she was being investigated for her overtime. However these allegations did not include sexual harassment or assault despite the fact that the assault had allegedly occurred by that point.[1]

Additionally, Thornley also took other proactive steps to place Garcia in a negative light including suggesting he would retaliate against her in response to her allegations and, in several different ways, disseminating negative information and making threats about Garcia. We observe that these actions are consistent with a pattern of one who is trying to discredit another individual.

*Fourth,* the investigation found evidence that raises issues about Thornley's credibility. Certain of our concerns pertain to the circumstances surrounding our attempt to interview Thornley in this investigation. Thornley did not make herself available to be interviewed by us. Through her attorney, we were informed that she tested positive for COVID. Although the fact an alleged victim does not sit for an interview is not evidence one way or the other of whether the assault occurred, we have evidence that she falsely claimed having COVID in order to avoid being interviewed, which undermines her credibility. The text messages we obtained from witnesses reflect that Thornley was trying to obtain a medical note with certain ambiguous language that could be read in such a way as to leave open the possibility that she did in fact have COVID. In the text messages, however, she stated unequivocally that she did not have COVID and also made clear that she was not otherwise ill, but rather was "fine".

There is other evidence from the investigation that has raised concerns regarding Thornley's credibility. There is evidence that Thornley has made statements to other individuals that based on other evidence from the investigation appear to be false in nature. There is also evidence that she has used Waud's electronic signature in an unauthorized manner. We also

---

[1] We have not as part of our work investigated the numerous other allegations Thornley made about Garcia. Those were beyond the scope of our mandate, and we make no findings on the credibility of those allegations.

*Attorney-Client Privileged*
*Attorney Work Product*

have evidence of various inconsistencies and misrepresentations on multiple versions of Thornley's resume or job applications.

*Fifth*, the investigation found a lack of evidence of prior conduct by Garcia consistent with the sexual assault and sexual harassment conduct alleged by Thornley. We have interviewed a number of individuals who have been in a position to observe Garcia's conduct. These include: the other current staff members at the Merit Board, the members of the Merit Board, several individuals at the Illinois State Police, and a friend of Garcia's. None have described witnessing him engaging in the type of behavior consistent with Thornley's allegations. To the extent any of the witnesses interviewed did make negative remarks about Garcia, we found that the negative remarks pertained by and large to other aspects of his personality and were not directly inconsistent with the descriptions of his conduct relevant to our findings on this point. Additionally, our review of electronic evidence available to us reflects an absence of any sexually inappropriate comments or language used by Garcia and instead evidences a professional and essentially congenial relationship between Thornley and Garcia.

### III.    Interview of Garcia

We interviewed Garcia twice during the investigation. Garcia denied having sexually assaulted or sexually harassed Thornley. We note that our investigative findings are based on the evidence that has been discussed and are independent of statements made by Garcia in his interviews. Information from Garcia's interviews is relevant to our assessment in that it did not alter or undercut our analysis of the evidence from the investigation or our evidence-based findings and conclusions. Although we note that there were a few points in Garcia's interview in which his statements conflicted with other evidence, overall we did not find the information Garcia relayed was inconsistent with the evidence we obtained from other sources in the investigation in any meaningful manner. We have made an evidence based assessment of the credibility of Garcia's denials of having sexually assaulted or sexually harassed Thornley. Based on the evidence we obtained during our investigation, we find the denials to be credible.

## PART II – OVERVIEW OF INVESTIGATION

---

We were retained by the Merit Board to conduct an independent internal investigation into two allegations: (1) allegations that Thornley stole payments for overtime to which she was not entitled; and (2) allegations that Garcia sexually assaulted Thornley.

By way of background, the Merit Board is responsible for hiring, promotion, and discipline of sworn ISP officers. The Merit Board offices are located in Springfield. During the relevant time period, the following individuals worked on the Merit Board staff: Garcia, who is the Executive Director; Dykstra, who is oversees the legal functions and is the General Counsel; Thornley, who oversees the fiscal functions, Emily Fox, who oversees program administration, such as the promotional testing and the hiring process; Eric Garvue, who oversees information technology; and Blayne Riley, who is the receptionist. The Merit Board itself is comprised of five individuals: Chairman Reeve Waud, Andrew Berlin, Nancy Maldonado, Bishop Earl Warren, and James Riley.

*Attorney-Client Privileged*
*Attorney Work Product*

Our work consisted of the following in summary. A more detailed description can be found in Appendix A - Investigative Steps.

- We conducted 66 interviews that included interviews of 45 separate individuals. The interviewees were from the Merit Board staff, the Merit Board, the Governor's Office, various government agencies including Illinois Office of Management and Budget ("GOMB"), Illinois Emergency Management Agency, Illinois Comptroller's Office, Illinois Department of Natural Resources ("DNR"), and ISP. We also interviewed non-state employee individuals. We had some interview attempts that were unsuccessful, including that of Thornley.

- We reviewed documents discussed in interviews that interviewees self-collected and sent to us including: (1) notes taken contemporaneously at the time of events, (2) text messages between the interviewee and Thornley, (3) voice mails left for the interviewee by Thornley, (4) call details between the interviewee and Thornley and the interviewee and Garcia, and (5) email correspondence between the interviewee and Thornley and the interviewee and Garcia.

- We reviewed documents provided by the Merit Board that we specifically requested including, among other requests: (1) Garcia's Merit Board emails; (2) Thornley's Merit Board emails; (3) Thornley's personnel file (Garcia's personnel file was missing and based on evidence in the investigation believed to be in Thornley's possession); (4) state desk phone records for Garcia and Thornley; (5) Merit Board state cell phone records for Garcia (Thornley state cell had been factory reset and there was no information on it); (5) Garcia's and Thornley's electronic calendars and Garcia's paper calendar for December 2019 and January 2020; (6) the Merit Board investigative file on theft of time; (7) the Merit Board payroll records; (8) the Merit Board video recordings; and (9) the Merit Board staff timekeeping records.

- We reviewed video footage from the Merit Board security system.

- We reviewed documents provided by Garcia through counsel: (1) phone records compiled by counsel for communications with select individuals his personal cell phone November to present; (2) text messages from his personal cell phone with Thornley and with Fox; and (3) a 2017 letter from OEIG.[2]

- We reviewed a forensic image of Garcia's Merit Board state cell phone.

- We reviewed a forensic image of Thornley's desktop and laptop computer.[3]

---

[2] Counsel for Garcia provided additional materials which we did not consider in our analysis.

[3] We note that the review of the forensic image of Thornley's computer was completed by forensic analysts. We did not independently reach any conclusion of the nature of Thornley's computer activity as seen on the forensic image. Instead, we relied on the conclusions and findings of the forensic analyst and used their conclusions and findings regarding Thornley's computer activity in our own analysis of the allegations.

*Attorney-Client Privileged*
*Attorney Work Product*

- We reviewed the documents contained in the Fiscal folder contained on the Merit Board system.

We have analyzed all relevant information obtained from the investigation. Based on that analysis, we have arrived at evidence-based conclusions on each of the allegations we were retained to investigate. We discuss our investigative findings below. *First,* we discuss our investigation into the allegation against Thornley for theft of overtime payments (Part III). *Second*, we discuss our investigation into Thornley's sexual assault allegation against Garcia (Part IV). *Third,* we discuss our interview with Garcia (Part V).[4]

## PART III – INVESTIGATION INTO ALLEGATION OF THEFT OF OVERTIME

The evidence from our investigation into the allegation against Thornley for theft of overtime supports a finding that Thornley (1) did not receive authorization to work overtime; (2) inaccurately represented the amount of overtime hours she worked on her timekeeping records; (3) inaccurately represented the amount of hours worked on days in which she did not claim that she worked overtime; and (4) even assuming she did accurately track the hours she worked overtime, caused payments to herself for overtime she did not work.

The first sections of this part provide context and background for our analysis into Thornley's theft of time. The first section discusses the Merit Board's investigation into Thornley's theft of time prior to our retention as counsel. We then discuss the Merit Board's policies related to timekeeping and attendance to provide an understanding of the requirements for working overtime and the possibility of working from home. In this section we also discuss Thornley's knowledge of these policies. As we discuss, the evidence shows that Thornley was aware of the process to work overtime. We further discuss the Merit Board's timekeeping practices and payroll process to explain how it would be possible for Thornley to caused overpayments to be made to herself. Following this section, we turn to a discussion of inconsistencies in Thornley's timekeeping documents and a discussion of the amount of overtime Thornley claimed in calendar year 2019. This section provides a basis for our later analysis of the maximum amount of overtime that Thornley could have been paid in overtime. Following this section, we discuss the overtime payments Thornley received, which also provides a basis for our later analysis of the maximum amount of compensation that Thornley should have received for any overtime worked, assuming she accurately reported her time.

Following these sections, we discuss our analysis of Thornley's claimed overtime worked. We discuss the fact that there is a lack of evidentiary support that Thornley received authorization to work the overtime hours for which she was paid. We also discuss that our review of video evidence, Thornley's email usage, Thornley's computer usage, and her own statements support a finding that Thornley inaccurately represented the amount of overtime hours she worked on her timekeeping records and inaccurately represented the amount of hours

---

[4] We note that any quoted material appears as it is reflected in the document or communication without signaling any misspellings or grammatical errors.

*Attorney-Client Privileged*
*Attorney Work Product*

worked on days in which she did not claim that she worked overtime. The fact that she inaccurately recorded these hours would have resulted in her receiving compensation for time she did not work. We further discuss our finding that Garcia's signature on Thornley's Comp Time Earned for May 2019 and Overtime Request Form September 2019 appeared to match Garcia's signature on Dykstra's overtime forms for June 2019 and October 2019.

We then turn to our discussion on the amount of overtime payments Thornley received in calendar year 2019. We discuss our analysis of her payroll records and timekeeping documents, which lead to our finding that even assuming Thornley accurately tracked the hours she worked overtime, Thornley caused payments to herself for overtime she did not work.

## I.  Merit Board Investigation Into Theft of Time and Related Events[5]

Prior to our retention as outside counsel to conduct an independent investigation, the Merit Board conducted its own investigation into Thornley's theft of time and reported its findings to Melissa Brandenburg at the Office of the Inspector General ("OEIG") on January 22, 2020.[6] Before discussing the factual findings of our investigation, we briefly discuss the Merit Board's investigation.

The Merit Board's investigation into Thornley's overtime began in late November 2019 when Fox informed Garcia that Thornley approached her and reminded her that she needed to submit her overtime for the month of November 2019 before payroll closed in early December to ensure that Fox received the overtime payment on December 13, 2019. Thornley commented that she had overtime to submit to payroll as well and was happy to have some extra money prior to her vacation. Fox questioned this comment as Fox did not recall Thornley working any approved overtime. Fox informed Garcia of Thornley's comment.

Garcia subsequently instructed Fox to review the Illinois Comptroller's website to determine how much Thornley had been paid.[7] The website indicated Thornley's yearly salary was $76,800, but showed a year to date earning of $87,500, which meant that Thornley had earned approximately $10,000 in other compensation (presumably overtime). Fox reported this information to Garcia. Garcia did not recall authorizing overtime for Thornley and was concerned that she had received approximately $10,000 more than her yearly salary.

On December 13, 2019, Thornley informed Garcia she was going to work overtime on a list of projects for a combined estimate of about twenty hours. Garcia thanked her for the prior notice and reminded Thornley about the requirements to text him about her arrival and

---

[5] Our summary of the Merit Board's investigation into actions taken prior to our retention as counsel comes from multiple sources including: our interviews with Merit Board staff, our review notes and memorandums written by Merit Board staff taken contemporaneously with investigative events, our review of email correspondence among Merit Board staff and third parties, and our review of the Merit Board's investigative file.

[6] Garcia also scheduled a meeting to report Thornley's conduct to the Springfield police for February 3, 2020, but that meeting was canceled due to Thornley's sexual assault allegation.

[7] This is a public website which shows state employees' annual salaries in addition to gross pay to date for each employee.

*Attorney-Client Privileged*
*Attorney Work Product*

departures when he was not in the office on the days she was working overtime. He also mentioned that they could retrieve any arrivals and departures with the camera system they had in place. Thornley forwarded this email as well as her response to her own personal email address.

On December 16, 2019, at 11:07 a.m., as part of the discussion regarding COLA increases, Garcia sent an email to Thornley copying Dykstra asking for a summary of: (1) the current base pay of each employee; (2) any overtime earned for all employees during calendar year 2019, broken out by employee and month; and (3) the base pay prior to raise in July 2019.

In response, at 1:09 p.m. that day, Thornley emailed Garcia a summary chart showing the overtime broken out for each employee. The summary showed Thornley had earned 13.5 hours of overtime in May and 32.5 overtime hours in September 2019, for a total of 46 hours. The summary did not have any additional overtime listed for Thornley.

On December 17, 2019 at 5:35 p.m., Garcia asked for the overtime sheets Thornley completed for those hours worked in May and September 2019. Thornley was scheduled to leave on a planned vacation the following day. On December 18, 2019, she went into the office, but sent Garcia an email at 6:51 a.m. stating that she ran out of time to provide him the sheets and would provide them upon her return. Despite being unable to comply with Garcia's request, she sent an email to her personal email address and to Dykstra forwarding Garcia's request for her overtime sheets and writing "funny."

While Thornley was out of the office, on December 27, 2019, Fox texted Thornley stating "hey do you know the name of the camera company we use at the MB". Fox sent Thornley two other texts, the first one reading "They are out of like Pekin or Peoria right [puzzled face emoji]". The second one reading "Was it Seico?"

On January 7, 2019, Garcia was conversing with Maldonado[8] when he gestured to a closed door and said something to the effect of "our fiscal person may be stealing overtime" and he may need to "move on an employee." Maldonado noted that Garcia appeared regretful.

Thornley returned from vacation on January 9, 2020.[9] Garcia verbally requested Thornley's overtime request forms again. Prior to 12:20 p.m., Thornley was in her office with her husband with the door closed. At approximately 12:20 pm., Thornley opened her office door and asked Dykstra to scan the monthly time sheets and overtime request forms that Garcia had requested and send them to her. Dykstra noted that the documents he was handed were copies rather than original documents. Further, one of Garcia's signatures was in blue ink while the other was in black ink. Dykstra scanned the documents on the copy machine and sent them to Thornley's email. Thornley forwarded these documents to Garcia at 1:25 p.m. that day.

At 1:16 p.m. that same day, Garcia requested the Merit Board personnel binder and all overtime sheets by the close of business that day. Thornley sought Dykstra's assistance in

---

[8] Maldonado recalled she was in the Springfield office on this date.

[9] Riley observed that there was tension in the office after Thornley had returned from vacation.

*Attorney-Client Privileged*
*Attorney Work Product*

preparing the binder and asked him to copy the timesheets for all of the employees. Thornley provided Dykstra four folders, each containing timesheets for each Merit Board employee. Dykstra noticed that all of the folders had the timesheets arranged in reverse chronological order, from December 2019 back to January 2019. However, Dykstra's folder had two original overtime request approval forms at the front of the folder. Dykstra recognized these overtime request forms as containing the same signatures and dates as the overtime request forms Dykstra had scanned for Thornley earlier in the day.

At 2:44 p.m., in reference to the timesheets and binder, Thornley texted Garcia's work cell stating "We do need some signatures on some sheets. I will mark those in the binder. Just so we have one that Emily and I can share as a 'master' and then one for you we can make copies for." In the late afternoon, Thornley provided Fox the copy of the binder. Upon reviewing Thornley's overtime request forms, Fox noticed that Garcia's signature and date on Thornley's overtime request forms for May and September 2019 matched the overtime request forms for Dykstra for June 2019 and October 2019. Upon notifying Garcia, Garcia instructed Fox to review the security camera video footage for the dates and times for which Thornley claimed overtime.

On January 10, 2019, Thornley requested Dykstra's assistance in updating the Attendance Report Summary, which contains leave accruals for all Merit Board employees. At 2:02 p.m. that day, Thornley forwarded Dykstra the excel report entitled "FY'19 employee Time" which contained the leave accruals. Dykstra noticed that Thornley had completed her Attendance Report Summary through June 2019 (which was the end of the fiscal year). Thornley had not updated the other employees' Attendance Report Summaries past April 2019. Dykstra completed the Attendance Report Summary for all employees using the timesheets that he copied the prior day and forwarded Thornley the revised copies on January 13, 2019. The revised Attendance Report Summary that Dykstra completed for Fiscal Year 2019 was entitled "Copy of FY'19 employee Time." The new Attendance Report Summary that Dykstra completed for Fiscal Year 2020 was entitled "Copy of FY20 employee Time." That same day, at 4:12 p.m. Garcia called Brandenburg of the OEIG regarding the Merit Board's investigation.

The Merit Board continued its investigation into Thornley for possible theft of overtime. On January 14, 2019, Garvue spoke with Garcia about setting up Fox's computer so that she could review video footage from the security camera.

Garcia met with Brandenburg on January 22, 2019[10] at 11:00 a.m. at the OEIG's Springfield office to file a formal complaint. Garcia brought supporting documents that Fox had prepared regarding the Merit Board's investigation to the meeting with him. Garcia requested that the OEIG conduct the formal investigation. When asked if he wanted to keep the fact he was making the complaint confidential, he declined. Garcia remained in communication with Brandenburg throughout the Merit Board's internal investigation.

---

[10] A memorandum that Garcia drafted states that he went to the OEIG on January 11, 2020, but there is no evidence supporting a meeting on January 11, 2020. Rather, the evidence suggests the meeting occurred on January 22, 2020.

*Attorney-Client Privileged*
*Attorney Work Product*

On January 23, 2019 at 3:30 p.m. Garcia sent an email to Thornley, Fox, Garvue and Dykstra stating "Effective immediately, the Executive Director will personally sign the monthly time sheets for all employees. I would like to have the time sheets before the 5th of the following month. If I am out of the office, you can give them to Emily to scan and send to me. Any questions, please discuss with me." Garcia further wrote "Dan, I would like to review current time sheet/attendance policy. If we don't have an appropriate one, we need to draft one for the Chairman's approval. Thanks". At 8:08 a.m. on January 24, 2020, Thornley replied to Garcia and Dykstra stating "Great! I'm not aware of any official policy but I will look through what I have and send anything to you all that I might have. Thanks". We know from the forensic image of Thornley's computer that Thornley subsequently reviewed a Merit Board policy.

On January 24, 2020, Fox reported to Garcia that Jared Thornley was at the Merit Board and assisted to move things out of Thornley's office and into her personal vehicle. With Waud's approval and at Garcia's direction, Garvue copied Thornley's computer that evening. Fox and Dykstra were in the office while Garvue copied Thornley's computer. At 4:54 p.m. on January 24, 2020, Thornley sent Dykstra three text messages to his personal phone stating:

- "you all at the office still trying to figure your lives out"
- "You better not say a word."[11]
- "And mr Ethics officer. The Board with all our mandated postings need to be put back out ASAP".

Dykstra was still at the office when he received these texts. On January 26, 2020, Thornley sent additional messages to Dykstra's personal phone stating:

- "I think it's funny how shady you all are."
- "I won't forget it."

On the morning of January 29, 2020, Garcia contacted Wendi DeMarco at Central Management Services to determine whether Thornley's employee class. Sarah Kerley at CMS sent an email on January 30, 2020 at 8:48 a.m. regarding Thornley's classification. Garcia and Kerley spoke over the phone later that day. On January 30, 2020, Garcia also spoke with Brandenburg regarding a threat Thornley had made to Jim Wolfe (Garcia's personal friend and Thornley's acquaintance) against Garcia. In light of the investigation, Garcia further requested that Fox set up a special board meeting as soon as possible to discuss the personnel issue.

On January 31, 2020, Garcia informed Waud that they were going to place Thornley on administrative leave effective February 3, 2020.[12] Garcia also advised the Governor's Office and CMS of his plan to place Thornley on administrative leave. In addition to placing Thornley on

---

[11] Dykstra interpreted this text to be in reference to Thornley's alleged new job at IEMA which she had told him about the prior day.

[12] Garcia had been sending Waud updates throughout the Merit Board's investigation.

*Attorney-Client Privileged*
*Attorney Work Product*

administrative leave, he planned on meeting with the Springfield Police Department on February 3, 2020 to discuss Thornley's theft of overtime.[13]

## II.     Merit Board Policies and Practices Related to Timekeeping

We now turn to a discussion of the Merit Board's policies and practices related to time and attendance. We discuss the fact that the Merit Board does not have official policies that are made known to its staff and discuss practices and expectations at the Merit Board. In this section we also discuss the evidence regarding Thornley's awareness of these expectations. As will be discussed, evidence suggests that Thornley was aware of these expectations. The last portion of this section discusses the timekeeping practices and payroll process, which provides context for how Thornley would have been able to cause payments to herself for overtime for which she did not work.

### A.     Timekeeping Policies

The Merit Board does not have a formal written attendance, timekeeping, overtime, or compensatory time policy that is provided to all employees.[14] In reviewing Thornley's emails and forensic image of her computer, we were able to locate two Merit Board policies related to overtime; however, evidence suggests that other Merit Board staff were unaware of these policies. The first policy was effective June 2014 and is consistent with the Merit Board's practices. Specifically, it provides that "Overtime & compensatory time will be limited to the actual need within the State Police Merit Board when all other means of accomplishing the work/tasks have been exhausted. All overtime/compensatory time must be approved by the Executive Director. Determination of the rate of pay for overtime and compensatory time are paid in accordance with the Fair Labor Standards Act. Employee's overtime is paid at time and a half. Compensatory time is also earned at time and a half. Compensatory time shall be scheduled at the convenience of the Merit Board after consideration of the employee's request."

The second policy does not have an effective date; however, it appears that it was connected to an audit, and consequently effective during that time, as it is contained within the "Audit FY17" and "2018 Audit" on Thornley's computer. This policy states that time off or overtime must be approved by the Executive Director or Director of Personnel (which was a role held by Thornley). However, this policy goes against current practices and against an email Garcia sent on April 28, 2017, when he became Director.

---

[13] Garcia was placed on administrative leave prior to this date. Consequently, the meeting did not occur.

[14] We were informed by Dykstra that Merit Board employees are covered by the Pay Plan. Our review of the Personnel Code suggests that all employees should not be receiving compensatory time or overtime at a rate of one and a half times their rate. Following Thornley's placement on administrative leave, Nina Pickrel (Payroll Manager at Central Management Services) has been running the Merit Board's payroll. During our interview with Pickrel she informed us that she was not paying all employees at one and a half times their rate because of what was contained in the Personnel Code, Pay Plan, and an internal document regarding overtime payments. Since it was not clear to us that all of the Merit Board employees are properly paid overtime, for the purposes of our investigation we assumed that all employees were permitted to earn compensatory time and overtime at a rate of one and a half times straight time.

*Attorney-Client Privileged*
*Attorney Work Product*

In the email Garcia sent on April 28, 2017, he stated: "I have had several inquiries regarding time off and overtime requests. First, thank you for the questions. I would like everyone to use the MB time off requests forms prior to the requested date. I realize there will be late last minute requests for family emergencies, etc., but if you know now you will be requesting specific time off (holidays etc.,) please get that in asap. I would also like to have the same format for overtime/comp time prior to earning the time when possible. Again, I know there will be last minute requests. I appreciate all your hard work and understanding as we get to know each other. Thank you." In practice, employees complied with this directive and made requests for time off or to work overtime via email, text, or phone call prior to taking or working the overtime.

As mentioned, pursuant to Merit Board policy and practice, compensatory time accrues at time and a half. However, the Merit Board according to the Illinois Personnel Rules, compensatory time shall be used during or liquidated at the end of the fiscal year in which it was earned. Further, employees are not permitted to carry over unused compensatory time for each fiscal year. Instead, if the employee has unused compensatory time, it is supposed to be liquidated at the end of the fiscal year.

Although there is no Merit Board policy, the Merit Board appears to follow this in practice. A review of the documents show that it was not common practice for employees to request a payout of compensatory time mid-year. A review of text messages suggests Thornley was aware of this policy. On June 8, 2017, Thornley sent Garcia a text message to his work cell phone stating "I'm going to take the day off tomorrow…I have comp time I need to burn before the end of this month [smiley face emoji]." This text implies that an employee is required to use compensatory time in the year it is earned or it is cashed out at the end of the fiscal year.

We also located a telework policy in a review of Thornley's personnel file that was effective fiscal year 2016. The policy permits employees to work from home on a full or part-time basis, but permits the Board to refuse to make teleworking available to an employee and to terminate a teleworking arrangement at any time. Thornley suggested that employees were covered by the telework policy in a text message she sent to Garcia on January 28, 2019 at 5:45 p.m. She informed Garcia "Just a reminder that you dan emily and myself  are covered by a telecommuting policy. Might come in handy this week with the cold. I know they are talking about. Losing down Wednesday and possibly Thursday". Despite this policy, the general practice was for employees to perform work in the office unless receiving prior authorization from Garcia.

Documentation also suggests employee are also covered by a flexible time policy. Specifically, Thornley submitted the 2019 Annual Flex-Time Report to Karen Weathers (Labor Relations Administrator at CMS Labor Relations) on January 29, 2020. The report stated that four employees are under Jurisdiction C of the Personnel Code and four employees are flex time positions (full time but working other than agency-scheduled work hours). Further, on May 7, 2019, Thornley emailed J. Garcia, copying Dykstra and Fox stating "I am requesting flex time for the month of May. I would like to work through my lunch and breaks and leaving at 3. My kiddos do not have aftercare this month due to staffing levels. This Friday I will be the only one in the office, I have no problem working my normal schedule this day or any other day needed."

*Attorney-Client Privileged*
*Attorney Work Product*

Garcia responded that day with "Approved."[15] Again, although employees were covered by a flexible time policy, employees typically worked 8:00 a.m. to 4:30 p.m. unless seeking prior approval from Garcia to work different hours. A review of the email communication and text messages did not reveal any additional request in 2019 for Thornley to work flex time or to telework.

### B.  Jenny Thornley's Knowledge of Merit Board Policies

The evidence suggests that Thornley was aware of the policy for requesting time off or working overtime. A review of Thornley's emails and texts show that she had frequently communicated her arrivals and departures to Garcia. Further, there was one occasion in 2018 where she sought approval for overtime prior to working it and another time she informed Garcia the following day that she had worked overtime. In December 2019, Thornley also requested prior approval from Garcia to work overtime. Thornley's communications are described in greater detail below.

### 1.  Thornley's Knowledge of Procedure for Time Off Requests

Thornley's text communications and emails suggest that she was aware of the policy for time off. Specifically, on multiple occasions Thornley emailed Merit Board employees or texted Garcia letting them know she was going to be out of the office.  The chart contained in Appendix B - Communications Regarding Time Out of Office, shows the text messages and emails Thornley sent regarding her time out of the office. As can be seen in the chart, Thornley commonly corresponded with Garcia regarding her whereabouts during the workday. She further communicated when she would take time off. For example, on October 30, 2018, she texted Garcia "I had my kids Halloween party at lunch today. Took over an hour. I will add that time to my time off sheet. Thank you." Thornley's communications suggest that she was aware that she was supposed to inform Garcia of the times when she was away from the office or taking time off.

### 2.  Thornley's Knowledge of Procedure for Working Overtime

A review of the email correspondence suggests that Thornley also knew the procedure for working overtime. The following are some examples:

---

[15] Despite this flex time request, Thornley reported on her May 2019 Attendance Summary that she left the office every day at 4:30 p.m. with the exception of Friday, May 17, 2019, when she reported that she left at 5:30 p.m., Sunday, May 19, 2019, when she reported she left at 2:30 p.m., and Friday, May 24, 2019, when she reported she left at 12:30 p.m. Further, the only weekdays that Thornley reported on her May 2019 Attendance Report that she arrived early (7:00 a.m.) and was not out of the office for 1.00 hours was Friday, May 17, 2019 and Thursday, May 23, 2019. In reviewing these timekeeping records, it does not appear that Thornley actually utilized the flex-time option.

*Attorney-Client Privileged*
*Attorney Work Product*

On September 13, 2017, Thornley texted Garcia's work cell phone saying "Hey boss…are you coming in on Sunday at all? I wanted to come in and get the travel vouchers taken care of."[16]

On April 23, 2018, at 8:53 a.m., Thornley emailed Garcia and Dykstra stating:

> "Good Morning Director-
> I just wanted to let you all know the audit is in full swing at this point. I am working on requests and will have those uploaded to the firms secure portal once I have them completed. It is a lot of detailed information.
>
> I will be working 10-15 hours of overtime this week depending on what additional requests I get from them.
>
> Please let me know if you have any questions."

More recently, on December 13, 2019, Thornley emailed Garcia at 2:50 p.m. stating[17]:

> "Good Afternoon Director Garcia -
> In the next 6 days, I am going to be working a little overtime. I just wanted to give you a list of things I will be working on. Combined estimate 20 hours?
>
> Our GOMB 2021 fiscal budget information is due today. I have a meeting with them monday and then I will have to enter all of our projections into the three systems they use for fiscal/fund/programs
> CMS- I have to start and send over paperwork for salary adjustment and new title position, I have to wait on some additional information from them to move forward
> End of year EEO, Fiscal, procurement, and inventory
> 166 fund entries compiled for the cadet calss
>
> I will keep Dan and Emily informed as well. I just wanted to get this to you for approval. Thank you"

Garcia responded on December 14, 2019 at 9:04 a.m. stating:

> "Thank you for the prior notice. As with Emily, I require her to let me know what time she arrives on any off days and when she is leaving via text. If it is a regular work day and I am not there, I require her to text me when she leaves so I can

---

[16] Later that morning at 11:34 a.m., Thornley texted Garcia's work phone: "Actually, I'm going to try and bust my ass to get them done before. Dan is going to help me with some paperwork." It therefore appears that she did not actually work on that Sunday, but was aware of the process.

[17] We note that this time around the time the Merit Board began investigating Thornley's reporting of overtime earned.

*Attorney-Client Privileged*
*Attorney Work Product*

note the time. Now that our camera system has a DVR, we can always retrieve that information should we be questioned. Thank you."

As can be seen in Appendix B - Communications Regarding Time Out of Office, following this email Thornley informed Garcia of the times at which she arrived at and left the office.

We also note that there was evidence that Thornley informed Garcia of the overtime she worked after the work had already been performed. For example, on March 1, 2018, Thornley emailed Garcia at 11:32 a.m. stating:

> "Good Morning-
>
> With the time that I worked over yesterday (2.5 hours) I would like to use that next Tuesday morning if possible. My Grandma is having Surgery at 7:45 that morning and she has asked me to take her.
>
> Time earned 2/29/18
> 3.75 hours
>
> Thank you-"[18]

### C. Timekeeping Practices and Payroll Procedure

The Merit Board does not have an electronic timekeeping system. Instead, employees must manually keep track of their own time for each day. Employees are expected to record their time on a document entitled "Illinois State Police Merit Board Attendance Report for [Employee Name] for the Period of [Month Period]." For each day of the month, employees record the "Time In", "Time Out," time spent "Out of Office," "Hours Worked," amount of "Time Used," amount of "Time Earned" and whether the time used was vacation time, sick time, personal time, or compensatory time. Employees fill out this information in an excel sheet. The excel sheet contains a formula which calculates the total number of hours worked along with the total amount of vacation, sick, person, or compensatory time used as well as the amount of overtime or compensatory time earned.

Employees are provided with set vacation time, sick time, and personal time. Compensatory time is not a set amount of time that is provided to employees. Rather, if an employee works overtime, they can either receive that overtime in the form of compensation for that month or "bank" that time to be used as another form of paid leave time at a later date. The "banked" time is called "compensatory time." As mentioned, compensatory time for all employees is calculated at 1.5 times the number of hours of overtime worked. For example, if an employee works 10 hours of overtime, they receive 15 hours of compensatory time.

---

[18] We did not locate evidence that Thornley requested to work overtime prior to the day on which the work was performed. However, this email is illustrative of the fact that Thornley sought approval prior to using any overtime worked as compensatory time for another day.

*Attorney-Client Privileged*
*Attorney Work Product*

On separate forms provided by the Merit Board, each employee is supposed to keep track of vacation time used, sick time used, personal time used, compensatory time used, overtime earned, and compensatory time earned for each month and submit them at the end of the month. Review of the timekeeping records show that in practice, Dykstra, Garvue, and Fox filled out an "Overtime Request Form" for overtime worked. Thornley completed a "Comp Time Earned" form for May 2019, a "Comp Time Earned" form for June 2019, an "Employee Overtime" form for September 2019, and an "Employee Overtime Earned" form for December 2019. Dykstra typically indicated that he would take the time as compensatory time by writing "Take as Time" on the form and represented to us that it was the expected practice to indicate such an intent for any time not to be paid as overtime.

At the end of the month employees submitted their Attendance Reports for the month along with their time used (vacation, sick, personal, and compensatory) and overtime earned sheets to Thornley to secure Garcia's signature on the forms. More recently, employees began obtaining Garcia's signature directly rather than providing the documents to Thornley to obtain Garcia's signature as they noticed forms were going unsigned. Subsequent to obtaining Garcia's signature, they would provide the forms to Thornley so that she could run the payroll.

Thornley used these documents to run payroll each month. The Merit Board uses the Central Payroll System to process payroll. All the employees and salaries are already contained within the system so Thornley would not need to manually enter the employee or pay rate in order for an employee to be paid. If an employee earned overtime, Thornley was supposed to enter the number of overtime hours worked and the rate at which the employee was to be paid (1.0 or 1.5 or 2.0) on Screen 4 of the Central Payroll System. Although Pickrel explained that common practice is to pay the number of overtime hours at a rate of 1.5, a review of the Overtime/Other Income statements reflects that employees were either paid overtime at 1.5 times their rate at 1.0 times the number of overtime hours worked during the pay period or 1.0 times their rate at 1.5 times the number of overtime hours. Screen 4 uses the information stored for each employee to calculate each employee's overtime rate of pay.

After information is entered into the Central Payroll System, a processer at CMS reviews the information and creates an electronic file to send to the Comptroller's Office. The Merit Board is provided a paper copy of the voucher, which contains a summary of information, including the amount of overtime paid to each employee. This voucher requires an original signature by Garcia or Dykstra. By signing the voucher, Garcia or Dykstra "certif[ies] that the employees named, their respective indicated positions and service times, and appropriation to be charged on the accompanying payroll voucher and corresponding electronic record are true, complete and according to the provisions of law; that such employees are involved in decision making or have direct line responsibility to a person who has decision making authority concerning the objectives, related to the objectives, functions, goals and policies of the organizational unit for which the appropriation is made; that all working time was expended in the service of the State, and that the employees named are entitled to payment in the amounts indicated." In practice, Dykstra stated that he typically did not review the payroll documents in great detail and assumed that Thornley accurately reported the time. After signing the voucher, the Merit Board is responsible for dropping off the hard copy to the Comptroller's Office. An employee at the Comptroller's Office compares the electronic file with the payroll voucher and,

*Attorney-Client Privileged*
*Attorney Work Product*

assuming they are the same, sends a file back to CMS so that CMS can create earning statements for employees.

In addition to running payroll, one of Thornley's responsibilities was to track the amount of sick time, vacation time, personal time, and compensatory time each employee had accrued. The Merit Board does not have an electronic system for tracking this information so Thornley manually tracked it. Thornley maintained a spreadsheet of the amount of sick, vacation, personal, and compensatory time each employee had earned for each fiscal year in the Attendance Report Summary for each employee. It was Thornley's responsibility to keep this spreadsheet up-to-date to ensure the time off was appropriately deducted or the employee was appropriately receiving compensatory time. As discussed above, this was not the case.

### III.    Inconsistencies in Jenny Thornley Timekeeping Documents

The records regarding Thornley's claimed overtime are inconsistent. Below we discuss the inconsistencies in the documents related to her overtime as well as in other timekeeping documents. The fact that Thornley had multiple inconsistencies in these timekeeping documents makes it difficult to know when Thornley actually claimed she worked overtime. This section provides a basis for our later analysis of the maximum amount of overtime that Thornley should have been paid. As described in detail below, even assuming Thornley worked all the overtime hours she claimed in all of the various timekeeping documents (which we do not believe the evidence supports), Thornley caused overpayments to herself for overtime she did not work.

### A.    Inconsistencies in Jenny Thornley's Overtime Documents

As mentioned, on December 16, 2019, Thornley provided Garcia with a spreadsheet showing that she worked 13.5 hours of overtime in May 2019 and 32.5 hours of overtime in September 2019. A review of Thornley's monthly Attendance Reports and Compensatory and Overtime Request Forms show that she claimed she earned overtime not only in May 2019 and September 2019, but also in June 2019 and December 2019. In addition to the overtime in May, June, September, and December 2019, the Attendance Report Summary that Thornley had completed for herself claimed she worked overtime in April 2019. Thornley also claimed that she used compensatory time in August 2019. She did not claim she used compensatory time during any other month. Further, although there is no completed Overtime Request Form and no mention of overtime hours earned in the August 2019 Attendance Report, there are three days in August 2019 which state she worked 8.5 hours (which would equate to 3 hours of overtime total) and a notation of 3 hours of overtime appear towards the bottom of Thornley's August 2019 Attendance Report. Finally, Thornley's October 2019 Attendance Report states that on October 17, 2019, she worked 11.50 hours (which would equate to 4 hours of overtime), but that time is not recorded in the Time Earned column nor did she submit an Overtime Request Form for that day.

In addition to the inconsistencies contained in the monthly Attendance Reports, the Attendance Summary, and the time off and time earned requests, there were a number of inconsistencies that were found on documents contained on Thornley's computer. The inconsistencies we identified were mainly on an Excel spreadsheet entitled

*Attorney-Client Privileged*
*Attorney Work Product*

"Timekeeping2019Master" and different versions thereof.[19] The following are the notable discrepancies we identified:

- "Timekeeping2019Master" (accessed on June 28, 2019) - used 2 hours of personal time in March 2019; used 15 hours of compensatory time in April 2019.

- "Timekeeping2019Master (version 1)" (accessed on August 13, 2019 and August 16, 2019) - used 2.0 hours of personal time March 2019; no compensatory time used in April 2019.

- "Copy of Timekeeping2020Master (version 2)" (accessed on September 11, 2019) - 3.0 hours of compensatory time earned for August 2019. This earned overtime was not claimed on any documentation submitted by Thornley.

- "Copy of Timekeeping2020Master (version 3)" (accessed on September 23, 2019) – earned overtime in September 2019 on September 10th (3.00 hours), September 11th (2.25 hours), and September 23rd (1.00 hours).

- "Copy of Timekeeping Master (version 1)" (accessed on November 28, 2019) - 4.00 hours of compensatory time earned in October 2019. This earned overtime was not claimed on any documentation submitted by Thornley.[20]

- "Copy of Timekeeping2020Master (version 1)", (accessed on December 15, 2019) - earned 19 hours of compensatory time in December 2019.

- "Copy of Timekeeping2020Master" (accessed on January 9, 2020) – no mention of compensatory time was in August 2019; 30 hours of compensatory time used in December 2019.

- "Copy of Timekeeping2020Master (version 2)" (accessed on January 13, 2020) - stated Thornley used 7.5 hours of personal time in December 2019.

- "Copy of Timekeeping2020Master (version 3)" (access on January 23, 2020) - no mention that Thornley used any compensatory time in August 2019.

---

[19] The discrepancies are inconsistencies within these versions as well as inconsistencies with what is contained on the monthly attendance reports.

[20] As mentioned, a review of Thornley's Attendance Report for October 2019 shows that on October 17, 2019, Thornley claims to have worked 11.50 hours total, which would have earned her 4.00 hours of overtime. These four hours are not reflected as time earned on the October 2019 Attendance Report, nor did Thornley submit an Overtime Request Form for this time.

*Attorney-Client Privileged*
*Attorney Work Product*

We are unable to determine why Thornley accessed these documents on these dates and why there are inconsistencies within these documents.[21] However, these documents show that Thornley was not maintaining completely accurate records of her time. Various reports show that she earned or used time in different months. These documents also show that at times she recorded she worked overtime in both August and October. Since we are unable to determine the purpose for accessing these records and Thornley did not claim this time on any of her signed attendance reports or with an Overtime Request Form, we do not give this evidence much weight.

## B. Inconsistencies in Jenny Thornley's Other Timekeeping Documents

In addition to inconsistencies regarding overtime, Thornley had other inconsistencies in her timekeeping documents for calendar year 2019. Specifically, for February 2019, Thornley submitted a Vacation Time form stating she was going to use 1.5 hours of vacation time on February 1, 2019; however, the February 2019 Attendance Report does not reflect that she took any time off on February 1, 2019. The Attendance Report Summary states that Thornley only used 11.00 hours of vacation time. If she had included the 1.50 hours she requested for February 1, 2019, the time used should be reflected as 11.00 hours. Further, Thornley submitted a sick time request form for February 11, 2019, but recorded the time on her February 2019 Attendance Report as vacation time. The Attendance Report Summary does not reflect that Thornley used any sick time for February 2019, but this time was recorded as vacation time used. Similarly, in July 2019[22], Thornley reported on her Attendance Report Summary that she used 7.5 hours of vacation time on July 5, 2019. The Attendance Report Summary reflects that she used 7.5 hours of vacation time; however, Thornley's timekeeping records include an unsigned request for sick time rather than vacation time.

While we note these inconsistencies in the documents, we make no finding as to the significance of the inconsistencies. Rather, they are illustrative of the fact that Thornley's timekeeping records were not entirely accurate.

## IV. Claimed Overtime Earned and Used by Jenny Thornley in Calendar Year 2019[23]

Before discussing how the evidence (1) supports a finding that Thornley inaccurately represented the amount of overtime hours she worked on her timekeeping records and (2) supports a finding that, even assuming she did accurately track the hours she worked overtime, Thornley caused payments to herself for overtime she did not work, it is important to have an

---

[21] Forensic analysis of Thornley's computer also suggests that she deleted versions of these documents. We are unable to say why Thornley may have deleted these documents.

[22] On July 1, 2019, J. Thornley recorded 2.0 hours that she took off for sick time. Email correspondence shows that she emailed Fox, Garcia, and Garvue on this date stating "I am leaving in a few to take ██ [Thornley's son] to see the doctor. I will be taking some sick time until I get back. I just wanted to let you all know in case you need something." The time for this day was accurately recorded.

[23] For the purposes of being efficient with the scope of the investigation we limited our review to Calendar Year 2019. We make no findings regarding Thornley's claims of overtime in the prior years of her employment with the Merit Board or in Calendar Year 2020, but rather limit our findings to 2019.

*Attorney-Client Privileged*
*Attorney Work Product*

understanding of the time that she claims she worked overtime. The below section discusses the amount of overtime Thornley claimed to have earned and used throughout calendar year 2019.

### A.    Overtime Claimed For April 2019

As mentioned, Thornley did not claim that she worked any overtime in April 2019 on her Attendance Report. Instead, the Attendance Report only claimed that she used 30.00 hours of vacation time. Thornley submitted a signed request form for this vacation time.

Despite not recording any overtime on her Attendance Report or having a Comp Time Earned or Overtime Earned Form, Thornley recorded that she earned 15.00 hours of EET Time[24], which is equivalent to 10 hours of straight time, on her Attendance Report Summary. April 2019 was the first time during the 2019 calendar year that Thornley's timekeeping documents stated she had earned or used overtime. At this time Thornley's Attendance Report Summary had a balance of 25 hours of EET time. The 15 hours claimed was added to this 25 hour balance for a new balance of 40 hours of EET time.

### B.    Overtime Claimed for May 2019

Thornley recorded that she earned 13.50 total hours in time for May 2019 on her Attendance Form. She recorded that she worked overtime on the following days:

- Monday, May 6, 2019 – 2.00 hours
- Friday, May 17, 2019 – 3.00 hours
- Sunday, May 19, 2019 – 6.50 hours
- Thursday, May 23, 2019 – 2.00 hours

Thornley's Comp Time Earned form dated May 1, 2019 contained Garcia's signature. The signature date was June 18, 2019. As discussed in further detail below, this signature appears to match the signature from Dykstra's June 2019 Overtime Request Form.

Thornley's overtime request form claims that on May 6, 2019 she earned 2.0 hours for working on "Fiscal Reporting 166 Fund." She reported that on May 17, 2019 she spent 3.0 hours for working on "End of Year Reporting." Thornley reported that on May 19, 2019 she spent 6.50 hours for working on the "End of Year Fiscal Reporting" and that on May 23, 2019 she spent 2.0 hours for working on "Procurement FY19." The overtime hours reported on her Comp Time Earned form match the overtime hours reported on her Attendance Form.

---

[24] EET Time refers to Equivalent Earned Time. Under Section 310.490(e)(1) of the Illinois Administrative Code, "Employees who are non-union, exempt under the Federal Fair Labor Standards Act, and in positions not eligible for overtime compensation may receive equivalent earned time for hours worked in excess of the hours per week indicated in the approved work schedule (80 Ill. Adm. Code 303.300) assigned to the employee." EET is to accrue at straight time and is not to be paid out to an employee. Section 310.490(e)(2) & (3). Although the Attendance Report Summary stated EET, Thornley seemed to track compensatory time earned as the time included in the chart was tracked at time and a half.

*Attorney-Client Privileged*
*Attorney Work Product*

Thornley recorded that she earned 20.25 hours of EET Time on her Attendance Report Summary, which is 1.5 times the number of hours she reported on her Attendance Form for May 2019. The new EET Time balance was 60.25 hours.

### C.    Overtime Claimed for June 2019

Thornley recorded that she worked 8.00 total hours in overtime for June 2019 on her Attendance Form. She recorded that she worked overtime on the following days:

- Sunday, June 16, 2019[25] – 5.50 hours
- Wednesday, June 19, 2019 – 2.50 hours

Thornley also recorded that she used 7.50 hours of personal time on June 11, 2019 and 7.50 hours of personal time on June 12, 2019 on her Attendance Form. She further recorded she used 7.50 hours of vacation time on June 13, 2019 and June 14, 2019 on her Attendance Form.

Thornley's June 2019 Comp Time Earned form is dated May 26, 2019 and is unsigned. It states that on June 16, 2019, Thornley earned 5.50 hours for working on "End of fiscal year EEO Reporting." It also states that on June 19, 2019, Thornley earned 2.50 hours for working on "Comptroller Reporting Fc580."

Thornley's Vacation & Comp Time form is dated May 26, 2019, but is also unsigned. The June 2019 Vacation & Comp Time form states 7.50 hours were used on "06/11 comp," 7.50 hours were used on "06/12 Comp," 7.50 hours were used on "06/13 Vac," and 7.50 hours were used on "06/14 Vac."

Thornley recorded that she earned 12.00 hours of EET Time on her Attendance Report Summary, which is 1.5 times the number of hours she reported on her Attendance Form. The new EET Time balance written on the form was 72.25 hours. Thornley's Attendance Report Summary did not have any compensatory time used for June 2019; however, the Attendance Report Summary stated she used 15.00 hours of personal time. This is consistent with the Attendance Summary, but inconsistent with the Vacation & Comp Time form.

### D.    Overtime Used in August 2019

Thornley's August 2019 Attendance Report stated that she used 7.50 hours of compensatory time on August 14, 2019, August 15, 2019[26], and August 23, 2019. It also states

---

[25] Sunday, June 16, 2019 was Father's Day.

[26] On August 13, 2019, Thornley emailed Garcia, Fox, and Dykstra that she was going to be off on August 14, 2019 and August 15, 2019. She also stated "I was in the office at 7am today and didn't take a lunch, I will be leaving around 3:30." Although Thornley's August 2019 Attendance Report reflects that she took time off on August 14, 2019 and August 15, 2019, the August 2019 Attendance Report does not reflect that she was in the office early, left the office early, or did not take a lunch on August 13, 2019. Instead, it shows that she was in at 8:00 a.m., left at 4:30 p.m. and was out of the office for 1.00. The video shows that Thornley was in the office at 7:13 a.m. and left at 8:59 a.m. Thornley returned to the office at 9:48 a.m. and left at 3:25 p.m.

*Attorney-Client Privileged*
*Attorney Work Product*

she used 5.00 hours of compensatory time on August 22, 2019, totaling 27.50 hours of compensatory time for August 2019.

Thornley has two Comp Time Used forms for August 2019. The first form is dated August 13, 2019 and is unsigned. It states she used 7.5 hours of compensatory time on August 14, 2019 for "Volunteer Day" and 7.5 hours of compensatory time on August 15, 2019 for "S███████"[27] Move in day." The total time written on the form is 8.0 hours, which does not add up to the time taken on August 14, 2019 and August 15, 2019. The second Comp Time Used form is dated August 21, 2019 and is also unsigned. It states she used 5.0 hours of compensatory time on "8/22 IWIL" and 7.50 hours of compensatory time on "8/23 IWIL" for a total of 12.5 hours of compensatory time. Thornley's Attendance Report Summary shows that she used 27.50 hours of EET Time for August 2019. The new EET Time balance was 44.75 hours.[28]

Thornley did not submit any Compensatory or Overtime Request forms for August 2019 nor did she claim on her Attendance Report for August 2019 that she worked overtime. However, the total hours worked on August 28, 2019, August 29, 2019, and August 20, 2019 are all 8.50 hours, which would equate to an hour of overtime each day for a total of 3.00 hours of overtime. Upon review of the August 2019 Attendance Report, the total of "Time Earned" reflects 3.00 hours. It further appears "Time Earned" for the days in which it states she worked 8.5 hours and compensatory time total were removed. We do not have evidence suggesting why the overtime possibly worked on these days would have been removed from the Attendance Report.

### E.     Overtime Claimed for September 2019

Thornley recorded that she earned 32.50 total hours in time for September 2019 on her Attendance Form. She recorded that she worked overtime on the following days:

- Sunday, September 8, 2019 – 6.50 hours
- Monday, September 9, 2019 – 3.00 hours
- Tuesday, September 10, 2019 – 3.00 hours
- Wednesday, September 11, 2019 – 3.00 hours
- Thursday, September 12, 2019 – 2.00 hours
- Friday, September 13, 2019 – 4.00 hours
- Wednesday, September 18, 2019 – 2.00 hours
- Thursday, September 19, 2019 – 4.00 hours
- Friday, September 20, 2019 – 2.00 hours
- Monday, September 23, 2019 – 2.00 hours
- Thursday, September 26, 2019 – 1.00 hours

---

[27] S██████ is Thornley's daughter.

[28] As discussed above, since Thornley had only updated her Attendance Report Summary through the end of the fiscal year, Dykstra entered this time into the updated Attendance Report Summary.

*Attorney-Client Privileged*
*Attorney Work Product*

Thornley's Comp Time Earned form dated September 30, 2019 contained Garcia's signature. The signature date was October 29, 2019. As discussed in further detail below, this signature appears to match the signature from Dykstra's October 2019 Overtime Request Form.

Thornley's Employee Overtime form states that on September 8, 2019 she earned 6.50 hours for working on "End of Fiscal 19 Year Reconciliations." It states that on September 9, 2019, Thornley earned 3.0 hours for working on "Procurement and APO training." It further states she earned 3.0 hours on September 11, 2019 for working on "Debt Transparency reporting/IOC." The form states she earned 2.00 hours for working on "EEO Reporting & 163 fund balancing" on September 12, 2019 and that she earned 4.0 hours on September 13, 2019 for working on "GOMB data entry." The form states that Thornley earned 2.0 hours on September 18, 2019 and 4.0 hours on September 19, 2019 for working on "OC voucher work for FY19" on both dates. Thornley also listed earning 2.0 hours on September 20, 2019 for "CMS 163 work." The form has two entries for September 23, 2019. The first entry is for 2.0 hours for "Promotional training help, store run and no lunch." The second entry is for "CMS Transitions training paperwork."[29] The Employee Overtime form states the total hours is 32.50; however, the Employee Overtime form does not have time listed for September 10, 2019, which accounts for the 3.0 hour disparity between the total listed and total if one were to add up all the time listed on the Employee Overtime form.

The Attendance Report Summary contains 48.75 hours of EET Time for September 2019, which is 1.5 times the number of hours she reported on her Attendance Form. The new EET Time balance was 93.50 hours.

### F.     Overtime Used in November 2019

Thornley's November 2019 Attendance Report does not show that she used any compensatory time for that month. Further, Thornley did not submit any Compensatory Time Used forms for November 2019. However, Thornley's Attendance Report Summary for November 2019 states that she used 67.50 hours of EET time. The new EET balance was 26.00 hours.[30]

Rather, Thornley's November 2019 Attendance Report shows that she used 33.00 hours of sick time, for which she also submitted a signed Sick Time Request Form. The Sick Time Request is inconsistent with the Attendance Report in that there is no request for 7.5 hours of sick time she claimed on November 25, 2019. Thornley's Attendance Report Summary for November 2019 shows that she used 33.00 hours of sick time.

---

[29] The Attendance Form included an entry for 1.00 hours on September 26, 2019. It is possible this date for the second form is a typographical error and should be September 26, 2019 rather than September 23, 2019.

[30] As discussed above, since Thornley had only updated her Attendance Report Summary through the end of the fiscal year, Dykstra entered this time into the updated Attendance Report Summary

*Attorney-Client Privileged*
*Attorney Work Product*

### G.  Overtime Claimed and Used in December 2019

Thornley recorded that she earned 11.25 total hours in time for December 2019 on her Attendance Form. She recorded that she worked overtime on the following days:

- Friday, December 13, 2019 – 2.75 hours
- Saturday, December 14, 2019 – 4.50 hours
- Sunday, December 15, 2019 – 4.00 hours

Thornley's unsigned Employee Overtime Earned form states that she earned 7.5 hours on December 13, 2019[31]; 4.50 hours on December 14, 2019; and 4.0 hours on December 15, 2019. This Employee Overtime Earned form does not contain a column to include the work performed. The Attendance Report Summary stated Thornley earned and used 16.88 hours of EET time, resulting in the balance of EET time remaining the same.

### V.  Overtime Payouts

In this section we discuss the amount Thornley was compensated in overtime during calendar year as shown in the payroll records.

A review of Thornley's payroll records show that Thornley was compensated $3,120.46 in overtime for pay period from 10/1/2019 to 10/15/2019, $3,072.46 in overtime for pay period from 11/1/2019 to 11/15/2019, and $4,320.64 for pay period 11/16/2019 to 11/30/2019 for a total of $10,513.56.  There were no other overtime payments to Thornley during calendar year 2019, and specifically, no payments at the end of the fiscal year liquidating her compensatory time bank.

An Overtime/Other Income form submitted by Thornley on December 4, 2019 reflects that she was compensated for 67.5 hours of overtime at 1.5 times her overtime rate. This overtime payment was reflected in Thornley's payroll for pay period 11/16/2019 to 11/30/2019. We know that Thornley submitted this Overtime/Other Income form for the 11/16/2019 to 11/30/2019 pay period rather than any other pay period because on December 4, 2019, Thornley submitted an Overtime/Other Income form for Garvue. The only time Garvue claimed overtime was in September 2019, when he recorded having worked 14.75 hours of overtime. The Overtime/Other Income form for Garvue reflected that he was paid 14.75 hours at 1.5 times his rate. A review of the payroll records reflects that Garvue only received overtime payments for the November 16, 2019 to November 30, 2019 pay period. Therefore, it appears these overtime payments are reflected in the payroll records for the November 16, 2019 to November 30, 2019 pay period.

Because the number of hours that Garvue was paid in overtime match the number of hours that he claimed in September, it appears his overtime payment is supposed to reflect the

---

[31] The Attendance Report Summary shows that Thornley worked 10.25 hours so should have only earned 2.75 hours in overtime. The total amount that Thornley claims she earned was 11.25 hours. Since she claimed she earned 4.50 hours on December 14, 2019 and 4.00 hours on December 15, 2019, this may have been a typographical error.

*Attorney-Client Privileged*
*Attorney Work Product*

number of September overtime hours worked. Although it is clear that these payments reflect Garvue's September overtime, it is unclear what overtime Thornley's payment represents as she did not claim she worked overtime in November 2019 nor does it match the number of hours she claimed to have worked overtime in September 2019. We do not know with certainty why Garvue and Thornley received overtime payments in this month (considering that Garvue worked overtime in September) and have no information regarding why Thornley received payments in months that differ from the claimed overtime months. However, we know that the only pay periods in which Thornley received overtime payments during calendar year 2019 was 10/1/2019 to 10/15/2019, 11/1/2019 to 11/15/2019, and 11/16/2019 to 11/30/2109.

## VI. Analysis of Thornley's Claimed Overtime and Overtime Payouts

The evidence supports a finding that Thornley (1) did not receive authorization to work overtime; (2) inaccurately represented the amount of overtime hours she worked on her timekeeping records; and (3) inaccurately represented the amount of hours worked on days in which she did not claim that she worked overtime. The basis for these findings are: the lack of evidence with Garcia's approval for overtime to be worked by Thornley prior to receiving any overtime payments; video evidence; Thornley's email usage; Thornley's computer usage; and Thornley's text and email communication. The totality of this evidence supports the above findings.

### A. Overtime Approval

As a preliminary matter, the evidence supports a finding that Thornley did not receive approval to work overtime in April, May, June, or September. With respect to April, Thornley did not complete an overtime request form, but only included it on the Attendance Report Summary. Thornley's June overtime request form was unsigned. Thornley's May and September request forms contained Garcia's signature, but as discussed in further detail below, the signature appears to match Garcia's signature on Dykstra's Overtime Request Forms for June and October 2019. During his interview, Garcia denied approving any overtime requests either orally or in writing for time worked in calendar year 2019, with the exception of the overtime worked in December 2019. Additionally, after a review of Thornley's email and text communication with Garcia, the overtime we have located that approved by Garcia for the 2019 calendar year was the overtime that was worked in December, which was after she received the payouts for overtime. Notably, as discussed above, a review of the email communications show that Thornley had previously requested to work overtime (in April 2018) so was aware of the process to request to work overtime prior to when it was worked. Although Thornley received approval to work overtime in December 2019, our investigation did not locate any requests by Thornley to work overtime in April, May, June, or September of 2019.

### B. Inaccurate Reporting of Overtime

The evidence demonstrates that Thornley was spending time out of the office, even on the days she claimed she worked overtime. First, a review of the video evidence shows that Thornley was arriving later than reflected on her Attendance Report and leaving earlier than reported on her Attendance Report. However, in addition to the video evidence, text message and

*Attorney-Client Privileged*
*Attorney Work Product*

email correspondence support the arrival and departure times contained on the videos and the fact that Thornley was not working the time she claimed. Moreover, a review of the forensic image of Thornley's computers support a finding that she was not performing work at the Merit Board or at home for the full time she claimed on her Attendance Report for the days in which she claimed to have worked overtime. Finally, there are text message and email correspondence from Thornley that support a finding that she did not work all the hours of overtime which she claims. We discuss each group of evidence in turn below.

### 1. Video of Arrival and Departure Times[32]

During the Merit Board's investigation, Fox reviewed video clips for Thornley's arrivals and departures from the Merit Board in September. We reviewed the clips provided by the Merit Board for the days that Thornley worked overtime and found that based on the video we received, we concurred with the times that Fox noted Thornley arrived at and left the office. A comparison of Thornley's "Time In" and "Time Out" reflected on the Attendance Report with the entry and exit times reflected in the video is contained in Appendix C – Days Thornley Claimed to Work Overtime.[33] Appendix C – Days Thornley Claimed to Work Overtime reflects the following[34]:

- 9/9/2019 – Thornley arrived 19 minutes later and left 1 hour and 55 minutes prior to what was reported on the September 2019 Attendance Report.
- 9/10/2019 – Thornley arrived 45 minutes later and left 6 minutes prior to what was reported on the September 2019 Attendance Report.
- 9/11/2019 – Thornley arrived 6 minutes later and left 1 hour and 34 minutes prior to what was reported on the September 2019 Attendance Report.
- 9/12/2019 – Thornley arrived 9 minutes later and left 1 hour prior to what was reported on the September 2019 Attendance Report.
- 9/13/2019 – Thornley arrived 1 hour and 13 minutes later and left 6 hours and 7 minutes prior to what was reported on the September 2019 Attendance Report.

---

[32] As mentioned, our review of this video is somewhat limited since we were only provided clips of the days in which Thornley claimed she worked overtime in September. We were unable to review full video or clips of Thornley's entry and exit times for April, May, June, and December as the recordings were overwritten. We further note that there is one entrance at the back of the building through which an employee could enter and not be captured on the video camera. The back entrance does not lead to a walkway and is not a natural entrance. Merit Board employees do not regularly use this entrance. However, Thornley mentioned in her meeting with Cusumano that she gets to her office through a back entrance and Garcia had video cameras "all over that place." We have no other evidence that Thornley utilized this entrance. If Thornley entered through this entrance, a bell would have sounded and she would have passed Garvue and Dykstra's offices. Dykstra does not recall Thornley using this entrance. It also would not necessarily make sense for Thornley to use the backdoor if she was trying to establish that she worked overtime. Rather, it would seem she would want to appear on the camera so that staff and Garcia could know that she was working at the times she claimed. Thus, it possible, but seems unlikely that Thornley utilized this entrance with any regularity.

[33] As noted below, it is possible Thornley was performing work for the Merit Board while not in the office. Therefore, we did not analyze the time that Thornley left during the middle of the day.

[34] Video does not show Thornley at the Merit Board on Sunday, September 8, 2019. We have not included it in the analysis below since Thornley could have been working at home.

*Attorney-Client Privileged*
*Attorney Work Product*

- 9/14/2019 – Thornley arrived 26 minutes later and left 2 hours and 4 minutes prior to what was reported on the September 2019 Attendance Report.
- 9/18/2019 – Thornley arrived 1 hour and 12 minutes later and left 4 hours and 21 minutes prior to what was reported on the September 2019 Attendance Report.
- 9/20/2019 – Thornley arrived 5 hours and 7 minutes later and left 2 hours and 3 minutes prior to what was reported on the September 2019 Attendance Report.
- 9/23/2019 – Thornley arrived 6 minutes later and 1 hour and 1 minute prior to what was reported on the September 2019 Attendance Report.
- 9/26/2019 – Thornley arrived 24 minutes later and 6 hours and 27 minutes prior what was reported on the September 2019 Attendance Report.

By our calculation, the total amount of time that Thornley arrived late or left early on these days that she claimed she worked overtime is 2185 minutes, or approximately 36 hours. In short, Thornley did not accurately report the number of overtime hours (or hours generally) that she worked on the days in which she claimed overtime.

Although the video suggests Thornley was not working during the times she was not in the office for the days in September for which she claimed she worked overtime, we cannot definitively say that Thornley was not working when she was not in the office as there is some evidence that supports that Thornley was performing some work outside of the office. For example, Katie Guy (Payroll Manager – Statewide at the Illinois Comptroller's Office) informed us that the Comptroller's Office requires original signatures on office. Dykstra informed us that they would physically deliver the payroll vouchers to the Comptroller's Office. Email and text communication support a finding that Thornley at times performed these tasks. For example, in a text to Garcia's work cell phone at 10:36 a.m. on September 18, 2017, Thornley states, "I need to run to the comptroller and CMS in a bit to drop off Mr. Springs payroll vouchers. Just an FYI."

There is additional evidence that Thornley attended trainings during work hours outside of the office. On October 10, 2018, at 9:10 a.m. Thornley texted Garcia on his work cell phone stating "Good morning boss, I'm headed to training. I will see you at lunch." Thornley also texted Garcia on his work cell phone on December 3, 2018 at 11:37 a.m. stating "I'm in ERP training until noon." On October 2, 2019, at 9:43 a.m., Chet Pinski at the Illinois Department of Human Rights emailed Thornley "I have a few corrections/edits for the AAP. Let me know when would be a good time to over then plan." Thornley responded "Of course, would Friday am work for you? Around 9? I am in training until Friday. Just let me know what works for you."

Therefore, while the video evidence is instructive, it is not determinative of whether Thornley was performing work during the times she claimed as it is possible that prior to the time she arrived in the morning or after the time she left at the end of the day, she may have been doing a task Merit Board work that was outside the office. That said, only three of the days she left prior to normal work hours (4:30 p.m.) so it is unlikely that for seven of the days she claimed overtime she was performing work after work hours. There is one day (September 20) where she arrived significantly after the start of the workday. As we discuss below, there is additional evidence Thornley was not working on this day, or the other days in which she claimed to have worked overtime.

29

*Attorney-Client Privileged*
*Attorney Work Product*

### 2. Thornley Email Usage

A review that we performed of Thornley's emails supports a finding that Thornley was not sending emails prior to or after normal work hours on the days that she claimed she worked overtime. Not only was Thornley not sending emails prior to or after normal work hours on the days she claimed she worked overtime, but with few exceptions, she was not sending emails during times in which she was not in the office on those days. In addition to the entry and exit times for days for which we have video footage, Appendix C – Days Thornley Claimed to Work Overtime also contains a comparison of Thornley's "Time In" and "Time Out" reflected on the Attendance Reports with the times Thornley first sent and last sent an email is contained in Appendix C – Days Thornley Claimed to Work Overtime.

As can be seen in Appendix C – Days Thornley Claimed to Work Overtime, on the majority of days in which Thornley claimed to have worked overtime, she did not send emails after her normal workday, which, according to her timekeeping documents, typically ended at 4:30 p.m. Further, on the days for which there is video evidence, Thornley did not send emails during any of the times she was not in the office. There are three exceptions when Thornley sent an email after work hours on the days she claimed to work overtime.

- May 6, 2019, at 6:43 p.m. - Thornley forwarded an email from her personal email account to her Merit Board email account. The email was an order confirmation from DoorDash with an order from Joe's Gallina. The email indicates that the message was forwarded from her iPhone.

- June 19, 2019, Thornley sent an email to Marshall Peterson (Human Resource Specialist – Technical Services Division at CMS) at 4:41 p.m. attaching data that had been requested.

- December 13, 2019 (one of the days for which Thornley had approval to work overtime), at 4:47 p.m. Thornley emailed VanDeKerckhove stating "I will be in tomorrow to finish up my stuff for you all and BRF as well [smiley face]."

It is important to note that the fact that Thornley was not sending emails after work hours or after leaving the Merit Board on days she claim to work overtime does not alone conclusively establish that she was not working. A review of Thornley's email correspondence shows that Thornley was not a prolific emailer. There were times when video evidence shows that Thornley was at the office, but was not sending any emails. Therefore, the fact that she was not sending emails does not mean she was not working as she could have been doing paperwork or performing other work on her computer.

However, the lack of email correspondence is one component of the overall picture of when Thornley was working. The lack of emails is important as it shows she was not performing this specific work at the times claims. Therefore, the fact that Thornley did not send emails after she left the office or up until the time she claims she works overtime is not dispositive, but suggests that Thornley was not actually working for the full time she claimed she worked on her attendance report.

*Attorney-Client Privileged*
*Attorney Work Product*

### 3. Thornley Computer Usage[35]

A review of a forensic image of Thornley's desktop and laptop computer also supports that Thornley was not working for all the time claimed in her Attendance Reports.

First, there are days for which Thornley claimed to work overtime, but the human activity on her desktop ends prior to the workday and there is no human activity on her laptop following her departure from the Merit Board. These dates include:

- May 6, 2019 – Thornley claimed to work from 8:00 a.m. to 6:30 p.m.; however, human activity on her desktop begins around 9:08 a.m. and ends at 3:48 p.m. There was no human activity on her laptop for this day.

- May 17, 2019 – Thornley claimed to work from 7:00 a.m. until 5:30 p.m., but the human activity on her desktop started at 8:17 a.m. and ended at 3:43 p.m. There was no human activity on her laptop that day.

- May 23, 2019 – Thornley claimed to work from 7:00 a.m. until 4:30 p.m., but the human activity on her desktop started at 9:03 a.m. and ends at 4:23 p.m. There was no human activity on her laptop that day.

Second, there are days for which Thornley claimed to work overtime, but the human activity on her desktop ends prior to video evidence showing that Thornley left the Merit Board and there is no human activity on her laptop following her departure from the Merit Board. These dates include:

- September 9, 2019 – Thornley claimed to work from 8:00 a.m. to 6:30 p.m. The video shows her arrival time as 8:19 a.m. and departure time at 4:35 p.m. Human activity on her desktop begins at 9:20 a.m. and ends at 3:36 p.m. There is no human activity on her laptop for this day.

- September 12, 2019 – Thornley claimed to work from 8:00 a.m. to 5:30 p.m. The video shows her arrival time as 8:09 a.m. and departure time as 4:30 p.m. The human activity on her desktop started at 8:13 a.m. and ended at 3:36 p.m. There is no human activity on her laptop.

- September 13, 2019 – Thornley claimed to work from 7:00 a.m. to 6:30 p.m. The video shows her arrival time as 8:13 a.m. and departure time as 12:23 p.m. The human activity on her desktop began at 8:28 a.m. and ended at 12:15 p.m. on this date. There is no

---

[35] As previously mentioned, we relied on our forensic analyst for an analysis of human activity on Thornley's computer. According to the forensic analyst, multiple forensic tools could not access the email stored locally on the desktop computer. Human activity was therefore limited to forensic analysis of human activity of internet browsing and interacting with office type files. Therefore, it is possible that an email may have been sent or received prior to or after to registered human activity. As our analysis above shows, however, Thornley was not sending or receiving emails prior to or after the video shows her arriving at the office.

*Attorney-Client Privileged*
*Attorney Work Product*

human activity on her laptop.

- September 18, 2019 – Thornley claimed to work from 8:00 a.m. to 6:30 p.m. The video shows her arrival time as 8:26 a.m. and departure time as 4:46 p.m. The human activity on her desktop begins at 11:16 a.m. and ends at 4:05 p.m. There is no human activity on her laptop.

- September 19, 2019 – Thornley claimed to work from 7:00 a.m. to 6:30 p.m. The video shows her arrival time as 8:12 a.m. to 2:09 p.m. The human activity on her desktop begins at 8:16 a.m. and ends at approximately 1:45 p.m. There is no human activity on her laptop on this date.

- September 20, 2019 – Thornley claimed to work from 8:00 a.m. to 6:30 p.m. The video shows her arrival time as 1:07 p.m. and departure as 4:27 p.m. The human activity on her desktop begins at 1:29 p.m. and ends at approximately 4:02 p.m. There is no human activity on her laptop on this date.

- September 23, 2019 – Thornley claimed to work from 8:00 a.m. to 5:30 p.m. The video evidence shows her arrival time as 8:24 a.m. and departure time as 4:29 p.m. Human activity on her desktop computer started around 8:21 a.m. and ended around 4:00 p.m. There was no human activity on her laptop.

- September 26, 2019 – Thornley claimed to work from 8:00 a.m. to 4:30 p.m. The video shows her arrival time as 8:24 a.m. and departure time as 10:03 a.m. Human activity on her desktop computer begins around 8:27 a.m. and ends around 9:36 a.m.

Third, there are days for which Thornley claimed to work overtime but there is no human activity recorded on either her desktop or laptop computers. These days include: May 19, 2019 and June 16, 2019.

We note that there was human activity on Thornley's laptop on Sunday, September 8, 2019; however, this activity occurred from approximately 5:46 p.m. to 6:37 p.m. and was mainly related to websites associated with SIUE (Southern Illinois University Edwardsville), EbscoHost (research database that serves libraries and institutions), and Blackboard (tool that allows educational faculty to add resources for students to access online), which do not appear related to Thorley's work or the work she claimed for this day. Moreover, there was no human activity on the laptop or desktop computer from 11:00 a.m. to 5:30 p.m. (or at any other point on this day), which were the times she claimed she was working overtime.

Although it is possible that Thornley was performing work not using her computer at the times she claimed she worked overtime, the fact that forensic evidence shows that there was no human activity on these dates and times is further evidence that Thornley likely was not performing any work. Moreover, the forensic evidence in conjunction with some of Thornley's statements detailed in the next section establish that it was very unlikely Thornley was performing work at some of the times she claimed.

*Attorney-Client Privileged*
*Attorney Work Product*

### 4. Thornley Statements in Communications

A review of Thornley's statements in text and email communications likewise reveal that Thornley was not working overtime on all the days she claimed. As previously discussed, Thornley claimed she worked 11.50 hours on September 13, 2019, earning 4.00 hours of overtime. However, on September 13, 2019, at 11:49 a.m. Thornley received an email from Ben DeBoice at the Department of Innovation & Technology saying, among other things, "Tried calling but you were out." Thornley responds that day at 12:15 p.m. saying "So sorry that I missed your call. **I am out until Monday at 8:30 a.m.**" (emphasis added). This email communication to DeBoice, combined with the fact that the video evidence shows Thornley leaving the Merit Board at 12:23 p.m. and the forensic analysis of her laptop shows she was not using her laptop after this time makes it very likely that Thornley did not work the overtime she claimed on this day.

Thornley also claimed she worked 9.50 hours on September 20, 2019, earning 2.0 hours of overtime. However, on September 19, 2019, at 5:49, J. Thornley texted Fox "Hey girlie- I'm chaperoning j█████ pumpkin patch field trip tomorrow. I will be in right after lunch. Feel free to call me if you need anything [heart emoji]." On September 20, 2019, Thornley texted Garcia's work cell phone at 8:00 a.m. "Morning Boss- I'm on a field trip with j████, pumpkin patch. I will be in after lunch. Emily knows but wanted to give you an FYI. Thank you" Later that day, at 11:32 a.m. Thornley texts Fox saying "Do you want anything for lunch babe," suggesting that, consistent with her other text messages, she had not been in the office prior to this time. As detailed above, there is no other evidence on September 20, 2019 that she worked the full 9.5 hours. The lack of this evidence in combination with the text messages from this day suggests that Thornley did not work a full day on this date, let alone earn 2.0 hours of overtime.

Further, Thornley claimed she worked 8.50 hours on September 26, 2019, earning 1.0 hours of overtime. On September 26, 2019, Thornley texts Fox around 8:33 a.m. stating "I have an MRI at 10:30 and then I have to go see my doc after that for the results. Just letting you know. I'm not sure how long it will take. They had someone cancel and just called me to come in." This text, in combination with the fact that video does not show her at the office after 10:03 a.m., she did not send any emails this day, and there was no human activity on either computer after video evidence shows she left the office supports a finding that Thornley similarly did not work a full day on September 26, 2019 or earn 1.0 hours of overtime on this date.

### C. Inaccurate Reporting of Time Thornley Did Not Deduct

In addition to the evidence supporting a finding that Thornley did not work the overtime that she claimed, video evidence that we reviewed, Thornley's email usage, Thornley's computer usage, and Thornley's text and email communication all support a finding that Thornley took time off of work, but did not deduct it from her personal, sick, vacation, or compensatory time bank.[36] The following are days for which it appears that she did not work a full day and did not deduct any time from any of her accrued leave banks: June 5, 2019; June 6, 2019; August 5,

---

[36] It is important to note that for these days, not only did she not deduct any time from her time bank, but her Attendance Reports for the days listed stated that she worked a full day.

*Attorney-Client Privileged*
*Attorney Work Product*

2019; October 24, 2019; November 19, 2019; and December 2, 2019.[37] We discuss each in turn below.

### 1.    June 5 and 6, 2019

On June 6, 2019, Thornley sent Garcia, Fox, and Dykstra an email stating:

Things are a little nuts but much better on the house end! We start moving back in the house later today. We are so ready to get back in! Thank you for your continued support.

I will be taking 4.0 hours yesterday
And 4.0 hours today

I am always accessible by phone.

Thornley did not record any time off on her June 2019 Attendance Report for June 5, 2019 or June 6, 2019. Instead, Thornley only has time off recorded for her Illinois Women's Institute for Leadership Training Academy Training from June 11, 2019 through June 14, 2019.

### 2.    August 5, 2019

On August 4, 2019, Thornley texts Garcia's work cell phone "Hey Boss- I will be in the office in the morning but the kids all have physicals and eye appointments tomorrow. Just an FYI [face palm emoji]." A review of Thornley's emails show that she sent an email at 7:55 a.m. and sent an email at 1:42 p.m. The forensic evidence of Thornley's computer shows that there was no human activity on her desktop or laptop computer after 8:49 a.m. Thornley did not record that she took any sick, personal, or compensatory time for this date. Instead, she reported on her August 2019 attendance form that she was in the office from 8:00 a.m. until 4:30 a.m. with an hour outside of the office.

### 3.    October 24, 2019

On October 24, 2019, video footage shows that J. Thornley entered the Merit Board at 8:20 a.m. and exited the Merit Board at 9:32 a.m. Forensic evidence of Thornley's computers show that there was human activity starting at 8:25 a.m. and ending around 9:10 a.m. on her desktop, but no other human activity on the desktop and no human activity on her laptop. That day, Thornley sent a text to Garcia's personal cell phone at 8:05 a.m. sending a picture of the Illinois Women in Leadership graduation invitation for the graduation in Chicago. It says that the welcome reception is at 3:00 p.m. and the ceremony is at 3:30 p.m. Thornley informs Garcia to "come by if you are around the area today" and includes a picture of the Trailblazers Award Reception, which states it begins at 5:30 p.m. in Chicago. At 12:55 p.m. on October 24, 2019, Thornley texts Garcia's work cell phone "Sorry I missed your call, was driving and singing away lol," suggesting that she was driving up to Chicago. Finally, a post by Amy Rueff on social

---

[37] We note that there were other instances during the time period of our review where video evidence or computer activity also suggested Thornley was not working at the times claimed; however, have only included some examples for days which Thornley's own communication also suggested that she was not working.

*Attorney-Client Privileged*
*Attorney Work Product*

media which was collected as part of the Merit Board's internal investigation, shared a picture of
J. Thornley with the text stating "Attended the 2019 IWIL Training Academy graduation this
afternoon in Chicago. Congrats ! Special treat to see my 2018 sister State Representative Lindsey
LaPointe cheering the ladies on."

Despite the fact that the evidence suggests Thornley worked for only a few hours, on the
October 2019 Attendance Report, Thornley recorded that she worked from 8:00 a.m. to 4:30
p.m. with only spending an 1.00 hours out of the office. She did not list any time off for this
date.[38]

### 4.    November 19, 2019

On November 18, 2019 at 8:27 p.m., Thornley texted Garcia on his personal cell phone
stating: "Hey Boss! I'm heading to northwestern at 6 am. I have appointments until at least 4. If
you need anything please let me know. I will have my laptop." Review of the video evidence
shows that Thornley was not in the office on November 19, 2019. Further, review of the forensic
image of Thornley's computer shows that there was no human activity on either computer.
Therefore, although Thornley claimed she had her laptop, she was likely not performing any
work. Despite the fact she had appointments until at least 4:00 p.m., she reported on her
November 2019 Attendance Report that she worked 7.50 hours and was only out of the office for
1.00 hours. She did not record any sick, personal, vacation, or compensatory time for this day.

### 5.    December 2, 2019

On December 2, 2019, Thornley emailed Garcia, Garvue, Fox, Dykstra, and Riley stating
"I am up in Chicago. I have to see my surgeon at 9:30 but otherwise will be working from my
phone and laptop if anyone needs anything at all." Although Thornley claims she was working
on her laptop, there was no human activity recorded on her laptop for this date.

Therefore, in summary, the combination of Thornley's communication stating she is not
going to be in the office, in conjunction with the video evidence and forensic analysis of her
computer makes it likely that she did not properly record her time even on some of the days for
which she did not claim to have worked any overtime.

### D.    May 2019 and September 2019 Overtime Signatures

In addition to inaccurately recording the amount of overtime worked, a review of
Thornley's May 2019 Comp Time Earned and September 2019 Overtime Request Form shows
that the signatures appear to be the same as Dykstra's June 2019 and October 2019 Overtime
Request Forms. We discuss our analysis of the similarities in these documents below.

---

[38] We acknowledge this was a professional event and do not have a basis from the evidence in the investigation to
definitively state that her attendance without taking time off was not permitted. However, we note that Thornley did
take time off for other IWIL events, such as a training in June 2019 and August 2019, suggesting she should have
taken time off for this event as well.

*Attorney-Client Privileged*
*Attorney Work Product*

As previously mentioned, Fox and Dykstra independently noticed that Garcia's signature on Thornley's overtime request forms for May 2019 and September 2019 appeared to match Garcia's signature on Dykstra's overtime forms for June 2019 and October 2019.[39] The below are images of Thornley's May 2019 Comp Time Earned form and Dykstra's June 2019 Overtime Request Form.



Thornley's May 2019 Comp Time Earned Form        Dykstra's June 2019 Overtime Request

We visually and electronically compared these documents. Although we are not handwriting experts, Garcia's signature on Thornley's May 2019 overtime request form appears to match the signature on Dykstra's June 2019 Overtime Request Form. Thornley's May 2019 Comp Time Earned form is dated 5/1/2019, but is signed in black ink on June 18, 2019. Dykstra's June 2019 Overtime Request Form is also signed on June 18, 2019. The signatures appear to be the same. On both sheets, the bottom of the "6" in the date is spaced approximately 7 centimeters away from the colon. The lower portion of the "J" is 4.5 centimeters on both documents. The lower portion of the "G" is 12 centimeters on both documents.

The below are images of Thornley's September 2019 Employee Overtime form and Dykstra's October 2019 Overtime Request Form.

---

[39] As previously noted, Dykstra noticed that his June 2019 and October 2019 were not in chronological order when he assisted Thornley scan in the documents. This was inconsistent with the rest of the documents.

*Attorney-Client Privileged*
*Attorney Work Product*



**Illinois State Police Merit Board**
Employee Overtime

Name: Jenny Thornley
Date of Request: 09/30/2019

| Date | Hours worked | |
|---|---|---|
| 9/8 | 6.50 | End of Fiscal 19 Year Reconciliations |
| 9/9 | 3.0 | Procurement and APO training |
| 9/11 | 3.0 | Debt Transparency reporting/ IOC |
| 9/12 | 2.0 | EEO Reporting & 163 fund balancing |
| 9/13 | 4.0 | GOMB data entry |
| 9/18 | 2.0 | IOC voucher work for FY19 |
| 09/19 | 4.0 | IOC voucher work for FY19 |
| 09/20 | 2.0 | CMS 163 work |
| 09/23 | 2.0 | Promotional training help, store run and no lunch |
| 09/23 | 1.0 | CMS Transitions training paperwork |
| Total | 32.50 | |

Approval: _____ Date: _10-29-19_



**Illinois State Police Merit Board**
Overtime Request Form

Name: Daniel Dykstra

| Date | Time Earned | Project Worked On |
|---|---|---|
| 10/14/19 | 4.00 | Travel to Chicago for Board Meeting on Holiday |

Approval: _____ Date: _10-29-19_

Thornley's September 2019 Overtime Request                    Dykstra's October 2019 Overtime Request Form

We similarly visually and electronically compared these documents. In reviewing the signatures, we found that the signature on Thornley's September 2019 overtime request form appears to match the signature on Dykstra's October 2019 overtime request form. Thornley's overtime sheet is signed with blue ink on October 29, 2019. Dykstra's October overtime sheet is signed with blue ink on October 29, 2019. On both forms, it appears that the pen was running out of ink at the "j". The beginning of the date is 2.5 centimeters away from the date line in both documents. The end of the date is 3 centimeters away from the date line in both documents. There is also a small dot that appears in the middle of the "9" in "2019" in both documents. Further, laying the signatures over one another electronically, the signatures appear to be the same.

While it appears that these signatures are the same, we do not have evidence regarding the manner in which Thornley would have forged these signatures. We did not locate Garcia's electronic signature on Thornley's computer nor do we have any direct evidence that she lifted Garcia's signature from Dykstra's overtime pages and placed them onto hers. However, we do have evidence that she had previously engaged in unauthorized use of Waud's electronic signature as discussed in detail below. Additionally, it was Thornley's responsibility to maintain these documents. As previously discussed, in addition to the signatures appearing the same, when Dykstra went to copy the documents, they were out of reverse chronological order while all of the other documents were maintained in reverse chronological order. We found no evidence suggesting that or motive for which Dykstra had forged Garcia's signature on his own timekeeping documents.

**E.    Overtime Payments**

Even assuming that Thornley accurately reported the amount of overtime earned, which as just discussed is not consistent with evidence, evidence supports a finding that Thornley paid herself out for more time than she claimed she had accrued. In this section we discuss our

*Attorney-Client Privileged*
*Attorney Work Product*

analysis of her payroll and timekeeping records, which lead to this finding. We also discuss the basis for which we believe Thornley caused these payments to be made to herself.

For our analysis, we assumed that Thornley accurately reported the time she earned (which as discussed above based on the evidence we do not believe to be the case) and used overtime in 2019, the totals are as follows:

- April 2019 – 15 hours earned
- May 2019 – 20.25 hours earned[40]
- June 2019 – 12 hours earned
- August 2019 – 27.5 hours used[41]
- September 2019 – 48.75 hours earned[42]

According to the documentation provided by the Merit Board, Thornley had 25 hours in her compensatory time bank in January 2019. Assuming she worked the above hours for April, May, and June of 2019, she would have had 72.25 hours in her compensatory time bank at the end of June 2019, which was the end of the fiscal year. Although Thornley should have paid out her compensatory time at the end of the fiscal year, we assume for purposes of our analysis that that it was permissible for Thornley to carry over this time. Therefore, we assumed that she carried over the 72.25 hours that were in her compensatory time bank.

Subtracting the 27.5 hours of compensatory that Thornley claimed she used in August 2019 and adding the 48.75 hours she claimed she earned in September 2019 results in Thornley having 93.5 hours in compensatory time in her compensatory time bank at the end of September 2019. Therefore, the maximum amount that Thornley should have been paid was for 93.5 hours of compensatory time (assuming that she could cash this compensatory time out at any time during the year).

We were able to calculate Thornley's overtime rate using the Overtime/Other Income form submitted on December 4, 2019 and payroll records from which reflected that Thornley received 67.5 hours of overtime at one and a half times her rate. For the November 16, 2019 to November 30, 2019 pay period she received $4,320.64 in overtime. Dividing the amount she received by 67.5 hours results in her overtime rate of approximately $64. Dividing the overtime rate by 1.5 results in a straight time rate of approximately $42.67.

Thornley was compensated the following in overtime in October and November 2019:

---

[40] We used the compensatory time rate of 1.5 times the number of overtime hours claimed to have worked.

[41] We did not include the 3 hours of earned overtime noted on the bottom of the August 2019 Attendance Report or the 4 hours of overtime that it was suggested Thornley worked on October 17, 2019 since Thornley did not include these amounts in the time earned column on the Attendance Report or complete an Overtime Request Form. Even if they were included, however, there would still be an overpayment.

[42] Since Thornley was not paid overtime for the 12/1/2019-12/15/2019, 12/16/2019-12/31/2019, 1/1/2020-1/15/2020, or 1/16/2020-1/31/2020 pay periods, we did not factor the time claimed that she earned for December into our analysis.

*Attorney-Client Privileged*
*Attorney Work Product*

- Pay period 10/1/2019 to 10/15/2019 - $3,120.46
- Pay period 11/1/2019 to 11/15/2019 - $3,072.46
- Pay period 11/16/2019 to 11/30/2019 - $4320.64[43]
- Total - $10,513.56

As noted, the maximum amount of compensatory time in Thornley's time bank was 93.5 hours. Multiplying this by $42.67[44], the maximum amount that Thornley should have been compensated in overtime payments if all of her overtime was properly claimed (which the weight of the evidence shows it was not) was approximately $3,989.88. Subtracting this amount from the amount that she was paid results in an overpayment of $6,586.56.

As discussed above, it was Thornley's responsibility to enter the amount of overtime into the Central Payroll System for an employee to be compensated overtime. Pickrel explained that if no overtime (or other payments) are to be made, the person entering payroll would not need to manually enter any information. Instead, the payroll system would automatically calculate an employee's pay for that pay period. Further, Pickrel explained that in order for an individual to be paid overtime, the amount of time and rate of pay must be manually entered. We received one Overtime/Other Income form which showed a payout of 67.50 overtime hours at a rate of 1.50.[45] A review of other payroll records for the above time periods show that this time was paid out in overtime to Thornley. For Thornley to have received these payouts, she would have needed to manually enter the time and rate of pay. While it is possible that someone could have accessed Thornley's computer to make overtime payments, we have not found any evidence suggesting that was the case and it seems unlikely as someone would have had to access Thornley's computer to cause unauthorized payments to be made to Thornley. Further, had Thornley received these overpayments without inputting them herself, she should have notified someone of an error. Thus, it is highly likely Thornley caused these payment to be made to herself.

In short, even if all of her overtime had been appropriately claimed, which the evidence shows it was not, Thornley still received an overpayment of at least $6,586.56. Again, this overpayment does not account for any overtime that Thornley claimed to have worked, but for which the evidence indicates that Thornley did not actually work. Therefore, the actual amount of over compensation for improperly claimed overtime is likely higher than this amount.

---

[43] It is also important to note that at the time of these payouts the evidence suggests that Thornley was not accurately tracking the number of compensatory hours she had earned or used. Although Thornley was supposed to maintain a spreadsheet containing the number of hours employees had earned or used, she did not keep this spreadsheet up to date and, as previously discussed, asked Dykstra for assistance in completing this spreadsheet. Without an updated spreadsheet when making payments in October and November, Thornley would not have known how much compensatory time she had accrued.

[44] Since the compensatory time was already calculated at 1.5 times the number of hours worked, she should have been paid overtime at her straight time rate.

[45] The Merit Board did not have these forms for Thornley's other overtime payments. Although we requested these forms from CMS, we did not receive them prior to the conclusion of our investigation.

*Attorney-Client Privileged*
*Attorney Work Product*

### V. Conclusions Regarding Thornley's Theft of Overtime

In summary, there is evidence to support a finding that Thornley caused herself to receive compensation for hours to which she was not entitled. Specifically, the evidence supports a finding that Thornley (1) did not receive authorization to work overtime; (2) inaccurately represented the amount of overtime hours she worked on her timekeeping records; (3) inaccurately represented the amount of hours worked on days in which she did not claim that she worked overtime; and (4) even assuming she did accurately track the hours she worked overtime, Thornley caused payments to herself for overtime she did not work

There is no record of Thornley requesting to work overtime in calendar year 2019 with the exception of December 2019. Further, Garcia did not recall orally approving Thornley to work overtime in calendar year 2019. Again, the only overtime that was approved prior to it being worked for calendar year 2019 was in December 2019, which was after Thornley received payouts of overtime. Further, a review of the video evidence, Thornley's email and text communications, and forensic image of Thornley's laptop and desktop computers shows that Thornley inaccurately represented the amount of hours worked on at least some of the days in which she claimed she worked overtime. Additionally, a review of the same evidence shows that Thornley inaccurately represented the amount of hours worked on at least some days in which she did not claim that she worked overtime.

Moreover, an analysis of the timekeeping and payroll records show that even assuming Thornley accurately reported the amount of time and overtime she worked, she was compensated for more time than she was entitled. The payroll records show she received more payments in overtime than what would have been paid had Thornley cashed out her compensatory time bank. Since Thornley was required to manually enter any overtime in order for an employee to be paid, she would have had to manually enter her overtime hours and rate of pay to receive this compensation. While there is a possibility someone accessed her computer without her knowledge, our investigation has not revealed any evidence to support this possibility and find it highly unlikely.

Finally, although we cannot definitively say the amount of overpayment, we can say that Thornley caused herself to receive at least $6,000 in an overpayment. This is likely an underestimate of the overpayment Thornley received as the evidence shows she inaccurately represented the amount of hours which she worked overtime. In addition, the fact that Thornley inaccurately represented the amount of hours which she worked on days in which she did not claim overtime would also have resulted in payment for time that she did not work.

## PART IV – INVESTIGATION INTO ALLEGATION OF SEXUAL ASSAULT

Thornley's sexual assault allegation as made on several occasions can be summarized as follows: Thornley has alleged that Garcia assaulted her on January 23, 2020. She alleged it occurred while she was in his office while she was standing at his conference table spreading out paperwork for him to sign. According to her allegations, Garcia came up from behind her and reached his right arm under her right armpit and groped her right breast. She removed his hand.

*Attorney-Client Privileged*
*Attorney Work Product*

He said "maybe if you dressed more like Emily we would get along better." She immediately left his office and went to back to her office. Based upon our investigation, we have found that the evidence is insufficient to support a finding that Garcia sexually assaulted Thornley.

Other than Thornley's own allegations, including the consistency we have observed among the multiple times of which we are aware she has raised the sexual assault allegations, and the fact that she and Garcia were in the office on the day alleged, our investigation has not found evidence consistent with the assault having occurred as alleged. To the contrary, our investigation has found evidence that is inconsistent with the assault having occurred as alleged. We have not found enough evidence to support a finding of sufficiency, which is particularly true in light of the evidence that is inconsistent with the assault allegations.

We discuss in detail the following: (1) Thornley's known statements concerning the alleged assault; (2) evidence relevant to the timing and location of the alleged assault; (3) evidence relevant to certain details of the alleged assault; (4) evidence of a motive Thornley may have had to fabricate the allegations; (5) evidence regarding Thornley's credibility; and (6) evidence regarding Garcia's overall conduct.

## I. Thornley's Known Statements Concerning The Alleged Assault[46]

Thornley made statements regarding her allegations to others close in time to the alleged event. She was largely consistent in her account of the allegations on the several occasions of which we are aware she made them. We have evidence that Thornley raised the allegation of having been assaulted by Garcia on January 23, 2020 several different times in formal written complaints and written and oral statements. Appendix D – Complaints Summary contains the date and time of each complaint of which we have knowledge and to whom it was made. Appendix D – Complaints Summary further contains the substance of the complaint and how the complaint was made (e.g. orally, written, recorded by another individual).

As can be seen in Appendix D – Complaints Summary, the first time we have seen evidence of her alleging a detailed account that she was sexually assaulted is in documentation regarding a workers' compensation claim that we believe may have been filed the night of January 31, 2020.[47] She described the injury as follows: "EE was standing in front of the table

---

[46] We note as a threshold matter that we have not been able to interview Thornley as she has not made herself available to us for an interview. We have not had the opportunity to hear from her directly about the allegations and question her about those allegations. We likewise have not had the opportunity to hear from her whether any evidence might exist to corroborate her allegations that would provide us other evidentiary avenues to pursue, including other individuals with whom she spoke. We have not had the opportunity to request items that may have evidentiary value from her. We recognize the significance from an investigative standpoint that this avenue of fact inquiry has not been available to us.

[47] Although we are not certain of the timing, our best understanding of when Thornley made her worker's compensation claim is as follows. It appears that Thornley likely called TriStar to make a workers' compensation claim. Two forms were generated: 1. The Notification of Injury and 2. Illinois Form 45: Employer's First Report of Injury. We believe both forms were completed by Heather Young of TriStar as a result of the call as both documents contain a box to include by whom the report was prepared. In the Notification of Injury under "Person Completing This Form" it states "hyoung." In the Illinois Form 45: Employer's First Report of Injury, under the "Report prepared by" it states "Young, Heather." Further, Heather Young (First Notice Associate at TriStar Managed Care)

*Attorney-Client Privileged*
*Attorney Work Product*

sorting out papers she needed him to sign.  He came up behind her and he put his right arm around her back and under her armpit area and groped her right breast.  EE tried to play it off and forcefully rejected his arm."

She next raised having been sexually assaulted in an email sent on the morning of February 1 to individuals in the Governor's Office in which she referenced having been subjected to sexual assault generally.

Later that same day, during the afternoon of February 1, 2020, Thornley provided a detailed account to attorneys in the Governor's Office, General Counsel Ann Spillane and Deputy General Counsel Whitney Rosen.  Both recall Thornley stating that she was in Garcia's office and was lining up attendance paperwork for him with her back to him when he came up and from behind her put his right arm underneath her right arm and groped her right breast.  She forcibly pushed his arm away and he stated "Maybe if you dressed more like Emily we would get along better."

On February 2, 2020, Thornley sent a text to First Lady MK Pritzker in which she appears to reference the assault.  Thornley also made a complaint to the Illinois Department of Human Rights ("IDHR") alleging the assault in detail.  We believe that the complaint was filed on February 3, 2020 based on statements made by personnel at IDHR to Dykstra.[48]

Thornley met with Michele Cusumano, Human Resources Director at the Illinois Comptroller's Office (the office where Thornley's husband works), for several hours on February 5, 2020.  During that meeting, she dictated a detailed narrative of the assault as well as additional information she set forth regarding Garcia, all of which was typed contemporaneously by Cusumano.

Thornley had a call with Sarah Kerley of Illinois Central Management Services ("CMS") on February 5, 2020, that was a continuation of discussions Thornley had been having with her about Fox's salary and numerous complaints about Garcia that were not of a sexual misconduct nature.  In this discussion, she made a reference to having been groped.  According to Kerley, Thornley stated that Garcia had been suspended because of a sexual harassment claim and that Thornley had made the claim. Thornley was not explicit about what had occurred but indicated

---

sent an email on January 31, 2020 at 7:59 p.m. with the subject "∼∼Notice of Escalation – State of Illinois – Jenny Thornley – Sexual Harassment Claim ∼∼" and a summary of the allegations of the complaint. Although we do not know for certain when Thornley initiated the call to TriStar, we believe it is possible it was during the evening of January 31, 2020 based on two pieces of evidence.  First, Young's email was sent at 7:59 p.m. Since it includes a Notice of Escalation, we believe it likely was sent close in time to when the call was made. Additionally, the Notification of Injury includes the Governor's email address. Thornley had asked Ambrose via text message to confirm the Governor's email was a ".gov" email at 9:23 p.m. on January 31. It is possible Thornley wanted to confirm the email she provided to TriStar was accurate.  We recognize it is possible this claim was made earlier or that there is an earlier claim she made of which we are unaware having found no evidence of it in our investigation.

[48] We note that in Thornley's lawsuit against the Merit Board it states that the she filed her IDHR complaint on January 27, 2020; however, based on IDHR's representation to Dykstra, we do not believe that representation was accurate.

*Attorney-Client Privileged*
*Attorney Work Product*

that there was an incident that was a physical touching or attempted physical touching and used the word "groping."

Thornley stopped by the home of Merit Board maintenance worker Bill Gosda on February 11, 2020.[49] According to Gosda, during that brief visit, Thornley told him that she and Garcia "had gotten into it" and Garcia had "grabbed her by the chest." This description is somewhat inconsistent with Thornley's other descriptions of the alleged assault. We note that while we have no basis upon which to believe Gosda misrepresented his recollection of his conversation with Thornley, we had concerns about the clarity of the recounting of his recollection. It was unclear from his description of the conversation whether Thornley had stated that she and Garcia having "gotten into it" happened in conjunction with Garcia having "grabbed her by the chest."

Accordingly, as reflected in Appendix D – Complaints Summary and noted herein, Thornley's allegations to different individuals or entities have been largely consistent with each other, with the exception of the allegation to Gosda in certain respects.

## II. Evidence relevant to the timing and location of the alleged assault

Thornley has been consistent in her allegations that the assault occurred on January 23, 2020 at the Merit Board offices in Garcia's office. Video evidence establishes that both Thornley and Garcia were in the Merit Board offices on January 23, 2020.[50] The video evidence shows Garcia and Thornley (as well as other Merit Board staff) entering and exiting the Merit Board and moving about certain areas of the Merit Board offices that day. The timeframes in which Thornley and Garcia were physically present in the Merit Board offices according to video review is as follows:

Thornley was in the Merit Board offices during following windows of time on January 23, 2020:

---

[49] Gosda stated that this was the first time Thornley had stopped by his home to speak with him.

[50] The video evidence consists of footage received from the Merit Board's security cameras as described in Appendix A. We note that on January 23, 2020, there was no camera in the back office area. We were able to review when individuals entered or exited the Merit Board and when they were walking to or from Emily's office, down the hallway, or the back offices, but we were unable to further review any activity occurring in the back office area. There was also no camera on the back entrance to the Merit Board or the outside entrance to the basement. Therefore, we could not review whether Thornley or Garcia were entering or exiting from those exits. We believe it is unlikely that Thornley or Garcia were entering or exiting from those exits on January 23, 2020. If they had entered or exited from the outside basement entrance, they would have appeared in the third camera once coming up from the basement. While it is possible that they entered through the back entrance, we also believe it is unlikely for a number of reasons. First, the back entrance does not lead to a walkway and is not a natural entrance. Second, if one uses the back entrance, he or she would walk past Dykstra's and Garvue's office and a bell makes a sound when the door is opened. Dykstra did not recall either Garcia or Thornley using the back entrance on that or any other day. Third, the times when Garcia was out of the office he was with Fox during the relevant time period. It is unlikely that both he and Fox used the back entrance as they both described errands they ran that day and they can be seen entering the front entrance. Fourth, Thornley also likely did not use the back entrance. Thornley can be seen leaving in her car. If Thornley were to use the back entrance, she would have had to enter the parking lot through the back road to not be seen on the cameras. Instead, she returns in her car and enters through the front entrance.

*Attorney-Client Privileged*
*Attorney Work Product*

- o 7:20 a.m. - 7:26 a.m.
- o 7:29 a.m. - 8:23 a.m.
- o 9:16 a.m. - 9:32 a.m.
- o 9:32 a.m. - 12:16 p.m.
- o 1:09 p.m. - 1:41 p.m.
- o 2:11 p.m. - 2:26 p.m. (leaves for day at 2:26 p.m.)

Garcia was in the Merit Board offices during the following windows of time on January 23, 2020:

- o 8:13 a.m. - 8:47 p.m.
- o 10:38 a.m. - 3:50 p.m.
- o 3:51 p.m. - 5:45 p.m. (leaves for day at 5:45 p.m.)

Thornley has alleged consistently that the assault took place in Garcia's office.[51] Thornley's statements regarding timing of the assault however have varied in their specificity in the different iterations of her allegations. The various timeframes she has alleged are as follows: between 10:00 a.m. and 2:00 p.m., between 10:00 a.m. and 1:30 p.m., and between 11:00 a.m. and 12:30 p.m.[52]

Within the various timeframes alleged by Thornley, we have analyzed and narrowed the timing in which it is possible Thornley and Garcia could have been his office by examining relevant electronic evidence. These include: Merit Board video footage that shows both entering and exiting the Merit Board as well as certain areas within the offices, Thornley's work emails, Garcia's work emails, Thornley's desk phone records, Garcia's desk phone records, Garcia's personal cell phone records, Thornley's personal cell phone call information obtained from witnesses, and times at which there was human activity on Thornley's computer.[53] Our analysis has shown that for the majority of the windows of time alleged by Thornley, the evidence does not support there having been an opportunity for them to be alone together in Garcia's office as alleged. The evidence further shows that, while there are limited points during January 23 within the timeframes alleged by Thornley when it is in fact possible that she and Garcia could have been alone in his office together, there is some contradictory or inconsistent evidence with each of these time periods.

---

[51] The only time that she alleged it occurred elsewhere was in the workers compensation documentation that was completed by Young in which it states that the assault occurred in the "Main corridor to director's office."

[52] The Notification of Injury form in the Injury/Incident section and Illinois Form 45 in the Date and Time of Accident section state the incident occurred at 10:00 a.m. The Notification of Injury form and the Illinois Form 45 in the Comments section states "Time of incident occurred between 10am-2pm." Rosen recalled that Thornley told Rosen and Spillane the assault occurred between 10:00 a.m. and 1:30 p.m. Cusumano documented that Thornley alleged the assault occurred between 11:00 a.m. and 12:30 p.m.

[53] We engaged a forensic analyst to review a forensic image of Thornley's desktop computer. The forensic analyst was able to view Thornley's computer activity and determine what activity was caused by a human (for example, browsing the internet) compared to automatic activity on the computer. The analyst created a timeline of the human activity for January 23, 2020. Because the activity occurred at times Thornley was in the office, we believe the activity can be attributed to Thornley and would reflect when Thornley was sitting at her computer.

44

*Attorney-Client Privileged*
*Attorney Work Product*

The below analysis sets forth the blocks of time during the period between 10 a.m. and 2 p.m. that based on a review of all of the Merit Board videos that Garcia and Thornley were both in the back office area, the area that includes Garcia's office where Thornley alleges the assault took place. This area also includes Thornley's own office as well as Dykstra's office, Garvue's office and the conference room. There is no video within the back office area from which we can further determine the location within that space of any particular person at any given time. Within each block of time where the video places both Thornley and Garcia in the back office space, we have included information from the above listed phone records, emails, and Thornley computer analysis to show Garcia's or Thornley's activity at a given moment on January 23, 2020. We have also included, based on review of the video evidence, the times during those blocks of time that Fox was in the back office area. We have done so because, as discussed above, in Thornley's recitation of events to Cusumano, which were typed by Cusumano contemporaneously, Thornley stated: "You have to enter through an empty office to get to get through his. Emily knew I was headed to his office and said 'You can go in there.'" In order for that conversation to have been able to take place between Fox and Thornley as Thornley alleges, Fox would have had to have been in the back office space at or prior to the time of the alleged assault. Following each block of time, we provide our analysis based on the evidence set forth of the times at which Thornley could have potentially been in Garcia's office.

| 10:38 – 10:40 a.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 10:34-10:56 a.m. | Garcia | Phone | Call from Retired ISP Sergeant C. Pfontenhauer |
| 10:38:50 a.m. | Thornley | Computer | https://www.amazon.com/ |
| 10:38:51 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/ (19 seconds) |
| 10:39:09 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/product/handle-buy-box/(1 second) |
| 10:39:10 a.m. | Thornley | Computer | https://www.amazon.com/ (0 seconds) |
| 10:39:10 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/ (84 seconds) |
| 10:40:31 a.m. | Thornley | Computer | https://www.amazon.com/s/ref=nb_sb_noss |
| 10:40:32 a.m. | Thornley | Computer | Amazon.com: childs old time vest: Home & Kitchen - Internet Explorer (0 seconds) |
| 10:40:32 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/s/ref=nb_sb_noss ?url=search-alias%3Dgarden&field-keywords=childs+old+time+vest (0 seconds) |

*Attorney-Client Privileged*
*Attorney Work Product*

| 10:40:32 a.m. | Thornley | Computer | Amazon.com: childs old time vest: Home & Kitchen - Internet Explorer (0 seconds) |
|---|---|---|---|
| 10:40:32 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/ (27 seconds) |
| 10:40:33 a.m. | Thornley | Computer | https://www.amazon.com/ |
| 10:40:58 a.m. | Thornley | Computer | https://www.amazon.com/s/ref=nb_sb_noss?url=search-alias%3Dgarden&field-keywords=childs+old+time+vest |
| 10:40:59 a.m. | Thornley | Computer | Amazon.com Shopping Cart - Internet Explorer (0 seconds) |
| 10:40:59 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/ (92 seconds) |

Based on the above information, we do not believe there is time within the 10:38 – 10:40 a.m. time frame that Thornley could have been in Garcia's office for the conduct she described to have occurred. Our belief is based upon, in addition to other evidence, the fact that Garcia's phone records reflect he was on a phone call during this entire time period.

| 10:43 – 10: 47 a.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 10:34-10:56 a.m. | Garcia | Phone | Call from Retired ISP Sergeant C. Pfontenhauer |
| 10:43-10:44 a.m. | Fox | Video | Fox was in the back office area |
| 10:43:13 a.m. | Thornley | Computer | https://www.amazon.com/s/ref=nb_sb_noss_1?url=search-alias%3Daps&field-keywords=kids+old+man+hat |
| 10:43:14 a.m. | Thornley | Computer | https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/ (0 seconds) |
| 10:43:14 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/(9 seconds) |
| 10:43:22 a.m. | Thornley | Computer | https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/ (0 seconds) |
| 10:43:22 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/(5 seconds) |

*Attorney-Client Privileged*
*Attorney Work Product*

| 10:43:27 a.m. | Thornley | Computer | https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/ (0 seconds) |
|---|---|---|---|
| 10:43:27 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/ (17 seconds) |
| 10:43:44 a.m. | Thornley | Computer | https://www.amazon.com/Birthday-Adjustable-Suspender-Pre-Tied-Matched/ |
| 10:43:50 a.m. | Thornley | Computer | https://www.amazon.com/gp/product/handle-buy-box/ref=dp_start-bbf_1_glance |
| 10:43:51 a.m. | Thornley | Computer | https://www.amazon.com/gp/buy/prefetch/pipeline-assets.html |
| 10:43:52 a.m. | Thornley | Computer | https://www.amazon.com/gp/buy/prefetch/pipeline-assets.html?prefetchSPP=1 |
| 10:44:50 a.m. | Thornley | Computer | https://www.amazon.com/ |
| 10:44:51 a.m. | Thornley | Computer | https://www.amazon.com/gp/buy/prefetch/store-html.html |
| 10:44:53 a.m. | Thornley | Computer | https://www.amazon.com/gp/cart/desktop/go-to-checkout.html/ref=ox_sc_proceed |
| 10:44:56 a.m. | Thornley | Computer | https://www.amazon.com/gp/buy/spc/handlers/display.html?hasWorkingJavascript=1 |
| 10:44:57 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/buy/spc/handlers/display.html?hasWorkingJavascript=1 (96 seconds) |
| 10:45:53 a.m. | Thornley | Computer | https://www.amazon.com/gp/cart/desktop/go-to-checkout.html/ref=ox_sc_proceed?isToBeGiftWrappedBefore |
| 10:46:49 a.m. | Thornley | Computer | https://www.amazon.com/gp/buy/spc/handlers/static-submit-decoupled.html/ref=ox_spc_place_order?ie=UTF8&hasWorkingJavascript= |
| 10:46:54 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/buy/thankyou (269 seconds) |

Based on the above information, we do not believe there is time within the 10:43 – 10: 47 a.m. timeframe that Thornley could have been in Garcia's office for the conduct she described to have occurred. Our belief is based upon, in addition to other evidence, the fact that Garcia's phone records reflect he was on a phone call during this entire time period.

*Attorney-Client Privileged*
*Attorney Work Product*

| 10:47 – 10:52 a.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 10:34-10:56 a.m. | Garcia | Phone | Call from Retired ISP Sergeant C. Pfontenhauer |
| 10:47:49 a.m. | Thornley | Computer | https://www.amazon.com/gp/buy/spc/handlers/static-submit |
| 10:49-11:14 a.m. | Fox | Video | Fox was in the back office area |
| 10:51:25 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/buy/thankyou1&purchaseId (4 seconds) |

Based on the above information, we do not believe there is time within the 10:47-10:52 a.m. timeframe that Thornley could have been in Garcia's office and the conduct she described occurred. Our belief is based upon, in addition to other evidence, the fact that Garcia's phone records reflect he was on a phone call during this entire time period.

| 10:55 – 10:56 a.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 10:34-10:56 a.m. | Garcia | Phone | Call from Retired ISP Sergeant C. Pfontenhauer |
| 10:49-11:14 a.m. | Fox | Video | Fox was in the back office area |

Based on the above information, we do not believe there is time within the 10:55-10:56 a.m. timeframe that Thornley could have been in Garcia's office for the conduct she described to have occurred. Our belief is based upon, in addition to other evidence, the fact that Garcia's phone records reflect he was on a phone call during this entire time period.

| 10:58 – 11:09 a.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 10:49-11:14 a.m. | Fox | Video | Fox was in back office area |
| 10:59:57 a.m. | Thornley | Computer | http://www.facebook.com/plugins/like |
| 11:01 -1:02 a.m. | Thornley | Phone Records | Call to VanDeKerckhove (5.08 seconds) |
| 11:03:45 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/ (9 seconds) |

*Attorney-Client Privileged*
*Attorney Work Product*

| 11:03:46 a.m. | Thornley | Computer | https://s.amazon-adsystem.com/v3/pr?exlist=an_n-lucid&fv=1.0&a=cm |
| 11:03:53 a.m. | Thornley | Computer | https://www.amazon.com/ |
| 11:03:54 a.m. | Thornley | Computer | https://www.bing.com/sa/simg/bing_p_rr_teal_min.ico |
| 11:03:54 a.m. | Thornley | Computer | https://www.bing.com/search?q=amazon+prime+music&form (0 seconds) |
| 11:03:54 a.m. | Thornley | Computer | ie.http:https://www.bing.com/search?q=amazon+prime+music&form (4 seconds) |
| 11:03:57 a.m. | Thornley | Computer | http://www.bing.com/search?q=amazon+prime+music&form |
| 11:03:57 a.m. | Thornley | Computer | https://www.amazon.com/gp/dmusic/promotions/PrimeMusic (0 seconds) |
| 11:03:57 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/dmusic/promotions/PrimeMusic (4 seconds) |
| 11:04:01 a.m. | Thornley | Computer | ie.http:https://music.amazon.com/home? |
| 11:04:56 a.m. | Thornley | Computer | https://www.amazon.com/gp/dmusic/promotions/PrimeMusic |
| 11:05 a.m. | Garcia | Email | Email to P. Garcia |
| 11:06:03 a.m. | Thornley | Computer | https://www.msn.com/content/images/icons/Favicon_EdgeStart.ico |
| 11:06:04 a.m. | Thornley | Computer | https://login.live.com/login.srf |
| 11:07 a.m. | Garcia | Email | Email to C. Pfontenhauer |
| 11:08:06 a.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/dmusic/promotions/PrimeMusic (13 seconds) |

Based on the above information, we do not believe there is time within the 10:58-11:09 a.m. timeframe that Thornley could have been in Garcia's office for the conduct she described to have occurred. Our belief is based upon, in addition to other evidence, the consistency human use of Thornley's computer during this time.

| 11:09 – 11:22 AM | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 10:49-11:14 a.m. | Fox | Video | Fox was in back office area |

*Attorney-Client Privileged*
*Attorney Work Product*

| 11:10:15 a.m. | Thornley | Computer | ie.http:https://cag.illinois.gov/vpn/index-CAG.html (13 seconds) |
|---|---|---|---|
| 11:10:28 a.m. | Thornley | Computer | ie.http:https://cag.illinois.gov/cgi/login (10 seconds) |
| 11:10:38 a.m. | Thornley | Computer | https://cag.illinois.gov/cgi/dlge (10 seconds) |
| 11:10:45 a.m. | Thornley | Computer | https://cag.illinois.gov/cgi/dlge |
| 11:10:46 a.m. | Thornley | Computer | https://cag.illinois.gov/Citrix/SOIWeb/ |
| 11:10:57 a.m. | Thornley | Computer | https://cag.illinois.gov/Citrix/SOIWeb/Resources/LaunchIca |
| 11:10:59 a.m. | Thornley | Computer | https://cag.illinois.gov/Citrix/SOIWeb/Resources/LaunchIca |
| 11:11:45 a.m. | Thornley | Computer | https://cag.illinois.gov/Citrix/SOIWeb |
| 11:17-11:20 a.m. | Fox | Video | Fox was in back office area |
| 11:21 – 11:22 a.m. | Thornley | Phone | Thornley leaves voicemail on M. Yokley cell |

While it may be possible Thornley could have been in Garcia's office during part of the 11:09-11:22 a.m. timeframe for the conduct she described to have occurred, specifically 11:11 – 11:22 a.m., this timing is largely inconsistent with Thornley's statement regarding the conversation she stated she had with Fox as she was going into Garcia's office with the exception of two short windows (11:11:45 and 11:14 a.m. and 11:17 and 11:21 a.m.) which we analyze as follows: (1) we believe the time period between 11:11:45 a.m., when Thornley is on her computer, and 11:14 a.m., when Fox leaves the back office area is a two minute window that would leave little time for Thornley to have left her computer and gone to Garcia's office area before Fox left and (2) we believe the time period during which Fox re-enters the back office 11:17 a.m. and the time which Thornley makes a phone call at 11:21 a.m. likewise leaves a very brief window of time in which she could have conversed with Fox, gone into Garcia's office, the sexual assault occurred, and leave his office to then make a phone call. Moreover, we note that Thornley leaves a voicemail for Michael Yokley, CFO of ISP immediately following this window of time, which as discussed in greater detail below is not consistent with what Thornley described following the alleged assault.

Both Garcia and Thornley are in the back office area from 11:25-11:26 a.m. Due to this short window and the fact that between 11:22 and 11:27 a.m. Garcia was seen on the video walking to and from the front office area, it seems unlikely that the conduct Thornley alleged occurred during this time. Moreover, Fox was not in the back office area at 11:25-11:26 a.m. or immediately prior to this time.

**11:27 – 11:53 a.m.**

*Attorney-Client Privileged*
*Attorney Work Product*

| Time | Person | Electronic Evidence | Description of Activity |
|------|--------|---------------------|------------------------|
| 11:30:57 a.m. | Thornley | Computer | -https://cag.illinois.gov/ |
| 11:31-11:33 a.m. | Garcia | Phone | Call from Bob Hehl (widower of Trooper Erin Hehl) |
| 11:40:16 a.m. | Thornley | Computer | https://c.urs.microsoft.com/ |
| 11:43:30 a.m. | Thornley | Computer | %ProgramFiles% (%SystemDrive%\Program Files)\Citrix\ICA Client\CDViewer.exe (2,342 seconds) |

     While it may be possible Thornley could have been in Garcia's office during part of the 11:27-11:53 a.m. timeframe for the conduct she describes to have occurred, specifically the time between 11:33 and 11:40 a.m. and 11:43 and 11:53 a.m., this timing would be inconsistent with Thornley's statement regarding the conversation she stated she had with Fox as she was going into Garcia's office since Fox was not in the back office area at or immediately prior to this time. We also note that there was human use of a program on her computer starting at 11:43 am that was in use for 2,342 seconds, or approximately 39 minutes. However, based on the forensic analysis, we cannot definitively say that Thornley was actively using the program throughout that entire time period since even though the forensic analysis shows it was opened, it may not establish consistent active usage for the duration and, as set forth below, there were other programs in use during that same time window.

| 11:53 a.m. – 12:15 p.m. | | | |
|------|--------|---------------------|------------------------|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 11:53 a.m. – 12:03 p.m. | Thornley | Phone | Call with M. Yokley |
| 11:59:59 a.m. | Thornley | Computer | ie.http:https://cag.illinois.gov/vpn/index-CAG.html (5 seconds) |
| 12:00:07 p.m. | Thornley | Computer | ie.http:https://cag.illinois.gov/vpn/index-CAG.html (190 seconds) |
| 12:01 p.m. | Garcia | Email | Email to Fox |
| 12:02 p.m. | Garcia | Email | Email to M. Davis |
| 12:03:37 p.m. | Thornley | Computer | Microsoft.Office.OUTLOOK.EXE.16 (16 seconds) |
| 12:08 -12:13 p.m. | Thornley | Phone | Thornley call to VanDeKerckhove (5.08 seconds) |
| 12:11 – 12:12 p.m. | Fox | Video | Fox was in back office area |

*Attorney-Client Privileged*
*Attorney Work Product*

 Based on the above information, we do not believe there is time within this block that Thornley could have been in Garcia's office for the conduct she described to have occurred. Our belief is based upon Thornley's phone usage and Thornley's computer usage.

| 1:09 – 1:20 p.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 1:09-1:23 p.m. | Fox | Video | Fox was in back office area |
| 1:16 p.m. | Thornley | Email | Email to D. Fristrom |
| 1:16:00 p.m. | Thornley | Computer | jthornley@ispmeritboard.org.ost -> Sent Items |
| 1:17 p.m. | Thornley | Email | Email to Dykstra |
| 1:17:13 p.m. | Thornley | Computer | Microsoft.InternetExplorer.Default (262 seconds) |
| 1:17:15 p.m. | Thornley | Computer | ie.http:https://cag.illinois.gov/vpn/index-CAG.html (56 seconds) |
| 1:18:11 p.m. | Thornley | Computer | https://imreset.illinois.gov/default.aspx (0 seconds) |
| 1:18:11 p.m. | Thornley | Computer | ie.http:https://imreset.illinois.gov/default.aspx (11 seconds) |
| 1:18:21 p.m. | Thornley | Computer | https://imreset.illinois.gov/Error.aspx (0 seconds) |
| 1:18:21 p.m. | Thornley | Computer | ie.http:https://imreset.illinois.gov/Error.aspx (4 seconds) |
| 1:18:24 p.m. | Thornley | Computer | ie.http:https://imreset.illinois.gov/default.aspx (8 seconds) |
| 1:18:32 p.m. | Thornley | Computer | ie.http:https://imreset.illinois.gov/Error.aspx (51 seconds) |
| 1:19:23 p.m. | Thornley | Computer | ie.http:https://imreset.illinois.gov/default.aspx (5 seconds) |
| 1:19:28 p.m. | Thornley | Computer | ie.http:https://cag.illinois.gov/vpn/index-CAG.html (8 seconds) |

 We believe it is possible Thornley could have been in Garcia's office during part of the 1:09-1:20 p.m. timeframe for the conduct she describes to have occurred, specifically the time between 1:09 and 1:16 p.m. We note however that this is a relatively short 7 minute window. Thornley returned to the office at 1:09 p.m. and walked down the hallway towards the kitchen area with a water bottle. She would have had to gone to her office, grabbed the paperwork, walked to Garcia's office, and started to set out the paperwork and either walked back to her

*Attorney-Client Privileged*
*Attorney Work Product*

office to grab the water bottle or left the paperwork in Garcia's office and had the water bottle with her. Moreover, immediately prior to this time, the video shows that Garcia and Fox were weighing a package in the hallway at the entrance to the back offices from the hallway. At 1:09 p.m. they remove the scale from the floor and walk towards the back offices with the package. At 1:23 p.m. Garcia walks to Fox's office with the box and Fox follows him. Although Fox was with Garcia at this time, it appears that they were together for this timeframe since they were working with the box and Fox followed Garcia to her office. We also note that this falls outside of one of the time periods she gave in terms of when she stated the assault occurred (between 11:00 a.m. and 12:30 p.m.).

| 1:24 – 2:02 p.m. | | | |
|---|---|---|---|
| **Time** | **Person** | **Electronic Evidence** | **Description of Activity** |
| 1:25-1:30 p.m. | Fox | Video | Fox was in back office area |
| 1:25 p.m. | Garcia | Email | Email to A. Hansen |
| 1:36 -1:46 p.m. | Garcia | Phone | Call to Jordan Mellecker (Friend of Garcia's daughter) |
| 1:36:20 p.m. | Thornley | Computer | https://login.microsoftonline.com/ |
| 1:36:20 p.m. | Thornley | Computer | https://www.bing.com/search?q=iemA&form (0 seconds) |
| 1:36:20 p.m. | Thornley | Computer | ie.http:https://www.bing.com/search?q=iemA&form (90 seconds) |
| 1:37:12 p.m. | Thornley | Computer | http://www.bing.com/search?q=iemA&form |
| 1:37:31 p.m. | Thornley | Computer | http://www.iema.illinois.gov/ |
| 1:37:50 p.m. | Thornley | Computer | http://www.iema.illinois.gov/ (0 seconds) |
| 1:37:50 p.m. | Thornley | Computer | ie.http:http://www.iema.illinois.gov/ (7 seconds) |
| 1:37:57 p.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/dmusic/promotions/PrimeMusic (17 seconds) |
| 1:38:26 p.m. | Thornley | Computer | ie.http:https://music.amazon.com/home (27 seconds) |
| 1:38:53 p.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/dmusic/promotions/PrimeMusic |
| 1:38:58 p.m. | Thornley | Computer | ie.http:https://www.amazon.com/gp/dmusic/promotions/PrimeMusic (1 second) |
| 1:39:18 p.m. | Thornley | Computer | ie.http:https://music.amazon.com/home (2 seconds) |
| 1:39:23 p.m. | Thornley | Computer | ie.http:https://music.amazon.com/home (0 seconds) |

*Attorney-Client Privileged*
*Attorney Work Product*

| 1:40:19 p.m. | Thornley | Computer | Microsoft.Office.OUTLOOK.EXE.16 (54 seconds) |
|---|---|---|---|
| 1:57 p.m. | Garcia | Email | Email to D. Fristrom |

While we believe it is possible Thornley could have been in Garcia's office during part of the 1:24-2:02 p.m. block of time for the conduct she describes to have occurred, specifically the time between 1:46 and 1:57 p.m., this timing would be inconsistent with Thornley's statement regarding the conversation she stated she had with Fox as she was going into Garcia's office since Fox was not in the back office area immediately prior to or at this time. We note, however, that this timeframe falls outside of two of the time periods she alleged the assault occurred (between 10:00 a.m. and 1:30 p.m., and between 11:00 a.m. and 12:30 p.m.).

We note that based on a review of emails and other evidence we believe it is likely that Thornley did have a conversation in person with Garcia between 12:20 p.m. and 1:17 p.m. that day. At 12:20 p.m., Thornley received an email from Robert Ditta (Executive Assistant at All-Circo, Inc.)[54] stating: "Hello Jenny, I'm just following up on Sheri's email regarding the IL Lobbying Registration. Can you please let me know as soon as you have done this so we can make sure everyone is in compliance? Thanks so much and as always, please call me with any questions at 708-256-1461. Thanks again!" At 1:17 p.m., Thornley forwarded Dykstra the email from Ditta adding: "Jack and I discussed this [email from Robert Ditta] briefly today but I would feel more comfortable if you handled this."

Based on a review of their desk phone records (for which we have outgoing call records but no incoming call records exist) and records for Garcia's work cell phone and personal cell phone, we do not believe that there was a phone communication between Garcia and Thornley during that time (although we note it is possible that Thornley could have called from her personal cell phone, for which we do not have records, to make an incoming call to Garcia's desk phone). We also note it is possible that Thornley, despite her representation, did not talk to Garcia about the email from Ditta that day as she stated or that she was referencing a conversation with Garcia that she had about the topic before this email came in as Ditta was following up on an email that was sent by Sheri Supena (Finance & Office Admin Assistant at All-Circo, Inc.) on January 14, 2020. On balance, however, we believe it is likely that Garcia and Thornley had an in person discussion in the Merit Board offices about the email after receiving it.

If Thornley did in fact talk to Garcia about this in person after receiving the reminder email from Ditta, we believe based on the evidence that the conversation would have had to have taken place between 1:09 p.m. and 1:17 p.m. at a location in the back offices. Thornley left the Merit Board offices at 12:15 p.m. and did not return to the office until 1:09 p.m. meaning that an in-person conversation would have to have taken place after 1:09 p.m. At the time she returned to the office, as noted, based on video review, both Fox and Garcia are in the back offices area after video evidence shows they had been weighing a box in the hallway at the entrance of the back offices. Based on video review, Garcia, Fox, and Thornley are all in the back office area until 1:20 p.m. when Thornley went towards the kitchen area (which is after Thornley's 1:17 the

---

[54] All-Circo, Inc. is a private corporation that has contracted to provide services to the Merit Board.

*Attorney-Client Privileged*
*Attorney Work Product*

email was sent). At 1:23 p.m. both Garcia and Fox walked towards Fox's office carrying boxes. Accordingly, we think it likely that there was an in-person discussion occurred between Thornley and Garcia during this time, but Thornley may not have been alone with Garcia in the office for the conversation.

Thus, the above analysis demonstrates that while there were points during the timeframes alleged by Thornley during which she could have potentially been alone with Garcia in his office, those windows of time are limited and there is some potentially contradicting evidence with each. The following are the timeframes when based on the above analysis of evidence it is possible Thornley was in Garcia's office on January 23 between 10:00 a.m. and 2:00 p.m. with the potentially contradicting evidence listed in parenthesis: 11:11-11:14 a.m. and 11:17-11:21 a.m. (length timing of windows); 11:25-11:26 a.m. (Fox not in back offices during or immediately prior to timeframe); 11:33-11:40 a.m. (Fox not in back offices during or immediately prior to timeframe); 11:45-11:53 a.m. (Fox not in back offices during or immediately prior to timeframe; Thornley computer application open indicative of potential human activity during this time), 1:09-1:16 a.m. (outside of certain timeframes alleged by Thornley), and 1:46-1:57 a.m. (outside of certain timeframes by Thornley).

### III. Evidence relevant to certain details of the alleged assault

There is evidence from the investigation that is inconsistent with the assault having occurred factually in the way detailed by Thornley in two ways. *First,* there is evidence that is inconsistent with what Thornley alleged she was doing in Garcia's office at the time of the alleged assault. *Second*, there is evidence that is inconsistent with the actions she alleged she took after the alleged assault.

#### A. Evidence is inconsistent with Thornley's statements regarding what she was doing in Garcia's office at the time of the alleged assault

The evidence does not support the veracity of Thornley's description of the reason for her being in Garcia's office at the time of the alleged assault. As detailed above, Thornley stated in her written complaints to IDHR and her workers' compensation forms that Garcia sexually assaulted her when she was at his conference table spreading out papers for him to sign. She provided more detailed specifics when she told Spillane and Rosen that the papers were "attendance paperwork," which she had carefully laid out, both of whom recalled this particular detail. Thornley was also precise in her conversation with Cusumano that she was spreading out documents for his signature that were "time sheets," which was documented by Cusumano in contemporaneous notes taken for Thornley and sent by Cusumano to Thornley.

We have reviewed and analyzed all Merit Board time and attendance records we have been able to locate. Because Thornley did not specify whether she alleges Garcia signed those documents either at the time or at a later date or at all, we have conducted our analysis for all possibilities. We have determined the following: (1) there are no time and attendance documents that were signed by Garcia on January 23, 2020; (2) there are no time and attendance documents that were in the Merit Board's possession that could have existed on January 23, 2020 that were signed by Garcia at a later date, were signed by someone else in Garcia's stead on either January

*Attorney-Client Privileged*
*Attorney Work Product*

23, 2020 or at a later date, or remained unsigned and could have conceivably been documents presented to Garcia for signature on that date.

In reviewing the Merit Board employee timesheets, Dykstra's, Garvue's and Fox's January 2020 Attendance Report and Overtime Request Forms contained entries after January 23, 2020 so were likely not created prior to that date. Dykstra's and Garvue's Sick Time Request Form for January 2020 were signed by Garcia and dated January 22, 2020. Any of the timekeeping records for December 2019 were signed prior to January 23, 2020.

We note that there were two documents that we located that were unsigned. Based on the evidence, however, these would not have been the documents presented to Garcia by Thornley. The first was Thornley's Overtime Earned Request form from December 15, 2019; however, this would have been contained in the binder that Thornley previously provided to Fox (and was subsequently provided to Garcia) and thus would not have needed to obtain Garcia's signature after providing the document. The second was a sick time form that we located on Thornley's computer for sick time requested on January 13, 2020. This document was unsigned and was not submitted as part of timekeeping documentation and was merely located on her computer. Although in theory, Thornley could have intended Garcia to sign this form on January 23, 2020, it is a single document that she would not need to spread out on his table, but rather she could have handed it to him at his desk and is inconsistent with the description she gave which was indicative of multiple documents. There are other timekeeping documents, including for receptionist Riley and maintenance worker Bill Gosda. Thornley did receive invoices on January 22, 2020; however, these documents were consistently signed by Thornley, not Garcia. Thus, it is inconsistent with the evidence that she was bringing these documents to Garcia.

Although they cannot be fairly characterized as "time sheets" or "attendance paperwork" as Thornley has stated, and would thus not match Thornley's description of the documents she brought to Garcia in his office in any event, we have also investigated other categories of documents that are handled by Thornley and signed by Garcia, namely vouchers and payroll documents. This analysis similarly showed that based on what we have seen to date there are no documents in either of those categories that Thornley could have presented to Garcia on January 23 for his signature.

Dykstra provided all vouchers that he was able to locate at the Merit Board for October 2019 through February 2020. While there were a few vouchers that could not be located from October and November 2019 as well as unsigned vouchers from October and November 2019, there were no vouchers that were dated after December 2, 2019. Further, Merit Board payroll for January 1, 2020 through January 15, 2020 was signed by Dykstra on January 17, 2020. Merit Board payroll for the second January pay period was signed by Dykstra on February 5, 2020; however, this payroll would not have been due or processed on or prior to January 23, 2020. The Merit Board also is responsible for signing cadet payroll. Dykstra signed the cadet payroll for the December 16, 2019 through December 31, 2019 pay period on January 16, 2019. Both cadet payrolls for January 2020 were signed by Dykstra on January 31, 2020. An email from Lynn Paice (Sworn Payroll at the Illinois State Police) on January 31, 2020 to Dykstra and Thornley says she was going to bring payroll vouchers over to the Merit Board that afternoon for

56

*Attorney-Client Privileged*
*Attorney Work Product*

signature. Since the signature reflects that it was signed on January 31, 2020, it is likely the Merit Board did not possess these documents prior to this date.

Based on the above analysis, we believe that Thornley's claim that at the time of the assault she was in Garcia's office laying out time sheets or attendance papers, or any other papers requiring his signature, on Garcia's conference table for him to sign when he came up from behind her is inconsistent with the evidence from the investigation.

### B. Evidence is inconsistent with Thornley's statements about what she did following the alleged assault

The evidence is also inconsistent with details in Thornley's allegations about what she did following the alleged assault. She made several statements to others regarding her actions after she alleges she was assaulted.

- Thornley told Cusumano that Thornley went to her office and called her friend Sara (no last name mentioned) and her husband and packed some things in her office.

- Thornley stated in her statements to Spillane and Rosen that she went to her office and shut her door and immediately called her therapist and saw her therapist that day and every day since. She further stated that she never went back to work following the alleged assault.

- Thornley stated in her IDHR complaint that she was so upset she was unable to work the rest of the afternoon at the Merit Board. Specifically, Thornley alleged "The physical, sexual assault was offensive to me and I rejected it immediately. It caused me to be upset and unable to work the rest of that afternoon at the Merit Board."

The evidence we have obtained demonstrates a different picture of events. While as discussed above, Thornley herself has given a range as broad as between 10:00 a.m. to 2:00 p.m. and as narrow as 11:00 a.m. to 12:30 p.m. as the timeframes in which the assault occurred, regardless of the point within those time frames, her actions on January 23, 2020, are inconsistent with what she described to others. The inconsistent actions are as follows:

- Thornley left the office for a period of time during the day with Dykstra. There is video evidence that shows Thornley and Dykstra leaving at 1:41 p.m. and returning at 2:11 p.m. According to Dykstra, he and Thornley went to run errands outside the office. Dykstra stated that there was nothing unusual about Thornley's behavior. Thornley did not say she had been sexually assaulted or sexually harassed or otherwise give any indication that anything upsetting had occurred.

- Review of the video footage shows Thornley moving around the office after the 11:00 a.m. to 12:30 p.m. time frame. In the video, it does not appear Thornley was distressed or distraught. As noted, at 12:15 p.m. Thornley left the Merit Board and returned at 1:09 p.m. At 1:20 p.m. Thornley walks towards the kitchen and waives towards the front offices (presumably to Riley). She returns to the back office at 1:24

*Attorney-Client Privileged*
*Attorney Work Product*

p.m. with a plate. At 2:17 p.m. she goes towards the front offices with what appears to be a coffee cup, then towards the back offices and again towards the front offices. At 2:18 p.m. Thornley walks down the hallway to the kitchen area and returns from the kitchen area to the front offices at 2:20 p.m. Thornley returns to the back offices at 2:21 p.m., walks to the front offices at 2:22 p.m., walks to the back offices at 2:23 p.m. and leaves the Merit Board at 2:26 p.m. Upon leaving the Merit Board she appears to say something to someone in the front offices. Notably, Garcia is present at the Merit Board (specifically in the kitchen area) at 2:02 p.m.

- As discussed above, email evidence suggests Thornley was in communication with Garcia following the 11:00 a.m. – 12:30 p.m. timeframe after which she said the alleged assault occurred.

- As detailed above, Thornley continued to work on her computer throughout the morning and afternoon, accessing websites such as cag.illinois.gov and imreset.illinois.gov.

- According to phone records Michael Yokley, CFO of the Illinois State Police, Thornley had a 10 minute call with Yokley that began at 11:53 a.m. According to Yokley, although he does not recall the specific discussion during the call, he believes it was work related. Thornley did not say she had been sexually assaulted or sexually harassed by Garcia. Additionally, Thornley left a voicemail for Yokley at 11:21 a.m. This is immediately following the one window of time (as discussed above 11:17 to 11:21) in which Thornley could have been in Garcia's office. For Thornley to have called Yokley, who is someone who appears to be a professional friend and to whom she made no statements about having been assaulted, immediately following having been assaulted is fairly implausible and also inconsistent with her description of what she did following the alleged assault. Yokley's phone records also show that he had a call with Thornley at 7:56 p.m. that evening. Yokley recalled that Thornley sounded upbeat because she thought she had a new opportunity at IEMA and was looking forward to leaving the Merit Board. Again, she did not make any statements about being sexually assaulted or sexually harassed during this call.

- According to multiple pieces of evidence, Thornley had a job interview with the IEMA Director Alicia Tate-Nadeau and Declan Binninger also of IEMA (with whom she had been communicating about the possible job as becoming their new CFO) on the afternoon of January 23, 2020. Video evidence shows Thornley left the Merit Board at 2:26 p.m. According to Dykstra, she told him she was going to a personnel meeting at IEMA. A text message obtained from Binninger sent by Thornley at 2:41 p.m. states that she had just pulled up. Binninger in a conversation with Rosen confirmed after reviewing his text messages that Thornley was interviewed on January 23, 2020.[55] At 6:14 p.m. that evening, Thornley text messaged Binninger

---

[55] In our interview with Binninger, prior to reviewing his text messages, he thought the interview was on January 24, 2020. In a conversation with Rosen, he said the interview was either on January 22 or 23, 2020; however, then

*Attorney-Client Privileged*
*Attorney Work Product*

stating "I can't wait to start!" At 7:56 p.m., Thornley text messaged Yokley stating "IEMA offered me the CFO position (emoji)."

- Thornley returned to work the next day, January 24, 2020. According to Dykstra, she was in a "good mood" and they conversed about Thornley's responsibilities so that Dykstra would be prepared when she left the Merit Board to work for IEMA.

We recognize that these events described above do not rule out the calls to her therapist, husband, and friend that she claims occurred on January 23, 2020. We do not have access to Thornley's personal cell phone records and have no other basis from which to say whether or not she may have called her husband, therapist, or friend following the alleged assault. Based on the evidence we do have however, her actions appear to be inconsistent with her claimed state of mind at the time and the actions she claims to have taken following the alleged assault.

### IV. Evidence of a Motive Thornley May Have Had to Fabricate the Allegations

Evidence from the investigation reflects a potential motive for Thornley to make a false accusation against Garcia. The evidence reflects that Thornley knew she was being investigated for her overtime and was attempting to leave the Merit Board quickly. The evidence further reflects that Thornley became distressed when she no longer had the job she thought she had been offered. It was during this time that she first raised allegations of sexual harassment and sexual assault by Garcia. The evidence also reflects that she previously had begun raising specific allegations of other types of alleged misconduct by Garcia once she was aware she was being investigated for her overtime but that her allegations did not include sexual harassment or assault despite the fact that the assault had allegedly occurred by that point.

#### A. Evidence Reflects that Thornley Knew She was Being Investigated for Overtime and was Attempting to Leave the Merit Board Quickly

The evidence supports a finding that Thornley knew that Garcia was investigating her overtime. It further demonstrates that during the same time period when Garcia was investigating her overtime and Thornley became aware, Thornley was attempting to leave the Merit Board as quickly as possible and was working on potentially obtaining a job at IEMA as their CFO or (at least initially) a position at ISP. She was preliminarily selected as the candidate for the IEMA CFO role pending vetting by the Governor's Office and wanted that process to go as quickly as possible so she could start immediately at IEMA. The evidence shows that she was becoming increasingly concerned that the Governor's Office was not going to approve her for the position. When the Governor's Office did not agree to her selection, and thus she did not have a new job that would have allowed her to leave the Merit Board, she was extremely upset. The evidence shows that during this same time period she raised sexual harassment by Garcia and ultimately alleged that Garcia sexually assaulted her just over one week earlier. We will discuss each of these points in additional detail.

---

clarified that it was on January 23, 2020 after reviewing his text messages. Based the text messages and Binninger's conversation with Rosen, we believe the interview occurred on January 23, 2020.

*Attorney-Client Privileged*
*Attorney Work Product*

### 1. Evidence of Thornley's Awareness of Overtime Investigation and Concern About Garcia Firing Her

The evidence shows that Thornley was aware that she was being investigated for her overtime and became increasingly concerned about Garcia taking action to fire her.

- On the morning of December 18, 2019, Thornley sent an email to her personal email address and to Dykstra forwarding Garcia's request for her overtime sheets and writing "funny."

- According to Garvue, on the morning of January 14, 2020, around 10:00 or 11:00 a.m., Thornley called Garvue over and said that Garcia was disputing the amount of overtime she had earned. She further stated that Fox had worked hundreds of hours and showed him two pieces of paper that had some kind of compilation that looked like it had been prepared by Thornley and Thornley's hours totaled approximately 40. Thornley said Garcia is targeting me for the amount of overtime hours I worked. Thornley further said that the Merit Board has a work from home policy and that Garcia was being unfair. She asked if Garvue knew anything and said to let her know if Garcia talked to Garvue and what Garvue says.

- According to Steve VanDeKerckhove of GOMB, when Thornley met with him on January 15, 2020, at GOMB, she said her time was getting scrutinized and that she only worked 30 to 50 hours of overtime and that got questioned when she knows someone else is working 100s of hours and she either got a big raise or was trying to get a big raise.

- At 4:54 p.m. on January 24, 2020, while Dykstra, Fox, and Garvue were at the office copying Thornley's computer, Thornley sent Dykstra three text messages to his personal phone stating:

  - "you all at the office still trying to figure your lives out"
  - "You better not say a word."[56]
  - "And mr Ethics officer. The Board with all our mandated postings need to be put back out ASAP".

- On January 26, 2020, Thornley sent additional messages to Dykstra's personal phone stating:

  - "I think it's funny how shady you all are."
  - "I won't forget it."

- On January 27, 2020, at 9:12 pm., in text messages with Binninger, Thornley expresses a belief that "Jack is coming to town [the following day] to chew my ass."

---

[56] Dykstra interpreted this text to be in reference to Thornley's alleged new job at IEMA which she had told him about the prior day.

*Attorney-Client Privileged*
*Attorney Work Product*

- On the morning of January 31, 2020, at 10:58 am, Thornley text messaged Michael Yokley that "Jack is trying to fire me" adding that "I mean I'm double exempt so he's just trying to say our styles don't match. He does not have approval from the governor's office."

### 2. Evidence of Thornley's Concern About Garcia Learning About the IEMA Job and Starting the IEMA Job Quickly

The evidence shows that Thornley was concerned about Garcia learning about the IEMA job (and prior to that the potential ISP job) and was attempting to secure the job and an immediate start date as quickly as possible.

- On January 18, 2020, at 12:38 p.m., in text message discussion with Yokley about the potential job with ISP, Thornley asked "Since we all had new backgrounds when jack started, will they just run an updated felony or will they do a whole new one (face palm emoji)."

- On January 18, 2020, at 9:03 p.m., Thornley text messaged with ISP First Deputy Matt Davis about a possible job there. During their exchange, she asked Davis to "keep it on the down low" stating that Garcia "would totally retaliate if he found out she was trying to leave."

- On January 19, 2020, at 8:58 a.m., in a text message with Davis about the potential job with ISP, Thornley similarly stated "I did have a FULL background when Jack came. So hopefully we could just update that." Davis responded "10-4, if we did it then it definitely makes a second one go quicker. Thanks".

- On January 21, 2020, at 10:50 a.m., Thornley similarly text John Thompson of ISP "Please make sure you don't say anything about what we talked about," referencing a possible job with ISP.

- According to Binninger, he observed Thornley's eagerness about the IEMA job start on January 22, 2020.

- According to Dykstra, on the morning of Thursday, January 23, 2020, Thornley informed him that she had been offered the job at IEMA (although she had not yet interviewed with the Director until later that day) and told him not to tell Garcia. The following day, after Dykstra told her he is not going to lie to cover for the fact that she was moving things out of her office, she sends an email to the entire office to say she was getting her office painted.

- On January 23, 2020 at 6:14 p.m. Thornley texts Binninger asking him about the process. On January 23 at 7:56 p.m. Thornley similarly asks Yokley how long the process would take.

*Attorney-Client Privileged*
*Attorney Work Product*

### 3. Evidence of Increasing Concerns About IEMA Job and Timing of Harassment and Assault Allegations

The evidence shows that Thornley had increasing concerns about whether or not she actually had the IEMA job and being able to leave the Merit Board, ultimately learning she did not in fact have the job. The evidence shows the timing of her allegations of sexual harassment and sexual assault appears to have been contemporaneous with those concerns.

According to the evidence, Thornley appears to have been aware that her co-workers were in her office on the evening of Friday, January 24, 2020. Thornley sent a text message to Dykstra at 4:54 p.m. in which she made a comment about Fox, Dykstra, and Garvue all being at the office stating, "You all at the office still trying to figure your lives out." Thornley may have been suspicious as Dykstra had pretended to leave for the day before Thornley and then returned to the office to work with Fox and Garvue to make a copy of Thornley's computer. Although it is unclear how Thornley knew Dykstra had returned, she may have seen his car back in the parking lot.

This appears to have been a catalyst for Thornley that caused her to become upset. Early in the morning on Monday, January 27, 2020, Thornley reached out to both Thompson and to Patty Ambrose of the Governor's Office. In a text at 8:23 a.m., to Thompson, Thornley told him her co-workers had been going through her office. Thornley told him she was upset and asked to meet. She stated: "I was offered a job at IEMA as cfo. I told dan just because I hired dan, he's my friend. Well, I guess not. He ran straight to jack and Emily." Thompson texted "Better accept". Thornley responded "I took it, that's why I wanted to prepare dan. So they locked me out of the building. Went through my office. Which I had nothing anyway." In a text with Ambrose sent at 8:21 a.m., Thornley asked to meet with her and made plans to meet at 10:30 that morning.

Throughout January 27, 2020 and January 28, 2020 Thornley had multiple meetings and with individuals in state government. On January 27, 2020, in addition to meeting with Ambrose, Thornley also ran into and met with Judy McAnarney who, as evidenced by text messages, Thornley was aware was involved in handling Thornley's IEMA application vetting for the Governor's Office. In that meeting, Thornley raised various allegations about Garcia and said things were bad at the Merit Board. She stated that she needed to start the IEMA job right away and requested a start date of February 1, 2020. Thornley also told McAnarney that someone had gone through her office. Thornley mentioned she had been discussing the issues with Ambrose and McAnarney told her Ambrose was not involved in personnel and Thornley should speak with Governor's Office staff member, Bria Scudder.

On the night of January 27, 2020, at 8:50 p.m., Thornley text messages Kerley asking her to meet the next day and they make a plan to meet at 10:00 a.m. and Thornley stated "I will bring over the files, that way we have everything." The next morning, on January 28, 2020, Thornley met with Kerley at Kerley's office at CMS bringing Garcia's personnel file among other files. They had a continued discussion regarding Fox's position. That afternoon, Thornley returned to the Governor's Office and waited for a significant period of time in an attempt to meet with Scudder. Thornley sent a Facebook friend request to Scudder likely around this same

*Attorney-Client Privileged*
*Attorney Work Product*

time which Scudder ignored. In addition to McAnarney having directed Thornley to Scudder regarding the issues she was raising about Garcia, Scudder was also the individual on whose approval Thornley's position at IEMA depended, a fact of which Thornley at least had some awareness as evidenced in multiple texts with Binninger.  Although on January 27, 2020 and January 28, 2020, Thornley had multiple conversations with individuals in the Governor's Office, McAnarney, Ambrose, and Kerley, about alleged misconduct by Garcia, the alleged misconduct she discussed did not involve allegations of sexual harassment or assault, despite the assault as alleged having occurred just days earlier.

During the time same time period of January 27, 2020 and January 28, 2020, Binninger's statements about finalizing the job and her start date were still encouraging.  In a text message on the night of January 27, 2020 at 9:12 p.m. with Binninger, Thornley asked about the status of her job and Binninger confirmed he had been speaking with Scudder.  Thornley stated "Hearing anything on your end? I'm inpatient [crying laughing face] especially when I'm trying to get away form jack" Binninger responded "Spoke w Bria and she's confident we'll be good. Hope to have an update on start date by mid week." Thornley responded "Omg you make me feel so much better" Binninger stated "No worries. I'll let you know if we run into any snags." Thornley continued: "Can't wait to be included in a real team! So excited. Judy wants me to meet with Bria at some point. They don't want him around much longer." Binninger responds "Well Bria is in town, might be able to meet this week" J. Thornley states "Yeah, Judy was going to set that up. I'm just ready to get away from him. Lol. I would love to see TN rip him a new one".[57]

By January 30, 2020 and January 31, 2020, however, the text messages show that Thornley has become increasingly apprehensive about the IEMA position.  From the evidence in the investigation, she appears to first raise allegations of sexual harassment during this time. On January 30, 2020, at 9:10 a.m., Thornley texts Yokley ""No start date yet! Have you heard from jack at all".  Later that same day, at 3:19 p.m. Thornley texts Binninger "Any word on your end?" On January 31, 2020, at 9:56 a.m., Thornley calls Binninger and leaves a voicemail stating that she has a new job and wants to check on the status of the IEMA position.

On the evening of January 30, 2020 at 6:19 p.m., Thornley sent a text message to Nikki Budzinski, stating that she wanted to speak with Scudder referencing a "serious case of sexual harassment with our director" and stating that she "can't seem to get anyone's attention to discuss this matter."[58]  On January 31, 2020, before noon, Thornley told Merit Board member Maldonado that Garcia had been fired and among other things that there was going to be a sexual harassment complaint against Garcia

---

[57] We have no evidence as to who "TN" references.

[58] Also on January 30, 2020, earlier in the day, Lee LoBue had three missed calls from Thornley on desk phone at 11:06 a.m., 11:14 a.m., and 12:52 p.m. LoBue never spoke with Thornley, and she did not leave a message. We have no evidence regarding the purpose of Thornley's calls but note that LoBue is McAnarney's supervisor and thus was also involved in the vetting of Thornley for the IEMA position.

*Attorney-Client Privileged*
*Attorney Work Product*

Later on January 31, 2020, Thornley learned that she did not get the IEMA job.[59]

- On January 31, 2020, at 4:17 p.m., Thornley texted Binninger. They appear to have had a phone conversation preceding the text message. Thornley is trying to understand the reason she is not getting the job stating, "I am totally baffled." As Thornley is discussing possible reasons, she states at one point, "Yeah, I have nothing on my record, I'm not a criminal. I don't understand. Ugh. If it's because of Jack [angry emojis]" Binninger responds, "Honestly I have no idea. I'll let you know if I find out anything more".

- Shortly thereafter, at 4:37 p.m., Thornley texted Yokley "So they just yanked the IEMA offer from me saying they have a more 'qualified' candidate." Yokley responds "Oh No" Thornley stated "Declan is upset" "I'm fucked" "(crying emoji)" "Glad I didn't say anything to jack".

- Approximately a half hour later at 5:07 p.m., Thornley texted Ambrose "So they just yanked the IEMA offer from me saying they have a more 'qualified' candidate. I'm devastated patty".

As discussed previously, we believe that Thornley filed her workers compensation claim on the night of January 31, 2020 raising allegations of sexual assault. She makes her subsequent allegations in an email the following morning on February 1, 2020, to the Governor's Office staff.

We find that the above detailed evidence is relevant as it is consistent with a potential motive for Thornley to make an accusation of sexual assault once she became concerned and then learned she no longer was going to be able to leave Merit Board immediately to go to IEMA as she had been attempting and do so before Garcia fired her or otherwise took overt steps regarding the theft of overtime. At that point, she no longer had the path she thought she had to leave the Merit Board and on which the evidence indicates she was depending. We recognize that our point on motive, including timing, is subject to multiple interpretations. One could interpret that she was desperate to leave the Merit Board because she had been assaulted and once she found out she didn't have an exit path she felt she was left no choice but to file complaints about the sexual assault. However, we believe that the weight of the evidence is not consistent with this alterative interpretation.

---

[59] In addition to the text messages demonstrating that she learned on January 31, 2020 that she did not get the IEMA job, according to Spillane and Rosen, Thornley told them that she learned on January 31st that she did not have the IEMA job.

*Attorney-Client Privileged*
*Attorney Work Product*

**B.    Evidence Reflects Increasing Attempts to Discredit Garcia During Period Thornley Became Aware of Garcia's Overtime Investigation**

Evidence from the investigation demonstrates Thornley raised other allegations about Garcia that coincided with the overtime investigation.[60]  She also took other proactive steps to place Garcia in a negative light including suggesting he would retaliate against her in response to her allegations and, in several different ways, disseminating negative information and making threats about Garcia.  These actions are consistent with a pattern of one who is trying to discredit another individual.

**1.    Thornley Raised Other Allegations About Garcia During the Period of the Overtime Investigation**

As a threshold matter, we note that there is evidence that even prior to the overtime investigation, Thornley had complained generally about Garcia and had also on multiple occasions attempted to or stated that she was attempting to leave the Merit Board for another job. The following are some examples.

- Dykstra stated Thornley did not like Garcia and recalled that since Governor Pritzker had been elected, Thornley was looking at moving agencies and getting a different state job.

- ISP Director Brendan Kelly recalled a conversation at an event that was sometime after January 2019 in which Thornley discussed general personality conflicts she had with Garcia.

- VanDeKerckhove stated that Thornley had previously brought up some displeasure with her job, stating that she was stressed when her boss was in town and complaining about how he delegates work assignments and the work he was having her do.  Thornley also told Garcia that he would "throw his authority around."

- Maldonado recalled that Thornley told her at a board meeting in summer 2019 that she was potentially leaving the Merit Board to accept a job with the Comptroller's Office.

- Cusumano stated that during the summer of 2019 she had heard from Thornley and her husband (who works in the Comptroller's Office) that Thornley might be getting job at Comptroller's Office.  Thornley had reached out to Cusumano about positions and had conversations with her about trying to come to Comptroller's Office.  Cusumano recalled Thornley making comments that she was unhappy at Merit Board and had to get out of there.

---

[60] We have not as part of our work investigated the numerous other allegations Thornley made about Garcia. Those were beyond the scope of our mandate, and we make no findings on the credibility of those allegations.  We have not considered them substantively as part of our assessment of the evidence in this matter.

*Attorney-Client Privileged*
*Attorney Work Product*

- Kerley stated that Thornley reached out to her on December 13, 2019, raising issues with a pay raise that was being contemplated for Fox, wanting to pay Fox into a higher job classification, and wanting to give Fox additional money because of her duties. Kerley recalled Thornley stated that she was not happy working for Garcia and that she should possibly look for another job.

Our investigation has not found an evidence of any specific allegations Thornley made about Garcia during this time (other than her 2017 complaint to OEIG when Garcia first started about his requiring background investigations) and no evidence that she ever raised any allegations of sexual harassment. The evidence shows, however, that following the start of the overtime investigation and once she was aware of that investigation, she began to make a series of allegations to multiple individuals in state government regarding specific conduct by Garcia. The following is a summary of information concerning allegations Thornley made of other alleged conduct prior to her raising allegations of sexual assault.[61]

- The first evidence we have of Thornley raising specific issues with Garcia's conduct was when she returned from vacation on January 9, 2020, which was after Garcia had specifically requested her time sheets. On that day, she raised additional issues again with Kerley and also with Ambrose claiming a number of things about Garcia's conduct, including that Garcia was lying on time sheets and that he was doing work for the Heritage Foundation on state time.

- On January 15, 2020, Thornley repeated these allegations as well as others to Lindsey Amerson and VanDeKerckhove.[62] These allegations were all forwarded to OEIG by the Governor's Office.[63]

- On January 16, 2020, Thornley raised other allegations – Garcia having lights on his car and a police badge – with Thompson.

---

[61] A detailed recitation of Thornley's allegation is set forth in Appendix D – Complaints Summary.

[62] Evidence shows that the fact that Thornley approached VanDeKerckhove was inconsistent with her past actions. VanDeKerckhove stated that normally would talk to Thornley once or twice a month, and that she came over once or twice a year for work. He thought she had probably only dropped in to say hello once before January 15 when she "came over to vent."

[63] We do not have evidence that Thornley knew these allegations had been by forwarded to OEIG by the Governor's Office. We also do not know when Thornley may have filed a complaint with the OEIG or the substance of any complaint. Amerson recalled that on January 15, 2020, during their meeting she told her and VanDeKerckhove that she filed an OEIG complaint a week prior to their meeting. However, on January 27, 2020, Thornley informed McAnarney that she had not yet filed a complaint with the OEIG. Her civil lawsuit claimed that the complaint was filed with the OEIG on or about January 30, 2020. On February 5, 2020, Thornley separately informed Cusumano and Kerley that she had filed a complaint with the OEIG. Kerley recalled that on February 13, 2020, Thornley informed Kerley that she spent three hours at the OEIG.

*Attorney-Client Privileged*
*Attorney Work Product*

- On January 27, 2020, Thornley met with Ambrose and also raises allegations of a similar nature. Earlier that same day she had seen McAnarney of the Governor's Office and raises issues about Garcia having done non-state work on state time among other things.

- On January 28, 2020, she met with Kerley and follows up on the prior allegations she had raised regarding Fox but also brings files related to Garcia.

- On January 31, 2020, Thornley called Maldonado just before noon. Thornley stated: she wanted to give Maldonado a heads up that Garcia was going to be fired. She stated that "they" want him out by February 1st. Thornley then began to talk very quickly making a number of allegations about Garcia (within which she also states that there was going to be a sexual harassment complaint against him).

During this same timeframe, we have evidence of Thornley having also told the above individuals as well as Thompson, Yokley, Davis, and Binninger that it was terrible working for Garcia and she needed to leave.[64]

Thornley had not brought up sexual harassment by Garcia in prior conversations with these individuals and also, despite some of these conversations occurring after the date of the alleged assault, had not raised the assault. For example, despite the fact that Thornley had spoken to Cusumano on occasions in the past, she had never raised any allegations of sexual assault or sexual harassment before February 5, 2020, and rather just said that she was not getting along with her boss.[65] Also, the assault allegedly occurred on January 23, 2020 after which on January 27, 2020 and January 28, 2020 she went to have in person meetings with Ambrose, McAnarney, and Kerley and during which she discussed Garcia specifically but never raised allegations of sexual harassment or assault. Kerley stated that she thought it was odd that February 5, 2020, was first time Thornley had made a sexual harassment allegation to her about Garcia because they had discussed Garcia on multiple occasions and they had specifically discussed Kerley's belief that Thornley needed to make an OEIG report about work on Heritage Foundation on state time. Kerley found it surprising that in the context of the discussion that Thornley had not shared the sexual assault allegation as well.

---

[64] Evidence shows that the fact that Thornley approached Cusumano in this manner was inconsistent with her past actions. Cusumano said it was unusual for Thornley to stop by but then in last couple months (leading up to February) she had stopped by three or four times. On February 5, 2020, Thornley came in and met with Cusumano for three and a half hours. Cusumano had asked Thornley if she documented the assault and then Thornley asked Cusumano if she could help her document it. Cusumano thought that was odd as she has never done that before and wondered why Thornley just doing that herself. She proceeded to type it up exactly as Thornley relayed it.

[65] When this point was discussed in Thornley's conversation with Spillane and Rosen, Thornley stated in that conversation that she had not told Ambrose or anyone at GOMB about the assault because she is private.

*Attorney-Client Privileged*
*Attorney Work Product*

### 2. Thornley When Discussing Her Allegations Against Garcia Expressed A View That Garcia Would Retaliate Against Her

During some of her conversations in which Thornley made allegations about Garcia, she commented that she thought Garcia might retaliate against her in some way.

In her February 5, 2020, conversation with Kerley in which she makes reference to having been assaulted as well, according to Kerley, Thornley stated, "I wouldn't be surprised if he didn't try to claim I did something." Thornley further stated that Fox could have been the one who reported on her or made an allegation against her. Kerley noted the difference from the notion of a potential future complaint to the fact that she knew someone had complained about her.

Also, Thornley's call with Spillane and Rosen on February 1, 2020, Thornley explained that she had been told by Binninger on January 27, 2020, that Scudder was working on her start date at IEMA but then on January 31, 2020, Binninger called and said IEMA could not move forward. Thornley wondered if the allegations that she was making were possibly the reason she was not getting the job. This was curious to Spillane since, to her understanding, Thornley had just made the allegations in an email that morning yet had been told the previous day that she did not have the job.

### 3. Thornley Took Steps to Disseminate Other Discrediting Information About Garcia and Made Statements of Threats Regarding Garcia

During the time period leading up to when the evidence shows she first raised the sexual assault allegation, there is evidence of threatening statements made by Thornley about Garcia. On January 19, 2020, in a text from Thompson, Thornley in reference to claiming she had spoken with a particular state senator about Garcia, stated: "You can bet your ass when she asks me about him I'm not lying. He needs to either change his behavior or be gone."

Additionally, on January 28, 2020, according to a friend of Garcia's named Jim Wolfe, Thornley called Wolfe.[66] Wolfe also knows Thornley. Wolfe described the five minute call he had with Thornley. According to Wolfe, Thornley's tone was normal at the beginning and then grew more agitated as the discussion ensued. Thornley stated something along the lines of: "[He] really needs to back off," "[He] doesn't know who he is messing with," and "the Governor's office would get involved if Mr. Garcia did not back off." Thornley asked Wolfe if he would be "comfortable calling Mr. Garcia and seeing if he would be willing to back off." She did not specify about what it was she was asking Wolfe to speak with Garcia. Wolfe recalled that he was taken aback and informed her that he did not know what she was talking about and could not help her. He took it to be a personnel matter. She then calmed down quickly.

Wolfe later learned from a discussion with Garcia that she had some issues with timesheets and then believed the call had to do with that issue. After subsequently learning that

---

[66] Prior to Wolfe's interview we received an affidavit from Garcia's counsel that had been signed by Wolfe detailing the call he had with Thornley, which Wolfe confirmed he had provided. Our analysis relies upon the statements he made in our interview.

*Attorney-Client Privileged*
*Attorney Work Product*

she had made a sexual assault allegation, he did not then think her call related to sexual harassment. In Wolfe's view, there was nothing in the call that was consistent with someone who had been victim of a sexual assault. Basing his opinion on his experience of handling situations of that nature in his professional capacity in the past, he stated he was 100% certain she was not calling about an alleged sexual incident. From his observations of the call and his understanding of surrounding circumstances, Wolfe believes Thornley was acting as someone looking to use her influence to get something and calling him to tell Garcia to stop investigating her falsification of timesheets or the Governor's Office would get involved.

Thornley took steps to disseminate other discrediting information about Garcia and made statements of threats regarding Garcia after her assault allegations. After Thornley made the assault allegation to the Governor's Office, and Garcia was placed on leave, Thornley took several actions to disseminate that information to others about him having been placed on leave. On February 2, 2020, after Dykstra has sent an email to the staff that Garcia on leave, Thornley asked Thompson whether they had gotten an email yet about Garcia and when he said they have not, Thornley tells him that Garcia is suspended. When Thompson asked why, Thorley stated "sexual harassment. Didn't hear it from me. He's done". Thornley then sent separate texts to Davis, Yokley, and Thompson a picture of the email stating that Garcia had been placed on leave. The next day, on February 3, 2020, Thornley texted Thompson asking him whether "anyone had been talking about this" in reference to Garcia having been put on leave.

There was also an incident in which an unknown individual called the Crowne Plaza Hotel to cancel Garcia's reservation for days during the week of February 3, 2020. On February 2, 2020, Fox and Dykstra were in the Merit Board offices and called the Crowne Plaza to cancel Garcia's reservation. Dykstra recalled that a front desk receptionist named Dominique told them that she was wondering whether Garcia would be going to the hotel because someone had called the hotel "yesterday or a few days before" and said "Jack would probably not be staying there anymore because he has been fired." Fox recalled that Dominique who was typically present when Garcia checked into the hotel informed them something along the lines of, "I thought it was weird and someone called a couple days ago and someone said to not direct bill his room because he was fired." Dominique said a co-worker, Shane, received the call from the individual.[67]

We have no evidence from which we can confirm that Thornley was the individual who called and cancelled the reservation. We note however the limited number of individuals who knew about Garcia having been placed on leave at that point, the number of individuals who would have known that he had a hotel reservation that week, and the fact that there would not have been a reason that we can discern for an individual known to us to have taken this action. We also note that the action of canceling the reservation and informing the hotel that "he wouldn't be staying there anymore" or that he "was fired" is consistent with steps by an individual who is attempting to take certain damaging actions in the wake of Garcia having been placed on leave.

---

[67] We spoke briefly to Dominique who confirmed generally the conversation relayed by Dykstra and Fox. We attempted multiple times but were unsuccessful in interviewing Shane who refused to speak with us.

*Attorney-Client Privileged*
*Attorney Work Product*

Following her allegations regarding the assault, Thornley also made statements suggesting the potential for media coverage of her allegations. In a call Thornley had with Spillane and Rosen on February 1, 2020, Thornley stated at the beginning and end of the call that she made statements that she "looks at the Pritzkers as friends" and "doesn't want them to be on the front page of the newspaper." Deputy General Counsel Scott Lerner likewise recalls a call he had with Spillane and Thornley on February 3, 2020 or February 4, 2020, in which Thornley made comments to the effect of "I just really want to make sure that this doesn't look bad for Governor Pritzker and MK Pritzker." Lerner interpreted the comment in the context in which it was made to be a soft threat.

These actions are consistent with that of a pattern of attempts to discredit another individual and thus provide a relevant backdrop to Thornley's sexual assault allegations that could tend to question the credibility of those allegations. We recognize that another interpretation of this evidence is that she believed or Garcia had been engaging in the other conduct she alleges and was rightfully raising complaints about his other actions. Although we have not investigated those allegations and make no finding as to their veracity, we believe that, regardless of whether or not there is any credibility to those claims, based on the totality of the evidence we do have from our investigation, this evidence is nevertheless consistent with what could have been an escalating effort to discredit Garcia and in certain respects undercuts the credibility of her sexual assault allegation.

## V. Evidence Regarding Thornley's Credibility

The investigation found evidence that raises issues about Thornley's credibility. We discuss our concerns regarding Thornley's credibility below. [68]

### A. Circumstances Under Which Thornley Declined to be Interviewed

Thornley did not make herself available to be interviewed by us. Although the fact an alleged victim does not sit for an interview is not evidence one way or the other of whether the assault occurred, we have evidence that she falsely claimed having COVID in order to avoid being interviewed, which undermines her credibility. Thornley was represented by counsel and our contacts with her were through her counsel, Carl Draper. We initially asked to interview her in an email to her counsel on March 17, 2020 and learned later that day that the state court overseeing her lawsuit against the Merit Board for violations of the open meetings act had issued an order that enjoined us from doing further investigation.[69] The court later reversed the ruling and we were able to resume our investigative work at the beginning of June 2020.

---

[68] We note that throughout the investigation we learned of other allegations against Thornley. For example, we learned that Thornley may have used Merit Board funding for use of a golf cart at the state fair. We did not investigate these allegations as they were not within the scope of our charge and make no finding as to the credibility of those allegations. We do not consider them as part of our assessment of the evidence in this matter.

[69] On February 20, 2020, Thornley sued the Merit Board in Sangamon County for violations of the Open Meetings Act (Case Number 2020CH000063). She subsequently filed a motion for a preliminary injunction seeing to enjoin, among other things, this internal investigation. Neither her lawsuit nor her preliminary injunction motion affect our evaluation and analysis of the evidence in our investigation.

*Attorney-Client Privileged*
*Attorney Work Product*

Through email communications with Thornley's counsel, we were able to schedule her for an interview that was set to take place on Wednesday, June 10, 2020. Her counsel canceled the interview in an email that was sent late in the day on June 9, 2020 stating "I am sorry to report that Ms. Thornley cannot meet tomorrow by any means. As I had mentioned to you she had a doctor appointment for today. She is ill and was exposed to COVID-19. She is awaiting tests but is highly likely to be positive as she was exposed and had her own immune-deficiency. Without getting into her full medical history she is ill and on medications that also make her very drowsy. If you like she will provide her doctor note confirming that he has advised her to rest at home. We will see how soon she may be released. Her physician has her on the required 14-days of isolation at this time." We requested an update after Thornley received her text results in the next day or two. Thornley's counsel provided the medical note she received from her provider on June 11, 2020, which is as follows:

Medical Note received from Thornley's counsel on June 11, 2020



On Monday June 15, 2020, Thornley's counsel informed us via email that she had tested positive for COVID-19 and could not be rescheduled for an interview at this time. That day, Dykstra requested that Thornley's counsel provide him with documentation of the positive test results. After receiving no response, on June 17, 2020, Dykstra requested that Thornley provide the positive test result by close of business on June 17, 2020 or provide a reason that it could not be provided by then. On June 18, 2020, Thornley's counsel emailed Dykstra stating "Dan, I will keep you updated as may be reasonably possible. However, Ms. Thornley is under orders to stay home. She did not receive any document but instead was called by her medical providers and advised of the positive test result. I shared that with you as soon as I had that update. She is not able to go to the doctor's office to pick up any document. This is in accordance with the Governor's Executive Orders and the doctor note that I did provide you. She is also not able to come to my office to deliver any documents. For health reasons, she is confined to her house. I will give you updates as soon as they are available."

71

*Attorney-Client Privileged*
*Attorney Work Product*

We subsequently received information that led us to question the veracity of Thornley having tested positive for COVID. That information led us to two individuals, Eugene Oliver and Nicole Johnson, with whom Thornley had communicated via text message on the evening of June 18. Oliver is a co-worker of Thornley's husband, Jared Thornley, at the Comptroller's Office and his significant other, Johnson, is a nurse practitioner with whom Thornley had communicated in the past regarding medical questions. In the below text messages, Thornley attempts to obtain a medical note with certain language. (We observe that the language could be read in such a way as to leave open the possibility that she did in fact have COVID.) As set forth in the text messages below however, she stated unequivocally that she did not have COVID and also made clear that she was not otherwise ill, but rather was "fine."

Text Messages with Oliver 6/18/2020





72

*Attorney-Client Privileged*
*Attorney Work Product*

Text Messages with Johnson 6/18/2020







*Attorney-Client Privileged*
*Attorney Work Product*

On Friday, June 20, 2020, Dykstra communicated with Thornley's counsel via email and set Thornley for an interview on Wednesday June 24, 2020. On Monday June 22, Thornley's counsel responded in an email stating that Thornley was still ill and could not attend. He attached documentation the health clinic that reflected almost identical language Thornley had included in her text message that she was looking to have reflected in a medical note.

Medical Note received from Thornley's counsel on 6/22/2020



**Respiratory Clinic or COVID-19- Memorial Medical Center**

This notice verifies that your employee/student – MS JENNY THORNLEY was seen in our facility on 06/18/2020.

The patient may return to work/school on See Restrictions with the following restrictions:

Other: Patient will be off work due to COVID 19 until released per PCP office.

In a letter sent to Dykstra that same day, her attorney again reiterated that Thornley had tested positive for COVID.

**B.  Statements Made to Other Individuals Believed to be False Based on Evidence**

In addition to the credibility questions surrounding the circumstances under which Thornley declined to be interviewed, Thornley has made statements to other individuals that based on other evidence from the investigation appear to be false in nature. Below are some examples of those statements.

o  On February 1, 2020 at 10:39 a.m., after sending the email to the Governor's Office regarding her sexual assault allegations approximately a half hour earlier, Thornley left a voicemail for Binninger, which Binninger provided us. In the voicemail she stated that she had spoken to "JB" the night before and that he "was not very happy with what's going on" stating further that it is "an issue of personal preferences." She also stated that she had a call from Spillane that morning. We believe based on the evidence that she was making a reference to the fact that she had learned that she was not going to be getting the CFO position with IEMA and claimed that she had discussed it with the Governor and he was not happy about it. She further appears to be suggesting that she received a call from Spillane on the same topic. Based on the evidence, we do not believe this statement was truthful. According to Spillane, who at

*Attorney-Client Privileged*
*Attorney Work Product*

our request asked Governor J.B. Pritzker if he had such a conversation with Thornley, the Governor has no recollection of having a conversation with Thornley and does not believe he would have answered a call from her. If for some reason he answered a call, he would have told Chief of Staff Anne Caprara, who was never told about any such conversation. Additionally, although Spillane had called and left a voicemail for Thornley shortly after receiving the email Thornley sent to staff in the Governor's Office regarding her allegations about sexual harassment by Garcia, the call made by Spillane was unrelated to the IEMA position and Thornley's intimation that it was is not accurate.

o On January 15, 2020 at 4:35 p.m., Thornley left a voicemail for Binninger, which Binninger provided, in which she stated that she "just left the governor's office talking with um Alexis and she wanted me to give you a call." Based on the evidence, we believe this is a reference to Alexis Sturm, Director of GOMB, with Thornley claiming that she had met with Sturm and that Sturm had told her to call Binninger about the IEMA CFO position. Additionally, on January 27, 2020, in a meeting with McAnarney, Thornley mentioned Sturm, stating something along the lines of "I talked to Alexis and she thinks it's really good too." According to Sturm, she has never spoken to Thornley. Sturm likewise did not meet with Thornley on January 15, 2020. Rather, Thornley met with Lindsey Amerson and VanDeKerckhove of GOMB that day, both of whom work under Sturm, and according to Amerson, it was Amerson who suggested that Thornley apply to IEMA.

o In her February 1, 2020 email to Governor's Office staff, Thornley made multiple statements that are either in whole or in part inconsistent with the evidence. In that email, she states that she is "very distraught by the sexual assault and harassment I have been subject to by our Director." She further states: "The layers of issues are deep. I have discussed them with Judy as well. She has been the only responsive staff from your office." The evidence supports this as being a reference McAnarney, who Thornley had spoken with on January 27, 2020. Although Thornley had spoken with McAnarney about her issues with Garcia, she had never mentioned that she had been sexual assaulted or sexually harassed by Garcia. Along those same lines, Thornley continues in the email that "I will be notifying the Governor personally today to let him know that I have tried for several weeks to discuss the mental and sexual harassment with several individuals within his office and I have been left with no response. I have left my card, messages, notes. No response. No safe place to continue my work as a public servant to our state." There is evidence that Thornley (1) waited on the afternoon of January 28, 2020 to speak with Scudder and was not able to meet with her, (2) on the morning of January 30, 2020, attempted to call Governor's Office staff member Lee LoBue multiple times without leaving a message, and (3) on the evening of January 30, 2020 sent a text message to Budzinski about trying to meet with Scudder and raised "serious sexual harassment" by Garcia. However, her email does not acknowledge that, as the investigation shows, she did in fact speak briefly in person with Deputy Governor Christian Mitchell (who was included on the February 1, 2020 email) and met in person with McAnarney and Ambrose and did not mention sexual harassment or sexual assault to any of them.

*Attorney-Client Privileged*
*Attorney Work Product*

o In a call with Spillane and Rosen on February 1, 2020, Thornley stated Maldonado had commented on Fox's attire as being provocative and described Fox's relationship with Garcia as being too close. According to Maldonado, Maldonado never made any such statements.

o In the call with Spillane and Rosen on February 1, Thornley also stated that she had not been to work since January 23, 2020. Multiple pieces of evidence demonstrate that she worked on Friday, January 24, 2020, and was again at work for at least part of the day on Monday, January 27, 2020 and Tuesday, January 28, 2020

o Additionally on the call with Spillane and Rosen, Thornley stated that she talked to Mitchell in the hallway and that Mitchell told her to "talk to Bria." At our request, Rosen spoke to Mitchell about this who informed Rosen that she had previously run into Thornley in the second floor rotunda at the Capitol and he does not recall what they discussed but does recall telling her to talk to Scudder. Mitchell is very clear however that Thornley did not raise any issues of sexual harassment or sexual assault with him and he did not tell her to go to talk to Scudder for the purpose of discussing those issues. Rosen noted that it would make sense that Mitchell would have sent him to talk to Scudder if Thornley had raised the pending vetting of her for the IEMA position.[70]

o On the February 1, 2020, call with Spillane and Rosen, Thornley also told Spillane and Rosen that her meeting with IEMA Director Tate-Nadeau was "two hours." Rosen subsequently spoke with Binninger who informed her the meeting was 30 minutes.

o Thornley told individuals that she had a job at IEMA, despite the fact that she did not yet have the job. For example, on the morning of January 23, 2020 according to Dykstra, Thornley told Dykstra that she had a new job at IEMA and was supposed to start February 1. At that point, Thornley had only been communicating with Binninger at IEMA and it was not until that afternoon that was going to be meeting with Director Tate-Nadeau. That evening, she told Yokley at 7:56 p.m. in text that "IEMA offered me the CFO position (emoji)" Yokley responded "That's awesome! Seriously happy for you!" Thornley texts "Thank you!" On January 27, 2020 at 8:23 a.m., Thornley texted Thompson "I was offered a job at IEMA as cfo." He asked "When do you start" to which Thornley responded "Feb 1 as CFO" Thompson responded "Congratulations. Love the (emojis)." Thornley did not in fact have the job which and had to be vetted by the Governor's Office, a process of which as reflected in numerous text messages, Thornley understood had to take place.[71]

---

[70] We note that Thornley also told Spillane and Rosen that she had "messaged Nikki," which we believe was a reference to Budzinski and who was included on the February 1st email. As previously noted, Thornley had in fact sent a text message on the evening of January 30, 2020 to Budzinski raising sexual harassment by Garcia.

[71] We note however that throughout the process in text messages between Thornley and Binninger, Binninger did suggest or at the very least not contradict Thornley's statements that she had the job. Specifically, even prior to the

*Attorney-Client Privileged*
*Attorney Work Product*

o  On June 28, 2020, Thornley texted Garcia suggesting the reason she was out of the office that day was because she was meeting with GOMB. She stated "So GOMB wants to bring all the CFO's under the b Governors office. They don't want us talking about it. but I think it would be bad for us." All of the individuals we interviewed from GOMB stated that there were no plans to bring all the CFO's under the Governor's Office.

o  In her meeting with Ambrose on January 10, 2020, Thornley claimed that a reporter, Bruce Rushton, had recently submitted a FOIA request to the Merit Board. Upon review of records by Dykstra, Rushton did not submit a FOIA request to the Merit Board. Yvette Loizon (Illinois State Police Chief Legal Counsel) also confirmed that he did not submit a FOIA to the Illinois State Police during this timeframe.

o  On the call with Maldonado on January 31, 2020, Thornley stated that Garcia reports to her. Although there is an organizational chart which states "Director Reports to PSA," ("PSA" is Public Service Administrator) in practice none of the Merit Board staff believed this to be the case.

### C.  Unauthorized Use of Reeve Waud's Signature

During the Merit Board's investigation, Fox located a word document in the fiscal drive (to which only Thornley and Garvue had access) that contained an image of Chairman Waud's signature that could be moved around or copied.[72] This discovery caused concern as Waud had given explicit direction that no one should have his electronic signature and only his assistant, Beth Ellingson, could add his signature to a Merit Board document with his approval.

We reviewed documentation to determine whether, besides including Waud's signature on Merit Board documents without authorization, Thornley had used his signature for any other purpose. We located three documents that contained Waud's movable signature and to which were either sent to Thornley or were contained in the fiscal drive. These documents included the bonus memorandum dated December 1, 2016, which was the document Fox located, an Affirmative Action Plan dated August 25, 2018, and a salary adjustment memo dated June 28, 2019.

Garvue informed us that Thornley requested that he affix Waud's electronic signature to the Affirmative Action Plan on September 10, 2018 and the salary adjustment memorandum on

---

January 23₋ 2020 meeting with Director Tate-Nadeau, on January 22ˑ 2020 at 3:06 p.m., Thornley texted Binninger and stated "Let me know if you have any luck with Christians assistant" (potentially a reference to Mitchell's assistant Scudder). Binninger responded "Just talked to her, she's good w it" Thornley stated "Omg I can't wait to start. I'm so excited to work with you" Binninger responded "Likewise!" Binninger asked Thornley to send him her resume.  Similarly, after the meeting on January 23, 2020 with Director Tate-Nadeau that evening at 6:14 p.m., Thornley sends a text to Binninger asking if he's hired other exempt staff and stating "I can't wait to start!!" Binninger responded "I have, shouldn't take long as the parties are all on board".

[72] This document was a Merit Board related document. Specifically, it was a bonus approval for employees dated December 1, 2016.

*Attorney-Client Privileged*
*Attorney Work Product*

October 22, 2019. This was done without Waud's approval. Evidence, including board minutes corresponding to these two documents, shows it is likely that the actions reflected in the documents were all actually approved. Garvue did not recall including Waud's signature on the December 1, 2016 bonus memorandum document and, upon search of the emails that were sent between Garvue and Thornley, neither we nor Garvue could locate another document. Evidence indicates the action reflected in the document was approved, as we have located a memorandum from December 16, 2016, signed by former Director Ron Cooley stating that the bonus had been approved by Waud. Therefore, although an image of Waud's signature was located on Thornley's computer, we have not located evidence that she caused some action through the signature that would not have otherwise been permissible.

We note, however, that the document regarding the 2016 bonus with Waud's signature affixed has a creation date of October 29, 2018. Further, Jacob Hill, one of the independent auditors, was specifically asking about information regarding this bonus in August and September 2018. Thornley did not provide a copy of the document (which was converted to PDF) to Hill until October 29, 2018. It appears possible based on the timing that this document may have been created for the purposes of the audit.

### D. Inconsistencies and Misrepresentations on Resume or Job Applications

We have noted various inconsistencies and misrepresentations on multiple versions of Thornley's resume or job applications. We reviewed three versions of her CMS100 and three versions of her resume.[73]

The first CMS100 we reviewed was submitted in May 2014 ("CMS 1"). The second CMS100 we reviewed was submitted in 2016 ("CMS 2"). The third CMS100 we reviewed was submitted to Binninger on January 23, 2020 ("CMS 3").[74] The first resume we reviewed was submitted to Colleen Callahan, Director at the Illinois Department of Natural Resources on March 1, 2019 ("Resume 1"). The second resume we reviewed was found on her desktop with a modification date of October 28, 2019 ("Resume 2"). The third resume we reviewed was sent to Binninger on January 23, 2020 ("Resume 3"). A few notable inconsistencies we observed are as follows:

| Education History – Robert Morris | |
|---|---|
| CMS 100 1 | There is nothing included. |
| CMS 100 2 | States she attended Robert Morris University from June 1988 to June 2001 (part time business & legal administration). |

---

[73] We confined our analysis of her resumes to the more recent ones we found on her desktop.

[74] The CMS 100 states "It is critical that all information requested be provided accurately and completely. It further requires a certification that states "I certify that all the information on this application is true and accurate and understand that misrepresentation of any material fact may be grounds for ineligibility or termination of employment."

*Attorney-Client Privileged*
*Attorney Work Product*

| CMS 100 3 | States she attended Robert Morris University, but she attended from June 1999-2001 (full time Business & Finance). |
| Resume 1 | States she attended Robert Morris University from June 1999-2001, but received a Master's Degree in business legal administration. |
| Resume 2 | Did not include attending Robert Morris University. |
| Resume 3 | States she attended Robert Morris University from May 1999-2001 (business & legal administration). |

| Education History – University of Illinois | |
| --- | --- |
| CMS 100 1 | There is nothing included. |
| CMS 100 2 | States she attended the University of Illinois from March 2010-2012 (Labor law studies). |
| CMS 100 3 | States she attended the University of Illinois from March 2010-2012 (Labor law). |
| Resume 1 | States she attended the University of Illinois, but received a labor and legislative certificate. |
| Resume 2 | States she attended University of Illinois (labor and legislative law), but there was no mention of a certificate.[75] |
| Resume 3 | States she attended the University of Illinois, but received a labor and legislative certificate. |

| Beginning Of Employment At The Merit Board | |
| --- | --- |
| CMS 100 | Does not include this information, but states she was employed with the Illinois Law Enforcement Training and Standards Board starting October 2013. |
| CMS 100 2 | States she started at the Merit Board in May 2014. |
| CMS 100 3 | States she started at the Merit Board in November 2013. |
| Resume 1 | States she started at the Merit Board in November 2013. |
| Resume 2 | States she started at the Merit Board in November 2013. |
| Resume 3 | States she started at the Merit Board in November 2013. |

| Position At The Illinois Law Enforcement Training And Standards Board | |
| --- | --- |
| CMS 100 1 | States she was the Private Assistant to the Director. |
| CMS 100 2 | States she was the Private Secretary II. There is no position listed on the other documents since she claimed to have started working at the Merit Board in November 2013. |
| CMS 100 3 | There is no position listed on the other documents since she claimed to have started working at the Merit Board in November 2013. |

---

[75] Notably, in an email she sent to Special Agent Robert Matos, of the Illinois State Police, on May 9, 2017 who was conducting a background check, she did not have any mention of college or university and clarified that the University of Illinois studies were online labor sessions – not a degree or credit program.

*Attorney-Client Privileged*
*Attorney Work Product*

| | |
|---|---|
| Resume 1 | There is no position listed on the other documents since she claimed to have started working at the Merit Board in November 2013. |
| Resume 2 | There is no position listed on the other documents since she claimed to have started working at the Merit Board in November 2013. |
| Resume 3 | There is no position listed on the other documents since she claimed to have started working at the Merit Board in November 2013. |

| Title At The Illinois Police Benevolent And Protective Labor Committee | |
|---|---|
| CMS 1 | States she claims she worked as the Director of Operations and Legislative Aide. |
| CMS 2 | The Director of Operations and Legislative Aide is not included. |
| CMS 3 | States she was the Financial Office and Director of Operations. |
| Resume 1 | States she was the Director of Operations, but does not mention any other position. |
| Resume 2 | States she was the Chief Financial Officer and Director of Operations. |
| Resume 3 | States she was the Financial Office and Director of Operations. |

| Duties At The Illinois Police Benevolent And Protective Labor Committee | |
|---|---|
| CMS 1 | Among other duties states:<br>• She provided administrative direction to Division Managers and other administrative staff;<br>• She served in a liaison capacity with all 98 police units they represented throughout the state; and<br>• She worked in direct contact with members of the legislature. |
| CMS 2 | She did not list the position. |
| CMS 3 | Among other duties states:<br>• She supervised staff;<br>• Managed a budget of over 10 million;<br>• Provided administrative direction to the Director and Executive Board on day to day policy and budget issues;<br>• She supervised a large professional staff through subordinate managers; and<br>• She served in a liaison capacity with the Office of the President of the United States. |
| Resume 1 | Among other duties states:<br>• She was a liaison between the Office of the Department of Natural Resources and the Policemen's Benevolent Labor Committee;<br>• She bargained management contracts with the agency and insured all levels of union contracts were compliant;<br>• She provided administrative direction to Division Managers and other administrative staff;<br>• She supervised a large professional staff through subordinate professional managers; and<br>• She served in a liaison capacity with the Office of the President. |

*Attorney-Client Privileged*
*Attorney Work Product*

| Resume 2 | Among other duties states: <ul><li>She supervised staff;</li><li>She supervised a large professional staff through subordinate managers; and</li><li>She served in a liaison capacity with the Office of the President of the United States.</li></ul> |
|---|---|
| Resume 3 | Among other duties states: <ul><li>She managed a budget of over 10 million dollars;</li><li>She provided administrative direction to the Director and Executive Board on day to day policy and budget issues;</li><li>She supervised a large professional staff through subordinate managers; and</li><li>She served in a liaison capacity with the Office of the President of the United States.</li></ul> |

| Position At The Merit Board[76] | |
|---|---|
| CMS 100 2 | States she is the Chief Financial Officer, and Director of Personnel. |
| CMS 100 3 | States she is a Public Service Administrator. |
| Resume 1 | States she is the Chief Financial Officer, and Director of Legislation, Personnel & Policy. |
| Resume 2 | States she is the Chief Financial Officer, and Director of Legislative Policy. |
| Resume 3 | States she is the Chief Financial Officer and Director of Legislative Policy. |

| Duties At The Merit Board | |
|---|---|
| CMS 100 2 | States that she supervised 2 professional, 1 technical / para-professional, and 3 administrative personnel. |
| CMS 100 3 | Among other duties states: <ul><li>She supervised 5 manual/trades, 2 technical/ para-professional, and 4 administrative personnel;[77]</li><li>She spoke on behalf of the Executive Director before the Governor's Office staff and legislators with the authority to commit resources;</li><li>She supervised staff in the implementation of personnel processes relative to employment of Merit Board staff;</li><li>She counseled staff regarding work performance;</li><li>She reassigned staff to meet day-to-day operating needs;[78]</li></ul> |

---

[76] She was not employed at the Merit Board when submitting CMS 100 1.

[77] Based on our interviews with Merit Board staff, Thornley's responsibilities do not involve supervising staff.

[78] Based on our interviews with Merit Board staff, this is not one of Thornley's responsibilities.

*Attorney-Client Privileged*
*Attorney Work Product*

| | |
|---|---|
| | <ul><li>She approved time off;[79] and</li><li>She effectively recommended and imposed discipline.</li></ul> |
| Resume 1 | Among other duties states:<br><br><ul><li>She spoke on behalf of the Executive Director before the Governor's Office staff and legislators with the authority to commit resources;</li><li>She initiated, approved, processed and tracked personnel information;</li><li>She oversaw staff engaged in activities to establish job descriptions;</li><li>She maintained the organizational structure of the Merit Board</li><li>She supervised staff in the implementation of personnel processes relative to employment of the Merit Board staff; and</li><li>She served as a full line supervisor, assigning and reviewing work, reassigning staff to meet day-to-day operating needs, and approving time off.</li></ul> |
| Resume 2 | Among other duties states:<br><br><ul><li>She spoke on behalf of the Executive Director before the Governor's Office staff and legislators with the authority to commit resources;</li><li>She managed a 10-15 million dollar budget;[80]</li><li>She served as an inter-department liaison in all related fields including CPO and EEO officer regarding procurement; and</li><li>She managed the daily statutory obligations of the Merit Board including hiring of sworn personnel, discipline, termination of sworn personnel, and promotion of all sworn personnel within the ISP.[81]</li></ul> |
| Resume 3 | Among other duties states:<br><br><ul><li>She spoke on behalf of the Executive Director before the Governor's Office staff and legislators with the authority to commit resources;</li><li>She managed a 10-15 million dollar budget;</li><li>She served as agency legislative and fiscal contact on all matters; and</li><li>She managed the daily statutory obligations of the Merit Board including hiring of sworn personnel, discipline, termination of sworn personnel, and promotion of all sworn personnel within the ISP.</li></ul> |

| Nationality | |
|---|---|
| CMS 100 1 | States she is "White not of Hispanic Origin." |
| CMS 100 2 | States she is "White not of Hispanic Origin." |
| CMS 100 3 | States she is "American Indian or Alaska Native." |

---

[79] Based on the evidence, Thornley does not have authority to approve time off.
[80] According to Waud, the Merit Board's budget is approximately $1-3 million.

[81] Based on our interviews with Merit Board staff, Thornley is not responsible for managing these functions.

*Attorney-Client Privileged*
*Attorney Work Product*

Thornley also posted on LinkedIn that she was obtaining an MPA in public leadership from Harvard University and attending the Harvard Kennedy School of Public Leadership. Upon review of information available about the program online, it is a non-degree online learning program for mid-career professionals that is a pre-requisite to apply to the Mid-Career Master in Public Administration Program. It is not the actual MPA program itself.

## VI.    Evidence Regarding Garcia's Prior Conduct

The investigation found a lack of evidence of prior conduct by Garcia consistent with the conduct alleged by Thornley.

### A.    Thornley Additional Allegations of Sexual Harassment Made at Time of Sexual Assault Allegation

In addition to the allegation Thornley made regarding the sexual assault, Thornley has made sexual harassment allegations. According to evidence from the investigation, the first point of which we are aware Thornley raised any allegations of Garcia having engaged in sexual harassment was on Thursday, January 30, 2020, the day before we first have evidence that she alleged the sexual assault. Below is a summary of the information from the investigation regarding Thornley's allegations about Garcia having engaged in other forms of sexual harrassment. These complaints are also detailed in Appendix D – Complaints Summary.

- January 30, 2020 at 6:19 p.m.: Thornley sent a text message to Budzinski in which she stated: "Hi Nikki - I need to speak with Bria about a serious case of sexual harassment with our director. I can't seem to get anyone's attention to discuss this matter. I'm truly disgusted and have no idea who to go to. It's very disheartening." The text message did not say anything about an alleged assault or that Thornley was the victim. (Budzinski did not respond at that time and on Saturday, February 1, 2020, Thornley sent the email to the Governor's staff to include Budzinski.)

- January 31, 2020 around noon: Thornley called Maldonado stating that Garcia had been fired making numerous allegations about a variety of conduct in which she claims Garcia has engaged. In the midst of her statements, Thornley mentioned in a single sentence that there either was or was going to be a sexual harassment complaint against him, without specifying what it was about or who filed or would be filing such a complaint. She did not say anything about the alleged assault.

- January 31, 2020 at 6:32 p.m.[82]: Thornley called Ambrose and stated "my boss just said to me if I dressed more like his assistant we would get along better." Thornley did not say anything about the alleged assault.

---

[82] Although Ambrose had a call at this time which was reflected on the phone record information she provided to us, she was not confident if this was the call on that day in which Thornley made the statement or a different call that day. Ambrose had a call with Thornley at 11:00 am that same day as well. Ambrose thought she may have been working at the time that Thornley relayed the statement to her.

*Attorney-Client Privileged*
*Attorney Work Product*

- January 31, 2020 evening/night[83]: Thornley calls TriStar to make a workers' compensation claim in which in addition to describing the alleged assault including the comment regarding dressing more like Fox, she stated that the "Director is constantly calling people Baby and sweetie, making snide remarks on how people dress."

- February 1, 2020 at 10:04 a.m.: Thornley emailed Governor's Office staff members Chief of Staff Anne Caprara, and Deputy Governor Christian Mitchell and Nikki Budzinski in which she referenced having been the subject of a sexual assault generally and also referenced sexual harassment generally.

- February 2, 2020 at 4:00 p.m.: Thornley spoke to Spillane and Rosen who were contacting her in response to the email. In addition to telling them about the alleged assault, she told them about the assault and stated words to the effect of "Jack generally engages in unwanted touching."

- February 2, 2020 at 1:46 p.m.: Thornley sent a text to First Lady M.K. Pritzker in which she stated in relevant part: "I have a horrible incident that has taken place. I sent a lengthy email to Anne Caprara and got a return call from Ann Splaine. I need JB to know what's going on and hope they are keeping him aware. (Sexual harassment) all complaints have been filed."

- February 2, 2020 at 5:10 p.m.: Thornley had a call with Thompson in which alluded to the fact that she was the victim of sexual harassment and may have said Garcia said something along the lines of "you'd look better if you dress like Emily" but did not share anything of a physical nature on the call.

- February 5, 2020: Thornley had a call with Sarah Kerley of CMS in which she referenced generally a physical assault and also vaguely alluded to other instances of conduct which Kerley understood to be verbal in nature.

- February 5, 2020 at 9:45 a.m.: Thornley met with Michele Cusumano, Human Resources for the Comptroller's Office. Thornley stated, as documented by Cusumano, that:

  o "Jack asked me to meet with him in Tinley Park Medicaid office to go over fiscal stability of Merit Board. During the meeting he was very touchy, feely, hugging, creepy and I just wanted to get away from him. I had on a dress with tights on. He was sitting next to me and kept touching my knee. Jack refers to me as "honey" or ....... That was the first time I became uncomfortable around him."[84]

---

[83] As previously stated although we do not know for certain when Thornley initiated the call to TriStar, the evidence of which we are aware indicates it was during the evening of January 31, 2020.

[84] This is the only instance where Thornley reported such conduct in the Tinley Park office.

*Attorney-Client Privileged*
*Attorney Work Product*

o "I verified with Sos, that Bianca (Heritage Foundation), Jessica Rigg ... feel that conduct between Jack and Emily is inappropriate. I've been approached many times by outside employees who have made comments about their behavior being unethical. Emily kept Jack's calendar and wouldn't share with anyone. We weren't allowed to know when he was in town. Emily is required to have Jack's coffee and donuts ready in hand when he arrives. Jack has expected me to do the same when Emily is away, which I will not do. Emily takes his car and gets lunch for them both. They eat lunch together. No one else is ever invited."

o "Jack used to buy body lotion, body spray for me, Emily and Julie for xmas, ad min asst day, birthdays, etc."

In the above statements Thornley made to Cusumano was the one specific sexual harassment allegation we learned of during our investigation. In her meeting with Michele Cusumano on February 5, 2020, as noted above, Thornley for the first time alleges that Garcia was touchy, feely, hugging, creepy, and touching her legs one time when he had asked to meet with her at the Tinley Park office and that she just wanted to get away from him.

Based on the information we saw in the investigation, we find there is insufficient evidence to support this allegation. From a review of the evidence, we believe the only time that Thornley went to the Tinley Park office was on April 25, 2017. We have found no evidence corroborating or otherwise supporting Thornley's allegation. Several pieces of evidence are inconsistent to at least some degree with her allegations. First, text evidence shows that this meeting was arranged by Thornley and she drove up at her own suggestion. Second, to our knowledge, Thornley has not share these allegations with any other witness or in formal filings when making complaints about Garcia. Second, text correspondence shows that she initiated a friendly text to Garcia following the meeting later that night about a custard place suggesting his daughter try it out. Third, Thornley filed a complaint with the OEIG regarding Garcia conducting background checks. This complaint was dated and emailed to the OEIG on May 9, 2017. Thornley did not mention anything about the alleged harassment in this complaint to the OEIG.

## B.  Observations by Witnesses Regarding Garcia Conduct

We have interviewed a number of individuals who have been in a position to observe Garcia's conduct.  These include: the other current staff members at the Merit Board, the members of the Merit Board, several individuals at the Illinois State Police, and a friend of Garcia's.  None have described witnessing him engaging in the type of behavior consistent with Thornley's allegations. To the extent any of the witnesses interviewed did make negative remarks about Garcia, we found that the negative remarks pertained by and large to other aspects of his personality and were not directly inconsistent with the descriptions of his conduct relevant to our findings on this point.

*Attorney-Client Privileged*
*Attorney Work Product*

## 1. Merit Board Staff

Merit Board staff work out of a small office in Springfield. Garcia was present in the office typically a couple of days a week. During the relevant time period, there were only a total of six individuals working in the office. With the exception of the receptionist, all have worked there the entirety of the time Garcia has been the Director. Given the size of the office, we believe that Merit Board staff had ample opportunity to observe Garcia's behavior and also Garcia and Thornley's interactions. None reported having ever seen Garcia engage in any sexually harassing behavior either generally or towards Thornley.

Dykstra stated that he has never heard Garcia make derogatory remarks towards or about women. Although Thornley had expressed dislike of Garcia in the past, Thornley had never said anything to Dykstra about Garcia making her uncomfortable or that Garcia had acted in a way that was inappropriate. Dykstra observed that Garcia and Thornley were "always polite" to each other in the office. Dykstra and Thornley have known each other for over eight years and have previously worked together. Dykstra had always considered Thornley a "friendly work colleague" and one for whom he had some level of knowledge of her personal and family life. From Dykstra's observations, Fox and Garcia have a parental-daughter relationship.

Fox has never felt that Garcia has behaved inappropriately towards her in the slightest. She feels that he treats her "like a daughter." Garcia does not have any physical interaction with her that could be misconstrued, like hugging. She has never heard Garcia comment on either her or Thornley's clothing and to the contrary states that he has said that "they represent the Merit Board" and "should dress as they see fit." She likewise never heard any statements regarding Garcia engaging in any sexually harassing behavior from prior female employees of the Merit Board during Garcia's tenure. From her observations, Garcia and Thornley were always cordial towards each other.

Garvue has never observed Garcia engage in any inappropriate behavior with females or otherwise. He has never heard him make any comments about women. He described Garcia as "no nonsense" and "gruff." He observed that Garcia and Thornley behaved in a business-like manner towards each other.

Riley as the receptionist sits immediately outside Fox's office. He has occasion to observe Garcia and Fox interact and has never seen any "touchy" type behavior or derogatory behavior by Garcia towards Fox. He has always observed Garcia to behave in a respectful manner.

## 2. Merit Board Members

The Merit Board members were consistent in their views of Garcia as being entirely professional. Although they are not present for the day to day operations in the Merit Board offices, during their quarterly meetings they have had occasion to observe Garcia interact with Fox and have other communications with Garcia, although the level of that communications varies between the board members.

*Attorney-Client Privileged*
*Attorney Work Product*

Waud described Garcia as "above reproach" and "100% professional." He has never heard him make any inappropriate comments about women and has always observed him to behave appropriately with the women with whom he has seen him interact – Fox and board member Maldonado.

Maldonado has observed Garcia to be a "straight arrow" and has seen this in how he reacts and has handled certain board business involving ISP discipline showing zero tolerance for inappropriate conduct towards women. Maldonado has never witnessed Garcia do or say anything inappropriate or sexist. She has observed the manner in which he has interacted with Fox as entirely appropriate and fatherly in nature. As a woman, Maldonado is cognizant of male inappropriate behavior and observed that nothing about Garcia has ever registered for her in that manner.

Berlin met Garcia before coming onto the board through mutual friend regarding memorial for ISP. He considers Garcia to be a personal friend with a friendship that is professional in its origin and has included meals with him over the years (mostly around business) and Garcia traveling with Berlin to baseball spring training twice. Garcia's brother also worked for Berlin as Berlin's driver for a period of time. Berlin described Garcia as a "gentleman" and has never see Garcia do anything inappropriate or "close to the line" with women or otherwise.

Warren described Garcia as a "professional" and a "stand-up guy" who is "very ethical." He has never observed any conversation that was questionable about females and has never felt uncomfortable by anything Garcia has said. He has observed him to be "a man of character and high moral standards."

Riley has known Garcia for many years since Garcia was Deputy Director at ISP and Riley was on the Merit Board. He described their relationship as "very friendly" and a personal relationship. Riley has had dinners with Garcia outside of board dinners with their wives. Riley played a role with bringing Garcia on as Executive Director. He describes him as a "great leader" and "very professional. Riley stated that from his observations he "treats women appropriately" and is "not that kind of guy" in reference to the allegations. He has only seen him behave in an appropriate professional manner

### 3. Illinois State Police

Director Brendan Kelly described Garcia as "kind, professional and courteous." He noted however that Garcia has a history at ISP and there are a "division of opinions" about him in that "some people like him and some people don't." He has seen Garcia in formal settings with women and never observed him act in way inappropriate towards women. He has never heard anything about Garcia having sexually harassed women or done anything inappropriate. He has heard female officers make remarks that Garcia is a little old fashioned or sexist but none have articulated any specific comments or examples and Kelly has no personal knowledge of any examples. In Kelly's view, these may just be personality conflicts.

*Attorney-Client Privileged*
*Attorney Work Product*

First Deputy Matt Davis has known Garcia for 20 years.  He stated that he does not share the same management style or philosophy with Garcia but stated that they have had a professional working relationship that did not inhibit progress.  He has heard Garcia's management style to be "perceived as abrasive by both male and female subordinates."  He views Garcia's management style as harsh and noted that it may be harsher towards female subordinates. He stated that there is nothing about it that is sexual in nature and rather it is "gruff" and "just blunt and demanding in a way that may not resonate well with some people."

Legislative Liaison John Thompson has known Garcia since at least 2010 in a professional setting and has "always gotten along fine" with him. He described Garcia as having a "strong personality."   He has never heard or seen him do anything in sexually inappropriate manner. He was "shocked" when Thornley alleged to him that Garcia had commented that she "would look better if she dressed more like Emily."

Chief of Staff Felix Canizares has known Garcia for 21 years and was Garcia's Chief of Staff at one point.  He described their relationship as a friendly professional relationship in which they mainly socialized at work functions when socializing.  He has observed him interact with women over the years and never seen anything sexually inappropriate.  He noted that Garcia "sometimes says things that are not as acceptable now as they were 20 years ago" that "with shift in times younger people might perceive as annoying" like saying to female subordinate "Hey can you get me cup of coffee" or "Hold onto this."  Canizares said that since Garcia's time at the Merit Board he has been aware of Garcia making remarks like this to Fox.  Canizares has observed Garcia throughout the years at ISP and at the Merit Board and never heard him say anything sexually inappropriate to or about women.  Canizares noted that "we have had conversations in joking where no one was offended – all used profanity" but never in a way that Canizares felt offended anyone.  He stated that he and Garcia have "had conversations where they will talk about a woman being attractive" but those were conversations between the two of them.  Canizares spoke to Garcia after Thornley made the allegation and said Garcia was matter of fact and stated that it was not true.  Canizares said the behavior alleged is not consistent with Garcia being the person he knows.

CFO Michael Yokley has known Garcia since 2002 when Yokley started at ISP.  He noted that Garcia had worked with Yokley's father. He described Garcia as "professional" but with an aspect of his personality that can "be pretty firm."  He has never seen anything other than "normal professional interaction with women."

### 4.  Friend of Garcia

Jim Wolfe has known Garcia for 10 to 12 years through building of ISP memorial.  He described them as personal friends with regular contact and who dine out a couple times a year with spouses.  Wolfe stated Garcia was "if not the most ethical person than certainly in top five." Wolfe has seen him interact with women and stated that Garcia has "always behaved appropriately" and has never seen anything "out of line "and never heard him reference women in a disparaging manner.

*Attorney-Client Privileged*
*Attorney Work Product*

### C.   Results of Review of Electronic Evidence for Indications of Inappropriate Conduct

Our review of electronic evidence available to us reflects an absence of any sexually inappropriate comments or language used by Garcia and instead evidences a professional and essentially congenial relationship between Thornley and Garcia.  We reviewed a significant volume of texts and emails between Garcia and Thornley over the entirety of their working relationship at the Merit Board.  We make the following observations from our review:  (1) The contacts in text messages, a more informal means of communication, were more frequently initiated by Thornley.  When an exchange was initiated by Garcia, the content evidences that the texts was initiated for a professional purpose.  (2) The majority of the content of the text and email communications were work related in nature.  Garcia's content and language was generally fairly formal although friendly at times in a workplace appropriate manner. Thornley sometimes sent text messages with friendly banter or pictures of her family or vacations to Garcia.  Garcia did not send similar text exchanges with Thornley although he responded in a courteous manner.  Our review observed no comments or language by Garcia that was inappropriate or had sexual overtones.  We also reviewed call detail for phones of Garcia.  The majority of the calls took place during business hours and we did not see any calls that took place at times that would be other than professional. Likewise, emails and text messages between Garcia and Thornley following the alleged assault on January 23, 2020 do not contain any content that is indicative of such a significant event as having taken place and are consistent with the other communications between the two.

## PART V – GARCIA'S INTERVIEW

### I.   Garcia's interview statements

We interviewed Garcia twice, the first interview lasting over six hours and a second interview follow up interview lasting approximately an hour and a half.  Our findings and conclusions set forth above are based on the evidence that has been discussed and are independent of statements made by Garcia in his interviews.  Information from Garcia's interviews is relevant in that it did not alter or undercut our analysis of the evidence or our evidence-based findings and conclusions.  We did not find the information Garcia relayed was inconsistent with the evidence we obtained from other sources in the investigation in any meaningful manner.  It is also instructive as providing additional context for certain areas of the information discussed above.  Accordingly, below we have set forth a summary of the relevant information from the interviews.

Garcia started at the ISP in 1985 and rose through ranks to First Deputy Director.  He retired in 2012 and went to the Cook County State's Attorney's Office for five years.  He started at Merit Board in April 2017 as the Executive Director. According to Garcia, he never has had any prior issues, either formal or informal, resulting in documented disciplinary action or undocumented action (other than "an incident in 1985 when a legislator said he was driving a little fast and he was spoken to"). He has never had complaints either formal or informal involving conduct towards women.

*Attorney-Client Privileged*
*Attorney Work Product*

### A.     General Information About Jenny Thornley

When he arrived at the Merit Board, he began running things in "a state police way" with "accountability and transparency." This was a change for the office. He felt staff welcomed change to have a boss who cared. He did not socialize with staff but tried to do some teambuilding activities. Garcia works in an office in Tinley Park at the Medicaid Fraud building and travels to Springfield a few days a week. He interacts mainly with Fox who oversees the program process and with Dykstra because he is the attorney for the board.

When Garcia started, he had background checks run on all employees: criminal history and financial. Thornley was upset and filed complaint with OEIG. The OEIG ultimately determined Garcia could conduct the background checks and closed the matter.[85] Thornley spoke to Garcia about the background check. Garcia recalled that during their conversation she was crying and embarrassed about her financial background, which had numerous current red flags including her mortgage being three months late. She said her husband had been laid off. Garcia was concerned due to her position at the Merit Board, but felt she should have a chance to succeed and, if what she said was true, she should have a chance to clear it up.

Upon starting, Garcia also moved the position of ethics officer to Dykstra because, based on Garcia's experience, Garcia felt it was better suited to legal department. Thornley did not say anything to him about the switch and from Garcia's perspective, he had thought she was relieved to no longer have those duties. Further, upon starting, he clearly communicated his expectations that Merit Board staff obtain his prior authorization in order to take leave time or work overtime.

In August 2017, an issue arose about Thornley's conduct at state fair. Individuals from ISP reported to Garcia that Thornley had acted inappropriately at the state fair by acting rude, referring to the ISP Director as "LEO," and acted like she was part of the Director's personal party at the fair. They also reported that she was sitting in the ISP area with her feet up and texting and further reported that she appeared to want to be catered to, asking "where are the wrist bands" and asked who from the ISP was driving her home. When Garcia confronted Thornley about her behavior she was not apologetic, but rather defensive and stating at one point "I'm going to call Leo" referencing the then head of ISP. Garcia would hear from time to time that Thornley was looking for another job

Garcia described Thornley as "a name dropper" who "was very vocal about working on the governor's campaign" and "liked to come and go and didn't like to be questioned." There were "always issues" with her performance i.e. things being late or not getting done, and Garcia did not think she was actually qualified for her job. However, he never took any discipline steps because thought he could just talk to her. Garcia believed that Thornley was jealous of Fox (and previous employee Julie Webster) because they got to go out of the office and go to board meetings and she did not as the fiscal person. However, when Fox was given raise at the board meeting in January 2019 and got the increase in June 2019, from Garcia's perspective, Thornley

---

[85] We have reviewed that Garcia's counsel provided from the OEIG that Garcia had obtained pursuant to a FOIA request. This letter confirms that the matter was closed.

*Attorney-Client Privileged*
*Attorney Work Product*

did not express any issue with it and was openly supportive of Fox getting paid at least what a prior employee whose duties Fox had taken over got paid.

Garcia has a professional work relationship with Thornley although they will talk about their children. Garcia noted that any personal conversations they have are an outgrowth of a work discussion. Garcia said his texts with Thornley are work related and professional; he does not initiate a text unless for work related purpose. Garcia stated his calls with Thornley are basically work related although Thornley might call him with non-work related question. He asserted he has never initiated a call to Thornley for a non-work purpose.

## B.    Investigation Into Thornley Theft of Overtime

Garcia recalled that the investigation began when Thornley told Fox to give her overtime if she had any, which Fox relayed to Garcia. Garcia had no recollection of authorizing any overtime for Thornley. He recalled September 2019 being a busy month because of the promotional process, but did not recall Thornley being part of the process. After reviewing the chart Thornley provided him, he recalled her numbers jumping out. He stated he was not concerned by the number of hours of overtime she claimed, but was concerned that she even claimed to have worked overtime at all. Rather, at the time she provided him the chart, he believed her overtime hours should have been zero. Garcia denied signing any of Thornley's overtime hour request. He noted that it would have been so unusual and out of the norm for Thornley to have earned overtime that he would have remembered.

Garcia believed that Thornley's "antennae were up" prior to going on winter vacation and, after she returned on January 9, 2020 thinks she knew they were investigating her. He described Thornley as "avoiding him like the plague" and stated "if she had anything for [Garcia] to do she would go to Emily." Thornley had been there when prior Julie Webster was investigated and terminated so Garcia thinks she knew from having been present during that time. Usually when Garcia would "call out" Thornley's behavior she would "avoid him for a few days" but in this instance it continued, and she was either not in her office or in there with door shut. By January 9, 2020, Garcia knew he would refer the potential theft of overtime to the OEIG and believed it would likely to lead to criminal charges. He had privately briefed board members on the situation on January 7, 2020.

On January 10, 2020 he reached out to Brandenburg at OEIG and said he was conducting an internal investigation and needed to meet with her. Garcia left town on January 11, 2020 and was not back until January 22, 2020 On January 22, 2020 he met with Brandenburg at OEIG. He filed the complaint about Thornley's theft of overtime and provided her a binder of information that Fox compiled. Brandenburg said it would be easier to interview Thornley regarding the matter if she is on payroll so plan was to have her come in on February 3, 2020 to put her on leave and then Garcia would meet with Deputy Chief of Springfield Police Department. When Garcia was walking out of the meeting, Brandenburg asked if he was the Merit Board contractually and if he was permitted to work from home. From this, Garcia assumed that Thornley had filed complaint about this with the OEIG. He was not angry with Thornley when believed she had filed OEIG complaint and more just felt like "here we go

*Attorney-Client Privileged*
*Attorney Work Product*

again." Garcia reached out to Deputy Chief of Investigations at Springfield Police Department the week of January 26, 2020.

Garcia has no basis from which to suggest that Thornley knew she was going to be put on leave or that he was meeting with law enforcement. Although Garcia heard that Thornley was saying she had a new job at IEMA, he never had any conversation with anyone at IEMA about Thornley. No one reached out to him, and he did not reach out proactively because he felt that he could not necessarily believe what Thornley was saying about having a new job. He informed the staff that they should not treat Thornley any differently.

Garcia took what Thornley said to Jim Wolfe as a statement she was going to have Garcia fired, which he considered a threat to his employment. On January 28, 2020, when she was at the Governor's Office he thought she was trying to do something against Garcia and possibly build a case against him before it got out about her theft of overtime.

## C. Thornley Sexual Assault Allegations

Garcia typically went to Thornley's office to meet if it was just a meeting with Thornley. If she came to his office, she would drop papers in his in box to sign and put it on his desk or in the in box on right corner of desk. Garcia normally sits behind his desk; he does not typically sit at the conference table. Although he has used his conference table to spread out paperwork in the past, he has not done so with Thornley. Garcia signed bills and payroll that Thornley brought. Fox would put together travel vouchers and time sheets for him to sign.[86] If Garcia could turn to them right away, Thornley might wait for him to sign. If she needed to explain something, there are two chairs in front of his desk in which she would sit. He never recalls using conference table with only Thornley. He only sat there if there were multiple people in a meeting in his office.

Garcia recalls certain details of January 23, 2020.[87] It was his father's birthday and Garcia called him first thing when got to office. This is corroborated by the phone records summary information provided by Garcia's counsel. Fox was upset that Thornley had drawn on travel voucher for Bishop Warren. Fox has the board members sign blank vouchers, as the vouchers require original signatures, and it was her last one. Instead of putting a post it note with other information that was needed, Thornley drew on it. The voucher has Garcia's signature and is dated January 23, 2020. Fox brings him board travel vouchers to sign, and Garcia believes he would have signed it before it went to Thornley who wrote on it. Garcia went to Thornley's office and confronted Thornley about it, telling her she needed to fix it. Thornley said "ok," and Garcia set it on her desk and walked away. Thornley was at desk for this conversation. Garcia recalled this with specificity because it was unusual. He also recalls it because of the fact that it

---

[86] Garcia did not specify which time sheets Fox would put together. Fox informed us she would get her own timesheets signed by Garcia.

[87] At some point after Thornley made her allegations, Garcia was made aware of the specific date on which she alleged the assault occurred and the details of her allegations. Garcia has seen her IDHR complaint because he had to respond to it.

*Attorney-Client Privileged*
*Attorney Work Product*

was his father's birthday and he recalls having been in an upbeat mood talking to his father and thinking "then here comes this drama out of nowhere." Garcia does not recall any other interactions with Thornley that day. He does not recall Thornley coming to his office, although it is possible. He does not recall whether or not he signed any documents that day, other than the Bishop Warren travel voucher which he acknowledge has his signature and that date on it.

Garcia denied the allegations of sexual assault as well as sexual harassment allegations made by Thornley.[88] Regarding Thornley's general sexual harassment allegations, Garcia denies ever complimenting Thornley on attire, commenting on her dress, comparing her dress to anyone else or Emily. He stated that he has never called her a nickname (other than a shortened version of her name "Jen") or pet name. Regarding Thornley's specific allegations, Garcia denies ever touching Thornley's breast at any point, standing behind her, touching her or brushing up against her, denies making comments about her attire, and denies saying anything about her dressing like Fox.

## II.    Assessment of Garcia's Interview Statements

Based upon the evidence in the investigation, we find Garcia's denials of having sexually assaulted or sexually harassed Thornley to be credible. We observe that, overall, Garcia's statements in his interview were consistent with other evidence in the case. We note that there were a few points in Garcia's interview in which his statements conflicted with other evidence which we address below in detail. Although we believe it is important to set forth this information to provide a complete assessment of Garcia's interview, none of the below points undermine our evidence based conclusions that his denials of having sexually assaulted or sexually harassed Thornley are credible.

First, Garcia described the one meeting he had with Thornley in the Tinley Park office in April 2017 where she drove several hours from Springfield to meet with him (referenced above) as being approximately 15 to 30 minutes in duration. The content and timing of text messages appear to demonstrate that the meeting was far longer and included lunch. Thornley alleged to Michelle Cusumano that Garcia sexually harassed her at this meeting. While we recognize that if Garcia did sexually harass Thornley at that meeting, there might be a motivation to inaccurately describe the meeting as shorter and not including lunch, for the reasons stated earlier, we find the evidence demonstrates to the contrary and do not believe that Garcia misrepresented his recollection of the length of the meeting as opposed to simply having remembered a meeting from over three years ago differently.

Second, Garcia gave a significantly different description of a call with Canizares at the time he was investigating Thornley for overtime. Garcia describes having reached out to Kelly to see about getting fiscal help for the Merit Board once Thornley was placed on leave and that

---

[88] Garcia's counsel provided us with the results of a polygraph examination that was administered to Garcia on February 10, 2020. In the examination, Garcia was asked "Did you touch that woman's breast?" to which Garcia responded "No." He was also asked "Did you touch that woman's breast on January 23, 2020?" to which Garcia responded "No." The examiner concluded that there was "'No Deception Indicated' (NDI), i.e. he passed the test regarding the…questions and issues." We have not considered the examination or its results in our investigation. Our findings are based on our analysis of the evidence from our investigation.

*Attorney-Client Privileged*
*Attorney Work Product*

Kelly had Canizares call him back. He said he did not tell Canizares anything about the investigation. Canizares recalls the incident differently and stated that Garcia reached out to him proactively to talk to him about certain aspects and details of the investigation and found it odd and went to Davis about it. Davis recalls Canizares relaying the conversation to him, but did not take any further action. Kelly did not relay any communications with Garcia of the nature Garcia described to us during our interview. When confronted with the account given by Canizares, Garcia stated that if Canizares recalled the matter that way then Canizares was likely correct. While we find it hard to reconcile the differences of recollection and note that Garcia could arguably have a motivation to not want to say that he was sharing details of the investigation outside the Merit Board other than for reporting purposes, we do not have a basis to believe that the discrepancy was anything other than a difference in recollection.

Third, we asked Garcia in his first interview whether he had spoken with anyone at the Merit Board since being placed on leave. The question was not limited in any manner to contacts only pertaining to this investigation. In response, Garcia described very minimal contacts with staff and board members. His description was not limited to conversations that related to the investigation (i.e. relaying he had had "a couple of contacts" with Dykstra when Dykstra would ask "where something was located" or to let him know when an interview would be scheduled as well as conversations with Berlin about a spring training trip and a conversation with Waud in which Waud was looking for some contact information).

Subsequent to our interview, at our request to Garcia's counsel, Garcia ultimately voluntarily provided us with cell phone record information that was prepared by Garcia's counsel from information from his cell phone account. That information reflected significantly more contacts than had been described by Garcia. Most notably, there appeared to be consistent and frequent contact with Dykstra. In his second interview, Garcia provided a detailed recitation of the substance of the numerous contacts. When asked about the discrepancies, Garcia (and his counsel) stated that they understood the question in the initial interview to be only asking about conversations Garcia may have had about the investigation itself. We note that we find it hard to reconcile that understanding with the question that we asked and the answers given. However, we do not have any evidence or a basis upon which to believe that there was anything improperly shared concerning the investigation. Thus, we do not necessarily see any reason these contacts have investigative significance and do not find there is a basis to believe that Garcia was intentionally misleading on this point.

## PART VI – CONCLUSION

Based on the evidence and analysis discussed above, the conclusions from our investigation are as follows. (1) The evidence in the investigation is sufficient to support a finding that Thornley caused payments to herself for overtime she did not work. (2) The evidence in our investigation is insufficient to support a finding that Garcia sexually assaulted Thornley.

# Appendix A

*Attorney-Client Privileged*
*Attorney Work Product*

## APPENDIX A – INVESTIGATIVE STEPS

Appendix A sets forth the investigative steps we took during this investigation.

### I. Background of the Investigation

We began our investigation in February 2020 and worked for approximately five weeks before we had to cease our investigation due to the court order that was entered in civil lawsuit Thornley filed against the Merit Board granting a preliminary injunction. When the court order was reversed, we were able to resume our work at the beginning of June 2020 and largely completed our work over the following four weeks. The below sets out the evidence we obtained through the course of our investigation.

### II. Information Gathered

#### a. Interviews

As part of our investigation, it was critical to talk to people with information potentially relevant to the allegations. These interviews helped provide clarity on the timeline of certain events and substance of the two allegations we investigated. We conducted 66 interviews of 45 total witnesses. Interviewees were from the Merit Board staff, the Merit Board, the Office of the Governor, the Governor's Office of Management and Budget ("GOMB"), Illinois Emergency Management Agency ("IEMA"), State of Illinois Comptroller's office ("Comptroller's Office"), Illinois Department of Natural Resources ("IDNR"), Illinois State Police ("ISP"), Illinois Department of Central Management Services ("CMS"), and other third parties. Below is a list of individuals we interviewed.[1]

- February 10, 2020 – Dan Dykstra (Merit Board Chief Legal Counsel). We first conducted an in-person interview with Dykstra on February 10, 2020. We conducted multiple follow-up phone interviews with Dykstra including on the following days: February 18, 2020; February 19, 2020; March 17, 2020; June 5, 2020; June 8, 2020; June 11, 2020; June 23, 2020; June 29, 2020; and July 16, 2020.

- February 12, 2020 – Scott Lerner (Office of Governor Deputy General Counsel). Phone interview.

---

[1] Throughout the course of our investigation we learned of several individuals who we did not interview. We specifically note that Jenny Thornley did not make herself available for an interview. A full explanation of the efforts to interview Thornley are detailed in our investigative report. We also did not interview Thornley's husband, Jared Thornley, or her friend, Sarah Downey, as we did not believe these individuals would make themselves available for an interview. We also attempted to interview two individuals: 1. Shane at the Crowne Plaza and 2. Lieutenant Brooks Young. Shane refused to sit for an interview. After undertaking some investigative work, were unable to obtain current contact information for Lieutenant Young. In addition, there were other individuals who we learned of through the course of the investigation but did not interview. Among other reasons, we opted not to interview these individuals in an effort to streamline our investigative efforts.

*Attorney-Client Privileged*
*Attorney Work Product*

- February 12, 2020 – Whitney Rosen (Office of Governor Deputy General Counsel). Phone interview.

- February 12, 2020 - Ann Spillane – (Office of Governor General Counsel). Phone interview.

- February 14, 2020 – Bill Gosda (Merit Board contractual employee). In person interview.

- February 14, 2020 - Blayne Riley (Merit Board contractual employee).  In person interview.

- February 14, 2020 – Emily Fox (Merit Board Program Administrator). We conducted an initial in-person interview with Fox on February 14, 2020. We conducted a follow-up phone interview on June 20, 2020; June 23, 2020; and June 24, 2020.

- February 14, 2020 - Eric Garvue (Merit Board Information Systems Analyst). We conducted an in-person interview of Garvue on February 14, 2020. We conducted follow-up telephonic interviews on June 4, 2020; June 11, 2020; and June 23, 2020.

- February 16, 2020 - Nancy Maldonado – (Merit Board member). We interviewed Maldonado in-person on February 16, 2020. We conducted follow-up phone interviews on February 26, 2020 and June 15, 2020.

- February 17, 2020 - Jim Wolfe (Friend of Garcia). Phone interview.

- February 17, 2020 - Dominique (last name unknown) (Crowne Plaza employee). Informal in-person interview.

- February 18, 2020 - Lindsay Amerson (GOMB Deputy Director). In-person interview.

- February 18, 2020 - Roma Larson (GOMB Deputy General Counsel and Ethics Officer). In-person interview.

- February 18, 2020 - Steve VanDeKerckhove (GOMB Budget Analyst). In-person interview.

- February 18, 2020 - Alexis Sturm  (GOMB Director). In-person interview.

- February 18, 2020 - Sarah Kerley (CMS Senior Policy Advisor). We conducted an in-person interview of Kerley on February 18, 2020 and conducted a follow-up in-person interview on February 19, 2020.

*Attorney-Client Privileged*
*Attorney Work Product*

- February 18, 2020 - Declan Binninger (IEMA Chief of Staff). We initially interviewed Binninger in-person on February 18, 2020. We had a follow-up phone interview on June 12, 2020.

- February 19, 2020 - Mindy Weir (Office of the Governor Executive Assistant). In-person interview.

- February 19, 2020 - Lee LoBue (Office of the Governor Deputy Chief of Staff for Personnel). In-person interview.

- February 19, 2020 - Bria Scudder (First Assistant to Deputy Governor Christian Mitchell). In-person interview.

- February 19, 2020 - Judy McAnarney (Office of the Governor Director of Executive Appointments). In-person interview.

- February 19, 2020 - Patty Ambrose (Office of the Governor Director of Constituent Affairs). In-person interview.

- February 25, 2020 - Joanna Gunderson (Comptroller's Office Executive Inspector). Phone interview.

- February 27, 2020 – Brendan Kelly (ISP Director). Phone interview.

- February 26, 2020 – Matt Davis (ISP First Deputy). We conducted two phone interviews on February 26, 2020 with Davis on this day.

- February 28, 2020 - Colleen Callahan (DNR Director). Phone interview.

- March 2, 2020 - John Thompson (ISP Chief of Government Affairs). Phone interview.

- March 4, 2020 - Michael Yokley (ISP Chief Financial Officer). Phone interview.

- March 4, 2020 - Felix Canizares (ISP Chief of Staff). Phone interview.

- March 4, 2020 - Adam Alstott (Comptroller's Office Deputy General Counsel). We conducted a phone interview with Alstott on March 4, 2020. We requested to interview Alstott on June 21, 2020; however, Comptroller's Office General Counsel Debjani Desai instead provided a proffer of information from Alstott.

- March 4, 2020 - Michele Cusumano (Comptroller's Office Human Resources Director). In-person interview.

*Attorney-Client Privileged*
*Attorney Work Product*

- March 10, 2020 – Kevin Richey (CMS Supervisor of Risk Management Division). Phone interview.

- March 16, 2020 - Andrew Berlin (Merit Board member). Phone interview.

- March 17, 2020 - Bishop Warren (Merit Board member). Phone interview.

- June 4, 2020 - James Riley (Merit Board member). Phone interview.

- June 12, 2020 - Katie Guy (Comptroller's Office Payroll Manager for Statewide). Phone interview.

- June 5, 2020 - Jack Garcia  (Director of the Merit Board). We conducted a video interview of Garcia on June 5, 2020 and conducted a follow-up video interview of Garcia on June 25, 2020.

- June 22, 2020 - Eugene Oliver (Comptroller's Office Purchasing Agent). Phone interview.

- June 22, 2020 - Nicole Johnson (Nurse Practitioner and Eugene Oliver's significant other). Phone interview.

- June 25, 2020 - Reeve Waud (Merit Board Chairman). Video interview.

- June 25, 2020 – Beth Ellingson (Waud Capital Partners Executive Assistant).  Phone interview.

- June 26, 2020 - Governor J.B. Pritzker (Governor of the State of Illinois) through questions provided to Spillane who relayed to us information obtained from Governor Pritzker in response to the questions on the above date.

- July 16, 2020 – Nina Pickrel (CMS Payroll Manager). Phone interview.

- July 17, 2020 - Nikki Budzinski (Former Senior Advisor at the Office of the Governor) through questions provided to Rosen who relayed to us information obtained from Mitchell in response to the questions interview was conducted and relayed to us by Rosen on the above date.

- July 17, 2020 – Christian Mitchell (Deputy Governor) through questions provided to Rosen who relayed to us information obtained from Budzinski in response to the questions on the above date.

*Attorney-Client Privileged*
*Attorney Work Product*

### b. Evidence Obtained from Merit Board

We obtained information and documents from the Merit Board. A summary of the documents and information provided by the Merit Board is included below:

- Garcia Merit Board emails
- Thornley's Merit Board emails
- Thornley's personnel file[2]
- Fox's personnel file
- Thornley's and Garcia's state desk and cell phone records
- Garcia's and Thornley's electronic calendars
- Text messages between Garcia and Dykstra, Fox, and Thornley from Garcia's work cell phone
- Copy of Garcia's desk calendar for December 2019 and January 2020
- Merit Board's investigative file on theft of time and documents related to its findings
- Merit board payroll and timekeeping records
- Merit Board security video footage[3] and security video clips[4]
- Merit Board's fiscal folder
- State civil complaint against Merit Board filed by Thornley through counsel[5]
- Administrative IDHR complaint
- Merit Board business records including: invoice vouchers, cadet payroll vouchers, Comptroller modification documents, an EEO quarterly report, employee performance reviews, contracts between the Merit Board and third parties, and intergovernmental agreements
- Map of the Merit Board

---

[2] Garcia's personnel file was missing from the Merit Board. Based on the evidence in the investigation, including statements made by Thornley to Kerley and Cusumano, the personnel file is believed to be in Thornley's possession.

[3] The video evidence consists of footage received from the Merit Board's security cameras. At the times relevant to this investigation, there were four cameras. The first security camera shows the outside of the front entrance of the Merit Board. On this camera one can see when someone enters or exits the Merit Board's front entrance walks to the parking lot. The second camera shows the entrance to the parking lot from Sangamon Avenue. On this camera one can see this parking lot entrance and portions of the front part of the parking lot. The third camera shows just inside the front entrance of the Merit Board, which includes the hallway leading towards the kitchen and bathrooms, as well as the side entrance near Sangamon Avenue. On this camera one can see when someone enters or exits the front entrance from the parking lot, walks to or from Fox's office, walks to or from the back offices (including Garcia's office, Dykstra's office, Garvue's office, Thornley's office, and the conference room), walks to or from the kitchen area or bathroom, or enters or exits the entrance on the side of the Merit Board near Sangamon Avenue. One can also see any activity occurring in the hallway.

[4] We received full video clips for days after January 10, 2020; however, the video for the days prior to this time had been overwritten. Therefore, we relied on the clips and screen shots collected by Merit Board staff and have accounted for this reliance in our analysis.

[5] Although we reviewed these documents for sexual harassment allegations, the fact that Thornley filed the civil complaint was not considered as part of our assessment of the evidence in this matter.

*Attorney-Client Privileged*
*Attorney Work Product*

- Photographs of Merit Board offices
- Medical documentation provided to the Merit Board by Thornley's counsel

### c. Evidence Obtained from Witnesses

We obtained documents from the various witnesses interviewed that they self-collected and either provided us directly or were provided us through counsel. A summary of the documents and information provided is included below:

- Notes taken contemporaneously by the interviewee at the time of events
- Memorandums written close in time to the time of events
- Text messages between the interviewee and Thornley
- Voice mails left for the interviewee by Thornley
- Call details between the interviewee and/or Thornley and Garcia
- Email correspondence between the interviewee and/or Thornley or Garcia

### d. Forensic Analysis

We engaged a forensic analyst who analyzed four pieces of information:

- Garcia work cell phone
- Thornley work cell phones[6]
- A forensic image of Thornley's desktop computer[7]
- A forensic image of Thorley's laptop computer[8]

The analyst provided us work product after analyzing the evidence listed above. The analyst additionally provided documents that had been recovered on Thornley's computers. We used this work product and the recovered documents in conducting our investigative analysis. Throughout the course of the investigation we also conferred with the analyst as needed.

### e. Documents provided by Garcia's Counsel

We received and reviewed the below evidence from Garcia's counsel.

- Phone records prepared by counsel from Garcia's personal cell phone from November 2019 through June 2020
- Text communications from Garcia's personal cell phone with Fox and Thornley

---

[6] When reviewing the work cell phones discovered they were factory reset. We cannot say whether Thornley reset them herself or whether she never used them.

[7] Garvue provided a forensic image of Thornley's desktop computer; however, the analyst also created his own forensic image of Thornley's desktop computer, which covered January 24, 2020 to June 12, 2020. We initially reviewed the image Garvue had created, but subsequently engaged the analyst and relied on the work product the analyst provided.

[8] The analyst created his own forensic image of Thornley's desktop computer.

*Attorney-Client Privileged*
*Attorney Work Product*

- 2017 letter from the OEIG

We also received the below additional items from Garcia's counsel which we did not consider or rely upon in our analysis.

- Timeline of events created by Garcia's counsel
- Polygraph report reflecting the polygraph taken by Garcia
- Affidavit of Jim Wolfe
- Christmas card to Garcia from Thornley

# Appendix B

*Attorney-Client Privileged*
*Attorney Work Product*

## APPENDIX B – COMMUNICATIONS REGARDING TIME OUT OF OFFICE

Appendix B sets forth text messages and email correspondence from Thornley to Garcia regarding her time out of the office.[1]

| Date | Time | Method | To Who | Content |
|---|---|---|---|---|
| 04/21/2017 | 1:17 p.m. | Text | Garcia personal | "FYI – I have an infusion today at 2 at memorial cancer center. I will have my phones if you need anything. I will be back after my infusion." |
| 04/27/2017 | 12:29 p.m. | Text | Garcia work | "I have a friend in town from D.C….we are meeting up for lunch. I won't be long." |
| 04/28/2017 | 10:45 a.m. | Text | Garcia work | "Taking my break to go get my son from school." |
| 05/03/2017 | 12:01 p.m. | Text | Garcia work | "I have a doctors appointment at 1. It might last a few minutes longer than my lunch but I was in at 7:30 so I have extra time if I need it. Just an FYI." |
| 05/05/2017 | 1:04 p.m. | Text | Garcia work | "Do you mind if I take some time of this afternoon? I really want to get my yard mowed. <br><br>If approved I will email you. <br>Thank you" <br><br>Garcia responds: "10-4. Enjoy" <br><br>Thornley responds: Thank you!!! It's beautiful out! Leaving around 2. [smiley emoji] Have a great weekend!" |
| 05/08/2017 | 10:47 a.m. | Text | Garcia work | "I'm heading to pick up my son from school. I'm going to take an early lunch at 11. Meeting Bourland for lunch…Just giving you a heads up!" |

---

[1] We note that any quoted material appears as it is reflected in the document or communication without signaling any misspellings or grammatical errors.

*Attorney-Client Privileged*
*Attorney Work Product*

| Date | Time | Method | To Who | Content |
|---|---|---|---|---|
| 05/10/2017 | 10:41 a.m. | Text | Garcia work | "Taking my break to pick up my son from school." |
| 06/07/2017 | 12:05 p.m. | Text | Garcia work | "Going to lunch Boss…let me know if you need anything." |
| 06/08/2017 | 12:45 p.m. | Text | Garcia work | "I am going to take the day off tomorrow. Dan will be in all day. Hope that's ok with you. I have comp time I need to burn before the end of this month [smiley face emoji]" |
| 06/14/2017 | 12:24 p.m. | Text | Garcia work | "Headed to lunch Boss. Be back soon." |
| 07/07/2017 | 12:55 p.m. | Text | Garcia work | "I have to go get some blood work on lunch. Be back soon." |
| 07/14/2017 | 7:54 a.m. | Text | Garcia work | "Just letting you know I'm at work [smiley face emoji]" |
| 07/25/2017 | 8:20 a.m. | Text | Garcia work | "Leaving the office to go to my appointment, be back soon! The AC people will be in this morning to look at the unit in the server closet." |
| 08/23/2017 | 9:21 p.m. | Text | Garcia work | "Hey Boss – I have a meeting at my daughters school at 8:30, I will be in as soon as it's over. Thanks" |
| 09/18/2017 | 10:36 a.m. | Text | Garcia work | "I need to run to the comptroller and CMS in a bit to drop off Mr. Springs payroll vouchers. Just an FYI" |
| 09/28/2017 | 3:41 p.m. | Text | Garcia work | "Hey Boss- just a reminder I have that pre-op visit with my Dr tomorrow morning. I will be in right after that. It's early. Have a great night!" |

*Attorney-Client Privileged*
*Attorney Work Product*

| Date | Time | Method | To Who | Content |
|---|---|---|---|---|
| 10/05/2017 | 7:20 a.m. | Text | Garcia work | "Hey Boss- I just sent you an email. I have been up all night in horrible pain. I am at least going to take off this morning to try and get a few hours of rest. [Two praying hands]" |
| 10/11/2017 | 8:10 p.m. | Text | Garcia work | "I'm feeling better for sure! Tomorrow morning I'm going to take it easy and go in when I wake up. I can't drive until Friday but I will have Dan come get me." |
| 10/31/2017 | 5:23 p.m. | Text | Garcia work | Picture of kids in Halloween costumes – "Thanks for letting me take my lunch late today!" |
| 11/13/2017 | 3:14 p.m. | Text | Garcia work | "I took my lunch late (2) and had to go to the eye dr. I'm almost finished but wanted to let you know I'm running late ugh" |
| 11/14/2017 | 9:17 p.m. | Text | Garcia work | "Hey Boss…if needed can I take some time in the morning and take J█ to the Dr? He is not feeling well. I'm going to see how the night goes." |
| 11/15/2017 | 7:48 a.m. | Text | Garcia work | "We are at prompt care, I will be in after we get done. Shouldn't take long." |
| 01/02/2018 | 10:16 a.m. | Text | Garcia work | "Good thing I scheduled today off…4 of the 6 people in the house have the flu. [sick emoji]" |
| 01/05/2018 | 7:19 a.m. | Text | Garcia work | "My daycare is closed today because of the flu. I will be about 30 mins late because I have to run the kids to my cousins in Riverton. Sorry" |
| 01/08/2018 | 2:52 p.m. | Text | Garcia work | "Hey Boss- C█ has her first volleyball game tonight in pawnee at 5. Is it ok if I leave a little after 4?" |

*Attorney-Client Privileged*
*Attorney Work Product*

| Date | Time | Method | To Who | Content |
|------|------|--------|--------|---------|
| 01/25/2018 | 7:34 a.m. | Text | Garcia work | "I'm going to be a few mins late. I was in the office until 5:20 last night so just letting you know it's been a rough morning. [smiley face]" |
| 02/22/2018 | 1:26 p.m. | Text | Garcia work | "Hey Boss, i am running to get my hair cut real quick. Be back soon." |
| 03/06/2018 | 12:38 p.m. | Text | Garcia work | "Hey Boss! Just letting you know grandma is still in surgery. They ran into a few unexpected stones in her gallbladder so it's taking longer than expected. I will keep you and Emily posted" |
| 06/06/2019 | 8:21 a.m. | Email | Garcia, Fox, Dykstra | "Things are a little nuts but much better on the house end! We start moving back in the house later today. We are so ready to get back in! Thank you for your continued support.<br><br>I will be taking 4.0 hours yesterday<br>And 4.0 hours today<br><br>I am always accessible by phone." |
| 06/10/2019 | 1:59 p.m. | Email | Garcia, Fox, Dykstra | "Good Afternoon-<br><br>I have attached my DC trip agenda just in case you need it. I fly out tomorrow morning at 6am.<br><br>I wanted to share this in case anyone needs me.<br><br>Have a great afternoon." |
| 04/12/2018 | 1:56 p.m. | Text | Garcia work | "I'm running to Walgreens to pick go a prescription be right back." |
| 04/26/2018 | 9:06 p.m. | Text | Garcia work | "Hey Boss, do you mind if I leave early tomorrow? I have all my audit requests caught up and nothing pressing going on. I still have to pack and get my oil changed. Just running out of time [eye roll emoji]" |

*Attorney-Client Privileged*
*Attorney Work Product*

| Date | Time | Method | To Who | Content |
|---|---|---|---|---|
| 07/30/2018 | 9:12 a.m. | Text | Garcia work | "Good Morning- i didn't take any time today. We came back last night. Just wanted to let you know I'm in the office. Thanks" |
| 10/10/2018 | 9:10 a.m. | Text | Garcia work | "Good morning boss, I'm headed to training. I will see you at lunch" |
| 10/30/2018 | 2:16 p.m. | Text | Garcia work | "I had my kids Halloween party at lunch today. Took over an hour. I will add that time to my time off sheet. Thank you" |
| 12/3/2018 | 11:37 a.m. | Text | Garcia work | "I'm in ERP training until noon" |
| 12/20/2018 | 11:57 a.m. | Text | Garcia work | "Just an FYI – J▮▮ is scheduled for surgery tomorrow at 5:30 a.m." |
| 01/15/2019 | 7:46 a.m. | Text | Garcia work | "I'm going to meet Matt at the park around 9. Just to make sure it's good and all taken care of." |
| 03/28/2019 | 6:47 p.m. | Text | Garcia work | "J▮ has an appointment with his eye surgeon at 8:30 so I will come in and then take him to his appointment if that's ok" |
| 05/24/2019 | 11:19 a.m. | Text | Garcia work | "Have a great weekend Boss. I'm headed to s▮▮▮ graduation" |
| 07/11/2019 | 11:58 a.m. | Text | Garcia work | "Hey boss, I'm sitting in the doctors office. I will call you as soon as I am done. So sorry" |
| 08/04/2019 | 8:57 p.m. | Text | Garcia work | "Hey Boss- I will be in the office in the morning but the kids all have physicals and eye appointments tomorrow. Just an FYI [face palm emoji]" |

*Attorney-Client Privileged*
*Attorney Work Product*

| Date | Time | Method | To Who | Content |
|---|---|---|---|---|
| 08/21/2019 | 2:10 p.m. | Email | Garcia, Dykstra, Fox | "I am heading to the Comptroller in a bit to drop off payroll and then I will head to pick up J█ from his first day of school. I took a shot [sic] lunch today and yesterday just to make up that time." |
| 08/22/2019 | 8:35 a.m. | Email | Garcia, Fox, Dykstra, Garvue | "Good Morning Everyone-<br><br>Please see my schedule attached for the remainder of the week.<br><br>Please let me know if you have any questions.<br><br>Have a great day!<br><br>*IWILTA SoIL Agenda was attached to this email" |
| 09/20/2019 | 8:00 a.m. | Text | Garcia work | "Morning Boss- I'm on a field trip with █, pumpkin patch. I will be in after lunch. Emily knows but wanted to give you an FYI. Thank you" |
| 11/12/2019 | 10:28 a.m. | Text | Garcia work | "What time are you getting to town? I need a ride to the office from the hospital. Just getting my treatment." |
| 12/02/2019 | 3:12 a.m. | Email | Garcia, Garvue, Fox, Dykstra, Riley | "Hi Everyone- I am up in Chicago. I have to see my surgeon at 9:30 but otherwise will be working from my phone and laptop if anyone needs anything at all.<br><br>I am expecting an update on our vehicle, I will keep you posted on that.<br><br>Hope everyone had a great holiday!" |
| 12/14/2019 | 9:12 a.m. | Text | Garcia work | "In at 8:45<br><br>I will let you know when I leave" |

*Attorney-Client Privileged*
*Attorney Work Product*

| Date | Time | Method | To Who | Content |
|------|------|--------|--------|---------|
| 12/14/2019 | 1:05 p.m. | Text | Garcia work | "I'm leaving" |
| 12/15/2019 | 7:42 a.m. | Text | Garcia work | "At the office working this morning<br><br>"Got in at 7:30 I will text you when I leave" |
| 12/15/2019 | 11:38 a.m. | Text | Garcia work | "Just locked the gate! Have a great day" |
| 12/16/2019 | 7:30 a.m. | Text | Garcia work | "At the office" |
| 01/23/2020 | 8:20 p.m. | Text | Garcia work | "Good Morning Boss, I was in at 7:15. I have to see my infectious disease doctor at 8:30. I have my time documented and will also bring a doctors note. Thanks!" |

# Appendix C

*Attorney-Client Privileged*
*Attorney Work Product*

## APPENDIX C – DAYS THORNLEY CLAIMED TO WORK OVERTIME

Appendix C sets forth the days included on Thornley's 2019 Overtime or Compensatory Time Request Forms. It includes the time in, time out, time out of office, total hours worked, and overtime earned that was recorded on the Attendance Report for that day. For the days in which there was video, it includes the time in and time out as seen in the video.[1] It also includes the times at which the first work-related and last work-related emails were sent on each day.

| Date | Time In on Attendance Report | Time Out on Attendance Report | Time in on Video | Time Out on Video | First Email Sent | Last Email Sent | Out of Office | Total Hours Worked | Time Earned |
|---|---|---|---|---|---|---|---|---|---|
| **May 2019** | | | | | | | | | |
| 05/06 | 8:00 a.m. | 6:30 p.m. | N/A | N/A | 9:57 a.m. | 6:43 p.m.[2] | 1.00 | 9.50 | 2.00 |
| 05/17 | 7:00 a.m. | 5:30 p.m. | N/A | N/A | 3:31 p.m. | N/A | - | 10.50 | 3.00 |
| 05/19[3] | 8:00 a.m. | 2:30 p.m. | N/A | N/A | - | - | - | 6.50 | 6.50 |
| 05/23 | 7:00 a.m. | 4:30 p.m. | N/A | N/A | 8:57 a.m. | 2:54 p.m. | - | 9.50 | 2.00 |
| **June 2019** | | | | | | | | | |
| 06/16[4] | 11:00 a.m. | 4:30 p.m. | N/A | N/A | - | - | - | 5.50 | 5.50 |
| 06/19 | 8:00 a.m. | 6:00 p.m. | N/A | N/A | 8:34 a.m. | 4:41 p.m. | - | 10.00 | 2.50 |
| **September 2019** | | | | | | | | | |
| 09/08[5] | 11:00 a.m. | 5:30 p.m. | N/A | N/A | - | - | | 6.50 | 6.50 |
| 09/09 | 8:00 a.m. | 6:30 p.m. | 8:19 a.m. | 4:35 p.m. | 8:38 a.m. | 3:13 p.m. | - | 10.50 | 3.00 |
| 09/10 | 7:00 a.m. | 5:30 p.m. | 7:45 a.m. | 5:24 p.m. | - | - | - | 10.50 | 3.00 |
| 09/11 | 8:00 a.m. | 6:30 p.m. | 8:06 a.m. | 4:56 p.m. | - | - | - | 10.50 | 3.00 |
| 09/12 | 8:00 a.m. | 5:30 p.m. | 8:09 a.m. | 4:30 p.m. | 8:16 a.m. | 1:44 p.m. | - | 9.50 | 2.00 |
| 09/13 | 7:00 a.m. | 6:30 p.m. | 8:13 a.m. | 12:23 p.m. | 8:17 a.m. | 12:15 p.m. | - | 11.50 | 4.00 |
| 09/18 | 8:00 a.m. | 6:30 p.m. | 8:26 a.m. | 4:26 p.m. | 9:32 a.m. | 12:09 p.m. | 1.00 | 9.50 | 2.00 |
| 09/19 | 7:00 a.m. | 6:30 p.m. | 8:12 a.m. | 2:09 p.m. | 8:19 a.m. | 1:37 p.m. | - | 11.50 | 4.00 |
| 09/20 | 8:00 a.m. | 6:30 p.m. | 1:07 p.m. | 4:27 p.m. | 1:23 p.m. | 1:56 p.m. | 1.00 | 9.50 | 2.00 |
| 09/23 | 8:00 a.m. | 5:30 p.m. | 8:06 a.m. | 4:29 p.m. | 8:15 a.m. | 2:35 p.m. | - | 9.50 | 2.00 |
| 09/26 | 8:00 a.m. | 4:30 p.m. | 8:24 a.m. | 10:03 a.m. | - | - | - | 8.50 | 1.00 |
| **December 2019** | | | | | | | | | |
| 12/13 | 5:45 a.m. | 5:00 p.m. | N/A | N/A | 5:53 a.m. | 4:47 p.m. | 1.00 | 10.25 | 2.75 |
| 12/14[6] | 8:45 a.m. | 1:15 p.m. | N/A | N/A | 9:11 a.m. | 11:21 a.m. | - | 4.50 | 4.50 |
| 12/15[7] | 7:30 a.m. | 11:30 a.m. | N/A | N/A | 7:46 a.m. | 11:16 a.m. | - | 4.00 | 4.00 |

[1] We were provided snippets of video showing Thornley's entrance and exit times that had been captured during the Merit Board's own investigation. We reviewed the snippets provided and confirmed the videos appeared to show Thornley entering and exiting the building at the noted times; however, due to the video being overwritten, we were unable to independently view the full videos for each day.

[2] It is unclear if this is a personal email or a work-related email. It is an email confirmation from a 4:46 p.m. DoorDash order that was forwarded from Thornley's iPhone to work computer at 6:43 p.m. If this is a personal email, the last work-related email would have been sent at 1:50 p.m.

[3] This was a Sunday.

[4] This was Father's Day.

[5] This was a Sunday.

[6] This was a Sunday.

[7] This was a Sunday.

# Appendix D

/

*Attorney-Client Privileged*
*Attorney Work Product*

## APPENDIX D – THORNLEY COMPLAINTS

Appendix D sets the complaints of which we are aware through our investigation that Thornley made regarding Garcia.[1]

| Date/Time | Creation of Complaint | Other Complaints | Sexual Harassment Complaints |
|---|---|---|---|
| 1/9/2020 9:00 a.m. | Thornley orally communicated complaint in call with Ambrose at noted date and time. Ambrose emailed Rosen the following day with a summary of the call. | Ambrose's email, in relevant part states:<br><br>• "I received a call advising me that the director of the ISP Merit Board, Jack Garcia, is conducting himself in an unethical manner by lying on time sheets, not coming to work, and 'other stuff.' The caller said Bruce Rushton, a reporter with the Illinois Times, is FOIA documents related to this. The caller said they would call me back with more details." | N/A |
| 1/10/2020 10:44 a.m. | Thornley orally communicated complaint in call with Kerley at noted date and time. Kerley documented the communication in a memorandum dated 2/19/2020. | Kerley's memorandum, in relevant part, states:<br><br>• "Executive Director Garcia is very paranoid and has ISP run background checks (Thornley did not know whether it was officially or unofficially through a friend who still works there) on the existing employees when he because Executive Director.<br><br>• Fox was the only person who knew when/where the Executive Director would be working.<br><br>• Executive Director Garcia only communicated with Fox, who then relayed information.<br><br>• Executive Director Garcia wanted Fox in a different classification because the salary range for HR Representative (Fox's position} was too low. | N/A |

---

[1] We note that any quoted material appears as it is reflected in the document or communication without signaling any misspellings or grammatical errors.

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | • Executive Director Garcia preferred Fox because Fox catered to him (e.g. always had coffee waiting for him when he arrived and accompanied him to most/all meetings when he was in town).<br><br>• Executive Director Garcia is the first Executive Director to be employed through a contract, which was just renewed for numerous additional years.<br><br>• Executive Director Garcia works out of a location in northern Illinois even though all the staff and files are in Springfield.<br><br>• Executive Director Garcia may not be keeping all Board members informed of the requests for additional money for Fox and may only be working with the Chairman.<br><br>• Executive Director Garcia spends State time working on ISP Heritage Foundation work (a non-profit for which he was formerly a Board member), and he takes Fox along with him to non-work meetings for the Foundation." | |
| 1/15/2020 8:28 a.m. | Thornley texted Thompson. | The text states:<br><br>• "I have to get out of the MB. I can't stand working for Jack. Its so bad." | N/A |
| 1/15/2020 3:30 p.m. | Thornley orally communicated complaint to VanDeKerckhove Lindsay Amerson during an in-person meeting. Amerson contemporaneously took notes of the meeting. VanDeKerckhove and Amerson drafted a summary of the conversation immediately after their meeting. | Amerson's notes, in relevant part, state:<br><br>• "She stated her director, Jack Garcia, has regularly spent his time on the clock working with the State Police Heritage Foundation, which is not a duty of the job. This Heritage Foundation is a non-profit ('501c'). He assigns Heritage errands to state employees.<br><br>• She stated he falsely reports his time. She stated the director is currently in Arizona as of 1/15/20, but regularly reports that he is on the clock.<br><br>• She stated the director works out of a State Police Office in Tinley Park, and | N/A |

*Attorney-Client Privileged*
*Attorney Work Product*

|  |  | regularly receives per diem and travel reimbursements coming to Springfield once a week. She stated he shouldn't be working in the same office building as the agency he oversees. The SPMB is the oversight agency of the ISP.<br><br>• She stated the director has a state issued vehicle (not through CMS), paid for using Fund #166. He receives oil changes and maintenance on this vehicle using state funds. He personally paid for police gear, which includes lights, for his state issued vehicle.<br><br>• She stated he is paid as a contractor, in order for him to still collect on his state pension. He spent a majority of his career at ISP.<br><br>• She stated a Public Service Intern/HR specialist works '700 hours of overtime' during a period. This same individual is also assigned clerical and administrative duties for the agency. This same individual 'gets his coffee and runs his errands.' She stated this same individual received a ~20% salary increase in May 2019 and a requested ~24% increase in January 2020, without receiving additional responsibilities.<br><br>• She stated she has worked in a 'stressful' environment since he became director. She stated she had to go up to Chicago to see a specialist for all the health issues she was having from his management. She stated she had to take medication ('Xanax') for stress. She spent some time in the hospital in fall of 2019.<br><br>• She stated the director was close with ISP management over the Internal Investigations division, and feared retribution for her anonymous OEIG complaint (she submitted last week). She was direct in saying she feared he would know who submitted the OEIG compliant ('come after me'). |  |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | • She stated she was the Ethics Officer for the agency. When she informed him about an ethics violation that she perceived the director violating, she stated he dismissed her claim. She did not state the timeframe, but following the dismissal of her allegation, he reassigned the Ethic Officers duties to another individual in the agency.<br><br>• She stated the director questions her overtime submissions with more scrutiny than other employees.<br><br>• She was informed she will not be receiving a COLA as outlined in the Merit Comp Plan." | |
| 1/16/2020 2:53 p.m. | Thornley orally communicated complaint in call with Thompson. Thompson recalled complaint during interview and call log supported date and time. | Thompson recalled Thornley stating:<br><br>• Garcia put lights in his car<br>• Garcia used a police badge<br>• There was an incident with Waud where he pulled over a motorist<br>• No salary increase for staff<br>• Garcia was a contractual employee but reported to Thornley | N/A |
| 1/17/2020 12:00 p.m. | Thornley orally communicated complaint in call with Yokley. Yokley recalled complaint during our interview. | Thompson recalled Thornley stating:<br><br>• Thornley needed to start looking for opportunities to change jobs and expressed frustrations about her job because of Garcia, but no specific allegations. | N/A |
| 1/17/2020 5:18 p.m. | Thornley orally communicated complaint in call with Davis. Davis recalled complaint during interview and call log supported date and time. | Davis recalled:<br><br>• Thornley indicated a desire to move on from the Merit Board. She expressed displeasure with working there and reference a tension between Garcia and her. | N/A |
| 1/19/2020 1:02 p.m. | Thornley texted Thompson. | The text states:<br><br>• "you can bet your ass when she asks be [sic] about him, I'm not lying. He needs to change his behavior or be gone." | N/A |

*Attorney-Client Privileged*
*Attorney Work Product*

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
| 1/24/2020 4:54 p.m. | Thornley texted Dykstra. | The text states:<br><br>• "And Mr. Ethics Officer. The Board with all our mandated postings needs to be put back out ASAP" | N/A |
| 1/27/2020 8:23 a.m. | Thornley texted Thompson. | The texts state:<br><br>• "I was offered a job at IEMA as cfo. I told dan just because I hired dan, he's my friend. Well, I guess not. He ran straight to jack and Emily."<br><br>• "I took it, that's why I wanted to prepare dan. So they locked me out of the building. Went through my office. Which I had nothing anyway." | N/A |
| 1/27/2020 In the morning | Thornley orally communicated complaint to McAnarney during in-person meeting. McAnarney documented her meeting in notes drafted on February 3, 2020. | McAnarney's notes, in relevant part, state:<br><br>• "She said that he is doing non-state work on state time and so is his assistant.<br><br>• She said they work on raising money for the Heritage Foundation, a not-for-profit for police officers.<br><br>• She also said that Jack has been trying to get a salary increase for his assistant and Jenny was upset about that.<br><br>• She also talked about Jack's contract, that it had been extended, and that the Chairman of the Merit Board, Reeve Waud, was a Rauner appointee.<br><br>• She said things were bad at the Police Merit Board and that she needed to get out of there as soon as possible.<br><br>• She said that someone had gone through her office that morning. I asked her why that was done. She said because they want to make sure I'm not taking anything with me to IEMA." | N/A |

*Attorney-Client Privileged*
*Attorney Work Product*

| 1/27/2020 Prior to lunch | Thornley orally communicated complaint to Ambrose during in-person meeting. Ambrose recalled the content of the complaint during our interview. | Ambrose recalled:<br><br>• Thornley told Ambrose that she was miserable and that the Director was very difficult to work with – that J. Garcia doesn't show up and he was rude and she was hoping to change jobs.<br>• Only issues that came up were with respect to time and maybe that he had access to a state vehicle and was using it for personal use. | N/A |
|---|---|---|---|
| 1/27/2020 9:12 p.m. | Thornley texted complaint to Binninger. | The texts state:<br><br>• "Jack is coming down tomorrow to chew my ass so please say a prayer for me."<br><br>• "Judy wants me to meet with Bria at some point. They don't want him around much longer." | N/A |
| 1/28/2020 *Time Unknown | Thornley orally communicated complaint to Kerley during in-person meeting. Kerley documented the communication in a memorandum dated 2/19/2020. | Kerley's memorandum, in relevant part, states:<br><br>• "Thornley came to my office - 715 Stratton Office Building - with multiple files in tow. We discussed several items related to Fox's position (How do you deal with multiple vacancies? What is appropriate compensation for temporarily handling duties of vacant positions? Would a second 20% increase be approved by CMS if it was approved by the Merit Board?). She also had brought what appeared to be Executive Director Garcia's file, some files related to pay increases, and other catchall files." | N/A |
| 1/28/2020 12:39 p.m. | Thornley texted complaint to Thompson. | The text states:<br><br>• "Does Jack have any juice? I just can't see it at this point" | N/A |

*Attorney-Client Privileged*
*Attorney Work Product*

| 1/30/2020[2] | OEIG Complaint | Unknown | Unknown |
|---|---|---|---|
| 1/30/2020 6:19 p.m. | Thornley texted complaint to Budzinski | N/A | The text states:<br><br>"Hi Nikki- I need to speak with Bria about a serious case of sexual harrassment with our director. I can't seem to get anyone's attention to discuss this matter. I'm truly disgusted and have no idea who to go to. It's very disheartening." |
| 1/31/2020 10:58 a.m. | Thornley texted Yokley. | The text states:<br><br>• "Jack is trying to fire me" | N/A |
| 1/31/2020 Around Noon | Thornley orally communicated complaint in call with Maldonado. Maldonado documented the communication in notes to herself. | Maldonado's notes, in relevant part, state:<br><br>• "jack spending state time on heritage foundation<br>• Jack is never there. She's not allowed to know when he's in<br>• he's rude and barks at people. Just nice in front of us.<br>• Jack and Reeve doing stuff behind board's back<br>• Jack ('they') always making fun of the bishop<br>• she also says he reports to her<br>• she says she talked to state senator iris Martinez that week. Who said I could be trusted because 'she's one of us'. I'm not quite sure what she means.<br>• she claims jack trying to influence decisions of the board" | Maldonado's notes, in relevant part, state:<br><br>• "in the midst of her venting she mentions in one sentence a sexual harassment complaint against him.<br><br>In our interview Maldonado was not sure if Jenny said that there is or there is going to be a sexual harassment complaint. Maldonado further stated:<br><br>• Thornley does not say it is her or who it is that is filing the complaint.<br>• Thornley doesn't say any of the details.<br>• The allegation is sandwiched into everything. |
| 1/31/2020 4:17 p.m. | Thornley texted Binninger. | The text states:<br>• "Jack changed the locks on my door, like Im in high school. Lol." | N/A |
| 1/31/2020 5:05 pm. | Thornley texted Yokley. | The text states:<br>• "Declan is upset" "I'm fucked" "(crying emoji)" | N/A |

---

[2] According to the civil lawsuit, this is the date Thornley alleges she filed an OEIG complaint. We do not have evidence regarding the substance of the OEIG complaint. We also have no basis from which to confirm whether or not the date her civil lawsuit alleges she filed an OEIG complaint is accurate.

*Attorney-Client Privileged*
*Attorney Work Product*

| 1/31/2020 6:32 p.m.[3] | Thornley orally communicated complaint in call with Ambrose. Ambrose recalled the content of the complaint in our interview. | N/A | Ambrose recalled Thornley stated something along the lines of:<br>• "my boss (the director) just said to me if I dressed more like his assistant we would get along better" |
|---|---|---|---|
| 1/31/2020[4] | Thornley orally communicated complaint in call with TriStar when making a workers' compensation claim. Thornley spoke to Heather Young of TriStar who generated: 1. the Notification of Injury form and 2. Illinois Form 45: Employer's First Report of Injury as a result of the call with Thornley. | N/A | <u>**Notification of Injury**</u> states (below text as reflected on form)<br>• <u>Incident date</u>: 1/23/2020<br><br>• <u>Incident time</u>: 10:00 a.m.<br><br>• <u>Incident location description</u>: Main corridor to director's office<br><br>• <u>How did the injury occur</u>: EE was standing in front of the table sorting out papers she needed him to sign. He came up behind her and he put her right arm around her back and under her armpit area and groped her right breast. EE tried to play it off and forcefully rejected his arm.<br><br>• <u>Injury/illness description:</u> Sexual Harassment. Shock. Director is constantly calling people Baby and sweetie, making snide remarks on how people dress. Mental abuse. EE has documented several occasions from the past 6-9 months that she has spoken to her doctor about.<br><br>• <u>Comments/other information:</u> EE has not reported the claim because it is against her director. Another number for JB Pritzker 312-814-2121. Time of incident occurred between 10am-2pm. Director made the comment that if she dressed more like Emily that they would get |

---

[3] Ambrose was not confident about this time. She thought she was working, but this would not be a time that she was working. There was an 11:00 a.m. call that lasted 5 minutes between Ambrose and Thornley.
[4] Time unknown – it includes the Governor's email on the claim and Thornley had asked Ambrose for the Governor's email address at 9:23 p.m.

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | | along better.<br><br>• <u>Name of physician/Facility where treated:</u> Dr. Fox; Vine Street Clinic; 3225 Hedley Rd, Springfield, IL 62711 Ph: 2177267300<br><br>**Illinois Form 45: Employer's First Report of Injury** states (below text as reflected on form):<br><br>• <u>Date and time of incident:</u> 01/23/2020 10:00 AM<br><br>• <u>How did the accident occur:</u> EE was standing in front of the table sorting out papers she needed him to sign. He came up behind her and he put he right arm around her back and under her armpit area and groped her right breast. EE tried to play it off and forcefully rejected his arm.<br><br>• <u>What was the injury or illness:</u> Sexual Harassment. Shock. Director is constantly calling people Baby and sweetie, making snide remarks on how people dress. Mental abuse. EE has documented several occasions from the past 6-9 months that she has spoken to her doctor about.<br><br>• <u>Comments:</u> EE has not reported the claim because it is against her director. Another number for JB Pritzker 312-814-2121. Time of incident occurred between 10am-2pm. Director made the comment that if she dressed more like Emily that they would get along better. |
| 2/1/2020 10:04 a.m. | Thronley emailed complaint to Budzinski, Caprara, and Mitchell. | The email, in relevant part, states;<br><br>• "The director is not appointed, he a contractual employee on paper and reports to me as the personnel director. He has been with the Board for 3 years. I am asking for his immediate termination. Working in an office of 4 employees can | The email, in relevant part, states:<br><br>• "I have followed the proper protocols and am very distraught by the sexual assault and harassment I have been subject to by our Director. I have tried many times to discuss this with Bria in the past |

*Attorney-Client Privileged*
*Attorney Work Product*

|  |  | cause much harm to the one person being attacked. I act as the EEO officer and have no other means of reporting this behavior." | week but have never had a call returned. The layers of issues are deep. I have discussed them with Judy as well. She has been the only responsive staff from your office. I sat outside Bria's office for over four hours this week without any chance to speak to her. I understand a pizza party is important but the safety of a woman's body should always be a top priority. This is just the beginning of issues that the director brings to the table.<br><br>• I will be notifying the Governor personally today to let him know that I have tried for several weeks to discuss the mental and sexual harassment with several individuals within his office and I have been left with no response. I have left my card, messages, notes. No response. No safe place to continue my work as a public servant to our state.<br><br>• I deserve a safe environment to work in and I will continue to work with my legal counsel to ensure that the Director of the State Police Merit Board does not have a chance to put his hands on another woman as he has done to me. I have been and will continue to seek my physicians services regarding this matter. I'm saddened by your offices response to my pleas for help and I hope sexual assault and harassment are taken as seriously as our Governor mentions in his most recent State of the State address.<br><br>• The following offices have been contacted-Department of Human Rights Division of Sexual Assault; Workman's Compensation Division of Work Place Incidents. I have a meeting with the OEIG this coming week, my counsel will accompany. |
| --- | --- | --- | --- |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | | • The director will be served with a restraining order this coming week, this will prohibit him from entering the workplace.<br><br>• As you know, I was elected by Comptroller Mendoza to serve on the anti-sexual harassment round table committee in 2018 and I don't take this matter lightly. If I don't stand up for women who are being sexually assaulted. Who will?" |
| 2/1/2020 4:00 p.m. | Thornley orally communicated complaint in call with Spillane and Rosen. Spillane and Rosen recalled the complaint during our interview. | Spillane Recollection<br>○ Thornley was in office of Merit Board on January 27, 2020. Garcia sent text messages to Thornley and on the January 28, 2020 Garcia came to Springfield. Thornley had a meeting at CMS with Kerley and had a meeting also at the Governor's Office on this day, so she put a note on her office door saying she had meetings.<br>○ 10:54 a.m. that day Garcia texted a picture of the note on her door asking if Thornley was coming back. Thornley responded that she had meetings. Garcia said "I'm not sure what that means but you are still a Merit Board employee."<br>○ Thornley said that Garcia has never liked that Garcia has to report to Thornley.<br>○ Garcia caters to the board members. His brother is Berlin's chauffeur.<br>○ Thornley said Garcia has called Bishop Warren the "n" word.<br>○ Thornley said that Maldonado raised with Thornley the inappropriate way Fox dresses and the way Garcia and Fox interact.<br>○ Thornley said the Board flies around in a jet.<br><br>Whitney Rosen Recollection<br>○ Thornley said it was a toxic work environment and that Garcia had removed her from being the ethics officer because he got upset about things he wanted, specifically the background | Spillane Recollection<br>• Thornley feels very unsafe and threatened at the Merit Board.<br>• Thornley was in Garcia's office and was lining up attendance paperwork (he likes to have things laid out carefully). Thornley said she had her back to him and he came behind her, put his right arm underneath her arm and groped her breast. She forcibly removed his hand.<br>• Garcia told her "maybe if you dressed more likely Emily you would get along better."<br>• Thornley went into her office and shut the door. She immediately called her therapist and has seen her therapist every day since then.<br>• Thornley shared that she is terrified of Garcia. He is a liar and acts like he's above the law.<br>• Thornley said she hadn't been to work since then.<br>• Thornley said Garcia sent one email saying Garcia needs to know when she's coming back to the office.<br>• Thornley said that Garcia has told people in the Merit Board office that they cannot talk to her and he even told the cleaning man that he cannot talk to Thornley.<br>• Thornley said she was offered a job by the director of IEMA and said that she wondered if it was the reason that this happened. |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | checks. Thornley didn't think running the background checks was appropriate and reported it to Rodger Heaton.<br>○ Thornley pushed back on these background checks and Garcia removed her from the ethics officer's job.<br>○ Thornley said the assistant is Garcia's girlfriend and the legal person is the ethics officer who does not report anything.<br>○ Thornley said Garcia thinks he is above the law. | • Thornley trusts Maldonado and told Maldonado about sexual harassment but did not tell Maldonado that it was her.<br>• Thornley looks at the Pritzkers as friends and does not want them to be on the front page of the newspaper. She noted that at the beginning and towards the end of the call.<br>• Thornley said she felt threatened by Garcia because he carries a gun and she is fearful of retaliation.<br>• Thornley was considering a restraining order, but hadn't filed anything.<br><br>Whitney Rosen Recollection<br>• Thornley feels unsafe and threatened in the office.<br>• She said the sexual assault occurred between 10 and 1:30 on Thursday, January 23, 2020. Thornley was in Garcia's office and she was going over attendance paperwork. She was putting the documents on the table with her arms were out rearranging paperwork. Garcia was standing behind her. He reached under her right arm and groped her right breast. Thornley forcefully pushed him away. Garcia said "maybe if you dress more likely Emily we'll get along better."<br>• Thornley called her therapist and saw the therapist that day.<br>• Garcia generally engages in unwanted touching.<br>• Thornley said she will be retaliated against and Garcia will go to the Board and make up whatever to get Thornley terminated. |
| 2/2/2020<br>1:46 P.M. | Thornley texted M.K. Pritzker. | N/A | The text reads:<br><br>• "Good morning, I hope all is well! I miss seeing you all and hope the kids are well. I have a horrible incident that has taken place. I sent a lengthy email to Anne Caprara and got a return call from Ann |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | Splaine. I need JB to know what's going on and hope they are keeping him aware. (Sexual harassment) all complaints have been filed. This is the only number I have. If JB would like to talk or to see the emails I have sent to his staff, he can reach me at this number. I appreciate your friendship. Jenny –" |
|---|---|---|---|
| 2/2/2020 2:51 p.m. | Thornley texted Thompson. | N/A | The text chain reads:<br><br>• "Not yet! Ugh. A lot of other things going on that I'm sure you'll hear about" Thompson responds "I never hear anything" and "Something wrong ?" Thornley texts "Major" Thompson responds "Oh. Him. What a tragedy. Very disappointing"[5] |
| 2/2/2020 4:46 p.m. | Thornley texted Thompson. | N/A | The text chain reads:<br><br>• Thornley texts "Did you all get an email about jack" Thompson responds "No" "About what" Thornley responds "he's suspended" Thompson texts "Yikes" "What happened" Thornley texts "Sexual harassment" "Didn't hear it from me" "He's done" |
| 2/2/2020 5:10 p.m. | Thornley orally communicated complaint in call with Thompson. Thompson recalled the complaint in our interview. | Thompson recalled:<br>• Thornley shared concerns that Fox worked 700 hours of overtime | Thompson recalled:<br>• Thornley alluded to the fact that she was the victim of the sexual harassment and may have said something along the lines of "you'd look better if you dress like Emily" Thornley did not share anything of a physical nature on the call. |
| 2/2/2020 5:40 p.m. | Thornley left voicemail for Dykstra. | N/A | Thornley in the voicemail states:<br>• "Hey Dan, it's Jenny. I know you've talked to Ann Spillane and, um, I know she's been in contact with me as well as my attorneys, but um, I will see, um, I'll be in the office tomorrow if somebody needs |

---

[5] During the interview Thompson explained that he thought Thornley was referring to a disciplinary incident occurring at this time.

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | | me to run payroll just to do that. But, you know, you need to let me know. Um I understand that Jack has been suspended so I want to make sure there is an email that is sent out to all of our employees um, expressing that, um and you and I need to sit down and have a conversation about the ethical issues since you are the ethics officer, um, that have taken place. So um anyway. Let me know, um, I'm pretty booked for tomorrow but you know I'd hate for everyone to not get paid. So anyway, let me know. Bye." |
| 2/2/2020 6:53 p.m. | Thornley texted Davis. | N/A | • Text includes a forwarded email of the notification of Garcia's administrative leave. |
| 2/2/2020 6:53 p.m. | Thornley texted Yokley. | N/A | • Text includes a forwarded email of the notification of Garcia's administrative leave. |
| 2/2/2020/ 2/3/2020 10:09 p.m./6:07 p.m. | Thornley texted Thompson. | N/A | • Text includes a forwarded email of the notification of Garcia's administrative leave.<br>• Text also states: "Was anyone talking about this?" |
| 2/3/2020 10:00 a.m./6:09 p.m. | Thornley texted Ambrose. | N/A | The text chain reads:<br>• Ambrose texts Thornley "You ok?" Thornley responds "no" Ambrose texts "I'm so sorry. Can you afford to not work?"<br>• "They have to pay me so that's not a worry. I mean I did have to put down a big retainer fee today ugh"<br>• |
| 2/3/2020[6] | Thornley submitted a complaint to the Illinois Department of Human Rights which contained a | The complaint, in relevant part reads:<br>• "The Illinois State Police Merit Board has failed to post the required notices for employees about the rights to be free from illegal discrimination or sexual harassment in the workplace and the | The complaint, in relevant part reads:<br>• "On January 23, 2020, I met with Mr. Garcia in his office with papers for him to review and sign.<br>• On January 23, 2020 at that meeting, Jack S. Garcia approached |

---

[6] Jenny claims in the civil court filing that she filed the IDHR complaint on the 27th, but first time contact was made was on February 3.

*Attorney-Client Privileged*
*Attorney Work Product*

| | narrative of her allegations. | State Police Merit Board has allowed the required posters concerning those rights to remain stored in a closet rather than posted for employees to see." | me from behind and reached with his right hand under my right armpit and grabbed my right breast in his hand.<br>• I turned around startled over being touched in this matter.<br>• Garcia stated to me at that time, 'maybe if you dressed a little more like Emily, we would get along better.'<br>• This physical, sexual assault was offensive to me and I rejected it immediately. It caused me to be upset and unable to work the rest of that afternoon at the Merit Board.<br>• I made complaints of sex harassment that were reported to Dan Dykstra, the Ethics Officer for the Illinois State Police Merit Board on or about February 2, 2020.<br>• On February 4, 2020, the Illinois State Police Merit Board met in an emergency meeting and directed that I be placed on administrative leave, preventing me from performing my duties as an employee. As part of that, I was ordered to surrender all of my state identification, office keys and directed that I could no longer perform any of my responsibilities." |
|---|---|---|---|
| 2/4/2020 1:03 p.m. | Thornley left a voicemail for Ambrose. | N/A | Thornley in the voicemail states:<br>• "This is all going to working out the best way that it can, but um, just some other things that I was like WOW, nothing to do with me, but I was like what the heck." |
| 2/4/2020[7] 1:04 p.m. | Thornley orally communicated complaint in call with Ambrose. Ambrose recalled the complaint in our interview. | N/A | Ambrose recalled:<br>• Thornley informed Ambrose that she was filing a sexual harassment "suit."<br>• Thornley did not provide any details about the sexual harassment suit.<br>• Ambrose just thought that it was in reference to the comment Garcia made about her clothes. |

[7] Ambrose thought the comment about the sexual harassment suit was during this call, but she said it could have been at another time as well.

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| 2/5/2020 9:45 a.m. | Thornley orally communicated complaint in meeting with Cusumano. Cusumano contemporaneously took notes, which she then forwarded to Thornley following the meeting. | Cusumano's notes, in relevant part, state:<br><br>• "April 2017<br>  • Meeting with all staff, threatening. Informed all staff that they would be doing ISP background checks to 'sweep off our own steps.' Extensive background check beyond standard, included fingerprints. After this meeting I met with Jack and explained that he shouldn't do that because the employees had already been through a background check when hired. Legal Counsel was present during this meeting.<br><br>• After meeting –<br>  • All staff met again. Brainstormed to understand why he wanted that. Emily Fox stated she was just going to do whatever he says. Other employees asked if this was ethical or a violation ..... called GO to get opinion. Spoke with GO's EEO/Chief Counsel (under Rauner) who stated it was not ethical. Informed her that employees are feeling discriminated against for the follow up background.<br>  • Jack's best friend, Leann Shirley, was Head Admin over DII for ISP, also on Heritage Foundation. ISP Director, Leo, told Shirley not to run background checks. Spoke with Roger Heaton and he said it was ridiculous. I filed a complaint with OEIG on behalf of our staff. Background checks still took place. Jack ended up firing Krista Grant because of her background check results from 20 years ago.<br>  • Jack then combined Krista's job with HR Rep, Emily's job. Once complaint was filed and got back to Jack, he removed me from Ethics Officer duties. I called Roger and explained that it was retaliatory.<br>  • Leann Shirley was sending money over seas to an account. $80,000. | Cusumano's notes, in relevant part, state:<br><br>• "Date Unknown (April 25, 2017)<br>  • Jack asked me to meet with him in Tinley Park Medicaid office to go over fiscal stability of merit board. During the meeting he was very touchy, feely, hugging, creepy and I just wanted to get away from him. I had on a dress with tights on. He was sitting next to me and kept touching my knee. Jack refers to me as 'honey' or ....... That was the first time I became uncomfortable around him.<br><br>  • Later on, I decided to keep to myself and stay in my office. I had limited access to Jack to get paperwork signed, etc. Emily would sign for him. No signature authority was given. I had use of a signature stamp. Dan has official authority to sign payrolls.<br><br>  • I verified with Sos, that Bianca (Heritage Foundation), Jessica Rigg ... feel that conduct between Jack and Emily is inappropriate. I've been approached many times by outside employees who have made comments about their behavior being unethical. Emily kept Jack's calendar and wouldn't share with anyone. We weren't allowed to know when he was in town. Emily is required to have Jack's coffee and donuts ready in hand when he arrives. Jack has expected me to do the same when Emily is away, which I will not do. Emily takes his car and gets lunch for them both. They eat lunch together. No one else is |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | Was caught and then removed from the foundation.<br>• Board members spend time outside of board meetings discussing board business. Dan is aware.<br>• Fountain covers were stored in the Merit Board office.<br><br>• Date unknown<br>  • He comes to Springfield, maybe once a week. When in Spi, he does work for IL State Police Heritage Foundation .... Jack is not officially associated with Heritage Foundation. Proof on cameras, banks can verify date/time of deposits for this purpose. Emily was awarded over 700 hours of OT attributed to the Foundation. I raised the issue to the Ethics Officer, Dan D. Dan just shrugged it off.<br>  • Jack and Emily falsified 2019 timekeeping records by changing over a year's worth of time by changing used time from vacation to sick so he could be paid for unused time.<br>  • Jack installed cameras to monitor employees while he was not in Springfield.<br>  • Heritage Foundation now has involvement with Merit Board business ..... expenses for Foundation business and events are being charged to the Merit Board, i.e. travel, vehicles, fund raising ...... Emily and Jack would charge travel, hotels, expenses to the Merit Board to attend fallen trooper services when no one else would get paid.<br>  • Falsified vehicle logs to reference 'errands' for Foundation business.<br>  • EEO and other legal notices that were required by law to be posted in the workplace, were removed from common area. Postings were placed in an area that was not a common area.<br>  • Jack specifically requested vehicle coordinator, Kent, to purchase a | ever invited.<br><br>• Jack used to buy body lotion, body spray for me, Emily and Julie for xmas, ad min asst day, birthdays, etc.<br><br>• Started seeking other employment about 9 month ago. Packet up a lot of belongings. Jack asked about it. I felt very uncomfortable and told him that I was just rearranging.<br><br>• Jan 23 approx 11-12:30<br>  • Director's office. You have to enter through an empty office to get through his. Emily knew I was headed to his office and said, 'You can go in there.' I was getting time sheets signed. I was standing over the front of his conference table, with my back to him. I was reaching and leaning over the table when he came up behind me, reached under my arm and grabbed my breast. I immediately turned around and with a forceful arm, I pushed him away. He said, 'maybe if you dress a little more like Emily, we would get along better.' I gathered things and went to my office and shut the door. Extremely upset. I have always been intimidated by Jack, but I never thought he would physically touch me. Jack has discouraged me from filing issues with the OEIG because he 'will know about it' and that he 'knows all the investigators' or 'we can fix things internally.'<br><br>• I talked to my friend Sara. Talked to Jared. I packed up a few things from my office. There have been times in the |

17

*Attorney-Client Privileged*
*Attorney Work Product*

| | | |
|---|---|---|
| | | special police vehicle through ISP. ISP denied the request. Col. Kelly Walter, denied the vehicle request, because they were police issued only. I had to go to Morrow Bros, contractor for law enforcement vehicles, to take pictures and forward to Jack. Pies inside and out of vehicles. Jack 'picks' his vehicle with special request for the utility box to lock up gun and/or evidence from police scenes. Jack then purchased his own lights with siren and installed on the vehicle via the visor of vehicle. Covert plates were also issued to his vehicle.<br><br>• Late Nov/Early Dec<br>  • Emily and Dan and I met with Jack in Orland Park to meet for a Xmas dinner with board members. Due to traffic, Jack used lights and sirens to get through traffic to get to the dinner.<br>  • Jack has used the N word in front of me, Emily, Dan regarding Bishop Warren. Jack attempted to change rules for per diem, continually encouraged Warren to NOT attend meetings.<br>  • Board member Andrew Berlin, stakeholder of the Chicago Cubs, bought and gave World Series games tickets to employees, Emily, Julie, Dan, maybe others.<br><br>• February 5<br>  • 2 weeks ago, Dan came to me and stated that since Jack has been with the Merit Board, Jack has interfered with 2 trooper cases involving jack's friends. Friends ended up with lesser charges, and inconsistent with past practices, therefore retained their jobs.<br><br>• Julie Webster case: charged with giving info to a trooper she was personally involved with. Info regarding promo | past that I have asked Jared to come sit with me while I work, because the environment is so hostile.<br><br>• Last week, call from Ron C, that the boss was coming to town because there is a problem. Ron didn't know what was up, but I knew. I was very scared. Went to my office, and placed a note on my door" |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | testing. Jack did not like Julie. | |
|---|---|---|---|
| | | • Promo process of 2018.<br>  • Macariah Fortson, Capt in ISP, Julie's 'boyfriend'. Written test, interview portion and computer portion of testing. One of the out of state assessors came to Emily and told her that felt Fortson was cheating. Emily never reported it. Once Jack found out, he called all out of state assessors to ask specifically about Fortson. Assessor stated to Jack that it was already mentioned to Emily. Dan and I were in the room when Jack was on phone with assessors. Jack lied in the investigation against Julie and never mentioned that Emily knew about the issue.<br><br>• Continually raise issues to Dan, but dan wants to please Jack. Which is why Jack has made Dan the ethics officer." | |
| 2/5/2020<br>*Time Unknown | Thornley orally communicated complaint in call with Kerley on noted date. Kerley documented the communication in a memorandum dated 2/19/2020. | Kerley's notes, in relevant part, state:<br><br>• "We discussed that there were still unresolved issues with Fox's official (CMS) personnel history not reflecting the information Thornley reported and had reflected in the agency's personnel file." | Kerley's notes, in relevant part, state:<br><br>• "In this call, I initially thought Garcia's 'suspension' was related to her reporting of him performing non-State work on State time. She explained that it was because of a sexual harassment claim and that she had made the claim. She was not explicit about what had occurred and did not provide details relate to time, location, etc. I did understand that there was an incident that was a physical touching or attempted physical touching. I believe she used the word 'groping' or 'I was the one he[/Garcia] tried to grope.'<br>• She said, vaguely, that there had been other instances of conduct, which I understood to be verbal in nature<br>• I believe she had told her husband about Garcia's conduct.<br>• At one point she said something to the effect of, 'I wouldn't be |

*Attorney-Client Privileged*
*Attorney Work Product*

| | | | |
|---|---|---|---|
| | | | surprised if he didn't try to claim I did something.'<br>• Later, she said that Fox could have been the one who reported on her/made an allegation against her. I noticed the difference from a potential future complaint to the fact that she knew someone had complained about her." |
| 2/11/2020 5:30 p.m. | Thornley orally communicated complaint in meeting with Gosda on the noted date. Gosda recalled the complaint in our interview. | N/A | Gosda recalled:<br>• Thornley stated that she and Garcia had gotten into it and that Garcia grabbed her by the chest.[8] |

---

[8] Two to three weeks prior Thornley had told Gosda that she wasn't comfortable coming to work anymore; however, Gosda could not identify a particular date. Gosda said that three weeks prior Garvue told him that they were not supposed to say anything about Thornley.